UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BENJI D. REED,

                    Plaintiff,

v.                                    9:22-CV-1094
                                    (BKS/ML)
J. AUCTER, Deputy Sheriff; RANDY
REED, Deputy Sheriff; and JEREMY
MYERS, Deputy Sheriff,

                    Defendants.
_____

APPEARANCES:                         OF COUNSEL:

BENJI D. REED
  *Pro Se* Plaintiff
Elmira Correctional Facility
Post Office Box 500
Elmira, New York 14902

MURPHY BURNS, LLP                 THOMAS MURPHY, ESQ.
  Counsel for Defendants
407 Albany Shaker Road
Loundonville, New York 12211

MIROSLAV LOVRIC, United States Magistrate Judge

## <u>REPORT and RECOMMENDATION</u>

       Currently before the Court, in this civil rights action filed by Benji D. Reed ("Plaintiff")

against defendants J. Aucter, Randy Reed, and Jeremy Myers (collectively "Defendants") who

are—or were at the relevant time—employed at the Lewis County Jail ("Lewis Jail"), is

Defendants' unopposed motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No.

19.)  For the reasons set forth below, I recommend that Defendants' motion for summary judgment be granted.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Claims

At this procedural posture, Plaintiff asserts the following two claims: (1) one claim of retaliation against Defendants Aucter and Myers; and (2) one claim that his due process rights were violated by Defendant Reed.  (Dkt. No. 7 at 41.)

### B.     Defendants' Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in a response.

1.      On August 13, 2022 at approximately 12:40 p.m., while conducting a security check in the A/B block day-space of the Lewis Jail, Defendant Myers observed playing cards on the floor and heard loud voices coming from incarcerated individuals on the block.

2.      Defendant Myers ordered the incarcerated individuals in the A/B block to pick up the playing cards and ordered the block to quiet down.

3.      Defendant Aucter was in A block at the time, heard a loud disturbance coming from the first floor of the cell block, and ordered all the incarcerated individuals to quiet down.

4.      At approximately 12:50 p.m., Defendant Aucter was still in the A/B block and was confronted by incarcerated individual Casey Turck who was loud, disrespectful, and further escalated the disturbance in the A/B cell block.

5.      Incarcerated individual Turck refused Defendant Aucter's orders to cease his disruptive behavior.  He was removed from the A/B housing unit and relocated to a holding cell by Defendant Myers and others.

6.      Once removed from the cell block to the holding cell, incarcerated individual Turck continued his disruptive and aggressive behavior.  At approximately 1:00 p.m., Defendant Aucter ordered Defendant Myers to lock down the Lewis Jail.

7.      After the Lewis Jail was locked down and the incarcerated individuals were in their cells, the incarcerated individuals in A/B block, including Plaintiff, started hollering and swearing at officers, slamming doors and toilets, and throwing items in their cells.

8.      At approximately 1:30 p.m., Defendant Aucter ordered a reorganization and provided Defendant Myers with a list of twelve incarcerated individuals to be relocated.  That reorganization process was completed at 2:00 p.m.

9.      Plaintiff was among the twelve incarcerated individuals ordered to be relocated pursuant to Defendant Aucter's order.

10.      During the reorganization process, officers observed that many of the incarcerated individuals possessed materials that were not permitted under the Lewis Jail rules.[1]

11.      Once the reorganization process was completed, Defendant Aucter ordered that all cells be searched and brought into compliance with the Lewis Jail rules.

12.      Defendant Aucter—not Defendant Myers—ordered the Lewis Jail to be locked down, the reorganization and moving of incarcerated individuals, and the search of all cells to bring them into compliance with the Lewis Jail rules.

---

[1]      To support this fact, Defendants cite to Defendant Aucter's affidavit at "112."  (Dkt. No. 19, Attach. 8 at ¶ 10 [citing Dkt. No. 19, Attach. 3 at "112"].)  However, the support for this asserted fact is in paragraph 12 of Defendant Aucter's affidavit.  (Dkt. No. 19, Attach. 3 at ¶ 12.)  In addition, Defendants' citation to Defendant Myers' affidavit correctly provides support for the fact asserted.

13.     As a result of the disturbance that began on A/B block, all incarcerated individuals were locked in, twelve incarcerated individuals were relocated pursuant to the reorganization, and all cells were searched.

14.     Defendant Aucter has no recollection of Plaintiff complaining to him about another incarcerated individual on August 13, 2022.

15.     Defendant Aucter affirmed under penalty of perjury that the actions he took on August 13, 2022, were to ensure the safety, security, and good order of the Lewis Jail.

Plaintiff's Fourteenth Amendment<br>Disciplinary Due Process Claim

16.     On June 8, 2022 at approximately 4:50 p.m., Defendant Aucter supervised a strip search of Plaintiff during Plaintiff's admission to the Lewis County Jail.

17.     During the strip search Plaintiff was found to be in possession of an item described as a 2-inch ball wrapped in toilet tissue.

18.     The item found to be possessed by Plaintiff during the strip search was turned over to the Lewis County Sheriff's Investigation Unit.  It was tested and contained a number of illegal narcotics including crack cocaine.

19.     Plaintiff was asked by a Sheriff's Investigator whether the contraband was crack cocaine.  Plaintiff responded with a head nod confirming that it was crack cocaine.

20.     The possession of the drugs by Plaintiff upon admission to the Lewis Jail was a violation of jail rules and—in addition to being charged criminally— Plaintiff was subjected to discipline for the jail rules violation.

21.     After Plaintiff was found to be in possession of the contraband, he was presented with a disciplinary hearing notification/waiver (the "Notice") by Defendant Reed who was serving as disciplinary hearing officer at the time.

22.     The Notice referenced "Incident No. 1391: Possession of Contraband."

23.     The Notice was presented to Plaintiff on June 25, 2022 at 7:00 p.m., and Plaintiff signed the notice acknowledging receipt.

24.     The Notice informed Plaintiff that the hearing would be held 25 hours later on June 26, 2022 at 8:00 p.m.

25.     At the conclusion of the disciplinary hearing, Plaintiff was found guilty of possession of contraband.  Defendant Reed sanctioned Plaintiff to five days keep lock confinement—beginning on June 27, 2022, and ending on July 1, 2022—and loss of tablet privileges for approximately six days.

26.     At the conclusion of the disciplinary hearing, Plaintiff received and acknowledged the results of the hearing in a hearing report that he signed.

27.     Defendant Reed did not receive an appeal of Plaintiff's disciplinary determination.  Defendant Myers conducted an investigation and could find no evidence that Plaintiff appealed his disciplinary determination.

28.     Plaintiff was provided the Notice more than 24 hours in advance of the hearing. At the hearing, Plaintiff had the opportunity to defend himself and contest the evidence presented against him.  At the conclusion of the hearing, Plaintiff was found guilty of possessing the illegal narcotics that were found on his person during his strip search while entering the Lewis Jail.

29.     Plaintiff did not file an appeal of that decision and never provided Defendant Reed with a written appeal.

30.     Notwithstanding, Plaintiff filed a grievance on August 4, 2022, in which he challenged Lewis Jail's strip search policy as unlawful and unreasonable ("August Grievance").

31.    Plaintiff's August Grievance was denied by Defendant Myers—who served as grievance coordinator.  Plaintiff acknowledged, in writing, receipt of the denial on September 5, 2022.

32.    Plaintiff appealed the denial of the August Grievance to the Chief Administrative Office, which upheld the denial noting that the strip search of Plaintiff was lawful.  Plaintiff acknowledged, in writing, receipt of the denial of the appeal.

33.    Plaintiff appealed the decision of the Chief Administrative Office to the New York State Commission of Correction Citizens Policy and Complaint Review Council ("NYSCC CPCRC").

34.    In a letter dated October 13, 2022, the NYSCC CPCRC stated that it reviewed the August Grievance and sustained the action taken by the Chief Administrative Office.

35.    A copy of the NYSCC CPCRC letter dated October 13, 2022, was sent to Plaintiff.

36.    On or about September 16, 2022—over two months after being found guilty of the contraband violation—Plaintiff filed a grievance inquiring into the status of what he claimed was his "disciplinary appeal" ("September Grievance").

37.    As grievance coordinator, Defendant Myers investigated the September Grievance and concluded that no such appeal had been filed by Plaintiff.

38.    On September 22, 2022, Plaintiff appealed the determination of Defendant Myers. On September 22, 2022, the Chief Administrative Officer denied the appeal.

39.    Plaintiff appealed the Administration's decision to the NYSCC CPCRC.  In a letter dated November 10, 2022, the NYSCC CPCRC notified Plaintiff that they had voted to

deny the September Grievance, thereby sustaining the action taken by the Chief Administrative Officer.

### C.    Parties' Briefing on the Motion for Summary Judgment

#### 1.    Defendants' Motion for Summary Judgment

Generally, in support of their motion for summary judgment, Defendants argue that (1) Plaintiff's First Amendment retaliation claim against Defendants Aucter and Myers[2] must be dismissed because (a) there is no material issue of fact that Plaintiff did not engage in a constitutionally protected activity, (b) there is no material issue of fact that Defendants Aucter and Myers did not take any adverse action against Plaintiff and instead took action against all incarcerated individuals to restore order and prevent further disturbances, (c) there is no causal connection between Plaintiff's allegedly protected activity and the allegedly adverse action against Plaintiff, and (d) in any event, the claim should be dismissed against Defendant Myers because the decisions to lock down the jail, conduct a relocation of twelve incarcerated individuals, and conduct a search of the Lewis Jail, were made by Defendant Aucter, and (2) Plaintiff's Fourteenth Amendment Due Process claim against Defendant Reed[3] must be dismissed because (a) Plaintiff was found to be in possession of contraband upon admission to the Lewis Jail, (b) the August Grievance was denied by Defendant Myers and upheld by the NYSCC CPCRC, (c) Plaintiff was provided the Notice more than twenty-four hours in advance of the disciplinary hearing, (d) Plaintiff attended the hearing and signed the hearing report after

---

[2]    Although Defendants' memorandum of law refers to this claim as being asserted against Defendants Aucter and Reed (Dkt. No. 19, Attach. 9 at 5-7), the claim is asserted against Defendants Aucter and Myers (Dkt. No. 1; Dkt. No. 7 at 24-25).

[3]    Although Defendants' memorandum of law refers to this claim as being asserted against Defendant Myers (Dkt. No. 19, Attach. 9 at 7-9), it is asserted against Defendant Reed (Dkt. No. 1; Dkt. No. 7 at 32-36).

he was found guilty and punished to five days in keep-lock and loss of tablet privileges, (e) there is no evidence to support Plaintiff's assertion that he appealed the decision finding him guilty of possessing contraband and punishing him to five days keep-lock and loss of tablet privileges, and (f) Plaintiff's September Grievance was denied by Defendant Myers and upheld by the NYSCC CPCRC. (Dkt. No. 19, Attach. 9 at 5-9.)

### 2.    Plaintiff's Failure to Respond

Plaintiff's response to Defendants' motion for summary judgment was due on December 12, 2023. (Dkt. No. 20.) On December 15, 2023, the Court received returned as undeliverable its Notice, which informed Plaintiff of his response deadline. (Dkt. No. 21.) The Clerk of the Court re-sent the filing to Plaintiff at the St. Lawrence County Sheriff's Office. (*Id.*)

On December 21, 2023, the undersigned issued a text order noting that according to a search of the Vinelink database, Plaintiff moved to the St. Lawrence County Correctional Facility. (Dkt. No. 22.) The text order *sua sponte* extended the deadline for Plaintiff to file a response to Defendants' motion until February 5, 2024, and reminded Plaintiff that he is required to keep his address up to date pursuant to N.D.N.Y. L.R. 10.1(c)(2). (*Id.*)

On December 26, 2023, Plaintiff filed a notice of change of address updating his address to the St. Lawrence County Correctional Facility. (Dkt. No. 23.) Plaintiff filed a letter advising that he did not receive a copy of the motion for summary judgment. (Dkt. No. 24.)

On December 28, 2023, Defendants filed a status report in response to Plaintiff's letter (Dkt. No. 24) which stated that upon receiving the Court's text order (Dkt. No. 22), Defendants again served on Plaintiff via regular mail at his new address—St. Lawrence County Correctional Facility—the entire motion for summary judgment packet. (Dkt. No. 25.)

On February 2, 2024, Plaintiff filed a letter requesting an extension of time to file a response to the motion for summary judgment. (Dkt. No. 28.) On February 2, 2024, the

undersigned granted Plaintiff's request and the deadline for Plaintiff's response to the motion for summary judgment was reset to March 6, 2024.  (Dkt. No. 29.)

On March 8, 2024, Plaintiff filed a letter requesting a continuance of discovery and extension of time to respond to the motion for summary judgment.  (Dkt. No. 30.)  On March 11, 2024, the undersigned granted in part and denied in part Plaintiff's requests.  (Dkt. No. 31.) More specifically, the undersigned granted Plaintiff's motion seeking an extension of time to file a response to the motion for summary judgment and reset the deadline to April 2, 2024.  (*Id.*) The Court noted that this was the third extension for Plaintiff to file a response and that no further extensions would be granted.  (*Id.*)  Moreover, the undersigned noted that the discovery deadline expired approximately six months earlier, on September 20, 2023, and Plaintiff failed to show good cause for not having sought an extension of the discovery deadline before its expiration or for the untimely motion.  (*Id.*)

On May 31, 2024, Plaintiff filed a notice of change of address reflecting that Plaintiff is now housed at Elmira Correctional Facility.  (Dkt. No. 32.)

To date, Plaintiff has not filed a response to Defendants' motion for summary judgment. (*See generally* docket sheet.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ.

P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute–even if that non-

movant is proceeding *pro se*.[5]  (This is because the Court extends special solicitude to the *pro se*

litigant largely by ensuring that he or she has received notice of the consequences of failing to

properly respond to the motion for summary judgment.)[6]  As has often been recognized by both

---

[4]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation
omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.
Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[5]      *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.)
(citing cases).

[6]      *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's

procedural rules.[7]

Of course, when a non-movant willfully fails to respond to a motion for summary

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that

the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Rather, as indicated above, the Court must assure itself that, based on the undisputed material

facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v.*

*Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the

movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement[8]–even when the non-movant was proceeding *pro se*.[9]

Similarly, in this District, where a non-movant has willfully failed to respond to a

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local

---

[7]      *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

[8]      Among other things, Local Rule 56.1 (previously contained in Local Rule 7.1(a)(3))
requires that the non-movant file a response to the movant's Statement of Material Facts, which
admits or denies each of the movant's factual assertions in matching numbered paragraphs, and
supports any denials with a specific citation to the record where the factual issue arises.
N.D.N.Y. L. R. 56.1.

[9]      *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*,
253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to
"perform an independent review of the record to find proof of a factual dispute.").

Rule 7.1(a)(3).[10]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Standard Governing Retaliation Claims

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action."  *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up).  As the Second Circuit has repeatedly cautioned, "[c]ourts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.

---

[10]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see also Phelps v. Kapnolas*, 308 F.3d 180, 187 n.6 (2d Cir. 2002).

"[A]dverse action" for the purposes of a retaliation claim has been defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights . . . [o]therwise the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." *Davis*, 320 F.3d at 353 (citing *Dawes*, 239 F.3d at 493).

To establish a causal connection between protected activities and the adverse action, the court may consider a number of factors, including "(1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and[] (4) the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller*, 98-CV-5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) *abrogated, in part, on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)). However, with respect to temporal proximity at the summary judgment stage, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).

It is well-settled that, even where the plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if he can show that the alleged adverse action would have occurred even in the absence of the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir. 2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)) ("[A] defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have

occurred."), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020).  The

defendant bears the burden of making the showing that he would have taken exactly the same

action in the absence of an improper motive.  *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at

288).

      If the defendant meets his burden offering a legitimate, non-discriminatory reason for the

adverse action, the burden returns to the plaintiff to show that the real reason for the adverse

action was his protected activity.  *See Porter v. Port Auth. of New York and New Jersey*, 15-CV-

3558, 2022 WL 991978, at *7 (E.D.N.Y. Mar. 31, 2022) (citing *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792, 802-04 (1973); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88

(2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)) (holding that

the *McDonnell Douglas* burden-shifting approach applies to retaliation claims in violation of 42

U.S.C. § 1983); *Alali v. DeBara*, 07-CV-2916, 2008 WL 4700431, at *5 n.12 (S.D.N.Y. Oct. 24,

2008) (citing *Thomas v. New York City Health & Hosps. Corp.*, 02-CV-5159, 2004 WL

1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004) ("While *McDonnell Douglas* . . . involved claims

brought under Title VII . . ., courts have held that discrimination and retaliation claims brought

under 42 U.S.C. §§ 1981 and 1983 follow the same analysis.")).

      **C.**    **Standard Governing a Due Process Claim**

      To successfully state a claim under Section 1983 for denial of due process, a plaintiff

must establish both the existence of a protected liberty or property interest, and that he or she was

deprived of that interest without being afforded sufficient process.  *Shakur v. Selsky*, 391 F.3d

106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460

(1989)).  Due process generally requires that the state afford individuals "some kind of hearing"

prior to depriving them of a liberty or property interest.  *DiBlasio v. Novello*, 344 F.3d 292, 302

(2d Cir. 2003).

The Supreme Court has held with respect to convicted prisoners that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . ., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).[11]  A pretrial detainee, however, need not meet such a stringent standard to establish a liberty interest because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial. . . ." *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001); *see also Iqbal v. Hasty*, 490 F.3d 143, 146 (2d Cir. 2007), *rev'd on other grounds, Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("Th[e Second Circuit] has said that *Sandin* does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").  Thus, "restrictions on pretrial detainees . . . may not amount to punishment . . . ." *Benjamin*, 264 F.3d at 188 (citations and internal quotation marks omitted); *see also Myers v. Bucca*, 15-CV-0553, 2015 WL 13401929, at *9 (N.D.N.Y. Dec. 7, 2015) (Baxter, M.J.) ("[I]n the case of a pretrial detainee, the court must determine whether the condition imposed on the inmate was for a legitimate purpose or for the purpose of punishment." (citations omitted)), *report and recommendation adopted by* 2016 WL 165016 (N.D.N.Y. Jan. 14, 2016) (Hurd, J.).

In determining whether a restriction is punitive, a court may consider

---

[11]    The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*.  *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000).  The Second Circuit generally takes the position that a convicted prisoner's SHU confinement under ordinary conditions for more than 305 days rises to the level of atypicality.  *Colon*, 215 F.3d at 231-32.

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable . . . and whether it appears excessive in relation to the alternative purpose assigned . . . .

*Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).  If a restriction or condition is deemed "punishment," it "may not be inflicted upon pretrial detainees without due process."  *Myers*, 2015 WL 13401929, at *9 (citing *LaRock v. Amato*, 12-CV-0503, 2013 WL 5466410, at *12 (N.D.N.Y. Sept. 30, 2013) (McAvoy, J.)).

The due process procedures to which a pretrial detainee is entitled are outlined in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and include a disciplinary hearing and written notice of the charges at least twenty-four hours in advance of that hearing; the opportunity to present witnesses and documentary evidence before an impartial hearing officer as long as doing so will not jeopardize prison safety and security; and a written statement including evidence relied on by the hearing officer in reaching his or her decisions and the reasons for the disciplinary action. *See* 418 U.S. at 564-66.

## III.    ANALYSIS

### A.    Retaliation Claim

After carefully considering the matter, for the reasons set forth in Defendants' memorandum of law (Dkt. No. 19, Attach. 9 at 5-7), I recommend that Plaintiff's retaliation claim against Defendants Aucter and Myers be dismissed.  The following is intended to supplement—not supplant—those reasons.

To the extent that Plaintiff asserts the facility-wide lockdown or facility-wide cell search were adverse actions by Defendants Aucter and Myers, those actions were "conducted throughout the entire facility and clearly not directed solely at Plaintiff." *Felder v. Filion*, 03-CV-0516, 2006 WL 8435089, at *6 (N.D.N.Y. Sept. 5, 2006) (Treece, M.J.). Thus, those actions cannot be said to have been adverse to Plaintiff since they were taken against every incarcerated individual at the Lewis Jail on August 13, 2022.

Moreover, as set forth above in Part II.B. of this Report and Recommendation, temporal proximity alone is insufficient to establish a genuine issue of fact for trial with respect to the causal connection element of a retaliation claim. *See Hendricks v. Mallozzi*, 20-CV-1035, 2022 WL 1129887, at *5 (N.D.N.Y. Jan. 14, 2022) (Lovric, M.J.) (citations omitted), *report and recommendation adopted*, 2022 WL 856885 (N.D.N.Y. Mar. 23, 2022) (D'Agostino, J.). Hence, even assuming *arguendo* that the facility-wide lockdown, facility-wide cell search, and reorganization of Plaintiff (and twelve other incarcerated individuals), were "adverse actions" for purposes of a retaliation claim, Plaintiff has failed to establish an issue of fact for trial that those actions were causally connected to his alleged protected activity.

Finally, Defendant Aucter—who was the sole decision maker with respect to the allegedly adverse actions—affirmed that "[t]he actions [he] took were for the purpose of restoring the safety, security, and good order of the Jail." (Dkt. No. 19, Attach. 3 at ¶ 18.) Thus, the record establishes that even in the absence of Plaintiff's protected speech, Defendant Aucter would have taken the same action to restore the security of the Lewis Jail. Plaintiff failed to show that the real reason for the allegedly adverse action or actions was his protected activity.

For each of these reasons, I recommend that Plaintiff's retaliation claim be dismissed.

### B.     Due Process Claim

After carefully considering the matter, for the reasons set forth in Defendants'
memorandum of law (Dkt. No. 19, Attach. 9 at 7-9), I recommend that Plaintiff's due process
claim against Defendant Reed be dismissed.  The following is intended to supplement—not
supplant—those reasons.

The record evidence establishes that Plaintiff was afforded all—or more—of the process
that he was due.  (*See* Dkt. No. 19, Attach. 5 at ¶¶ 14-16 [Defendant Reed's declaration
affirming that Plaintiff was provided notice of a disciplinary hearing with more than 24 hours
advance notice of the hearing, Plaintiff had an opportunity to defend himself and contest the
evidence presented against him, and Plaintiff received a copy of the disciplinary hearing report
that found Plaintiff guilty of the violation and imposed discipline].)

Moreover, "[t]here is no constitutional right to appeal the decision of a disciplinary
hearing."  *Calhoun v. Quiros*, 23-CV-0715, 2023 WL 8618745, at *9 (D. Conn. Dec. 13, 2023)
(citing *Staton v. Gonzalez*, 22-CV-0855, 2023 WL 3042187, at *6 (D. Conn. Apr. 21, 2023)); *see*
*Cox v. New York City Dep't of Corr.*, 94-CV-3644, 1995 WL 604699, at *4 (E.D.N.Y. Oct. 3,
1995) (although the state may afford a prisoner the right to appeal from a disciplinary
proceeding, there is no federal constitutional right to such an appeal).

For each of these reasons, I recommend that Plaintiff's due process claim against
Defendant Reed be dismissed because the record established that Plaintiff received the process
that he was due.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 19) be
**GRANTED**; and it is further respectfully

**RECOMENNDED** that Plaintiff's Complaint (Dkt. No. 1) be dismissed in its entirety; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[12]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[13] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 25, 2024
        Binghamton, New York

Miroslav Lovric
Miroslav Lovric
U.S. Magistrate Judge

---

[12]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[13]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

## *MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

## I. REQUEST FOR RECONSIDERATION
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

## II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF
ACTION
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is **GRANTED in part,** and **DENIED in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is **DENIED,** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is **DISMISSED** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

## Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🔑 Exhaustion of other remedies

Representative for a social security payee failed to exhaust her administrative remedies before filing her claim since there was no final decision after a hearing. The Social Security Administration (SSA) garnished the representative's wages after attempting to work out a repayment plan since the representative was overpaid on behalf of the payee. The representative contacted the SSA to complain about the garnishment and shortly thereafter, the representative filed the action with the Small Claims Court, without having a hearing or final order from the Commissioner of Social Security. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

28 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the Northern District of New York, William H. Pease, Esq., Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* action filed by Donna Este–Green ("Plaintiff") to recover funds allegedly owed to her by the Social Security Administration, is a motion by Michael J. Astrue, Commissioner of Social Security ("Defendant") to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction due to Plaintiff's failure to exhaust her administrative remedies before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the motion. For the reasons set forth below, Defendant's motion is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**

On or around May 27, 2009, Plaintiff brought this action in Small Claims Court, City of Ithaca, County of Tompkins ("Small Claims Court"), naming the Social Security Administration ("SSA") as Defendant. (Dkt. No. 1, Part 3.) Liberally construed, Plaintiff's Complaint alleges that the SSA wrongfully garnished her wages in the amount of five hundred seventy-one dollars ($571.00). (*Id.*) On June 24, 2009, the United States Attorney's Office for the Northern District of New York removed this case from the Small Claims Court, pursuant to the exclusive original jurisdiction of the District Court under 42 U.S.C. §§ 405(g)-(h) and 1383(c)(3), "because Plaintiff's claim appeared to relate to the payment of Social Security benefits to her as representative payee for the account of Albertina King." (Dkt. No. 3.)

**B. Relevant Facts**

In 1999, Plaintiff had been acting as representative payee for Albertina King, who had been receiving Social Security benefits under Title II of the Act. (Dkt. No. 3.) In October 1999, the SSA issued an overpayment to Plaintiff on Albertina King's account. (*Id.*) In March 2001, the SSA and Plaintiff arranged a repayment plan pursuant to which Plaintiff agreed to repay the amount due the SSA in fifty-dollar installments beginning on April 15, 2001. (*Id.*) In October 2007, the SSA sent a letter to Plaintiff, in which the SSA stated the following: (1) Plaintiff had been overpaid as representative payee; (2) Plaintiff had the right to question the decision about her overpayment and to ask that the SSA not recover

*Este-Green v. Astrue, Not Reported in F.Supp.2d (2009)*

the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of

Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is *DISMISSED.* The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 936297

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,

v.

Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).

|

Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility, Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

 **\*1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"), proceeding *pro se,* is currently an inmate at Orleans Correctional Facility in Albion, New York. From late 1997 until early 1998, the time period relevant for this lawsuit, plaintiff was incarcerated at Fishkill Correctional Facility ("Fishkill"). On December 12, 1997, plaintiff filed a grievance alleging that Officer C. Madura ("Madura") and Officer Robert Muller ("Muller" or "defendant") "spread malicious rumors to the inmate population that [plaintiff] was illegally selling Inmate Liaison Committee ("ILC") supplies" in retaliation against prior grievances that plaintiff had allegedly filed against the officers. *See* Ex. A. On January 15, 1998, the Superintendent of the Inmate Grievance Program denied plaintiff's grievance seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February 20, 1998, reasserts his December 12, 1997 retaliation claim against Muller, pursuant to 42 U.S.C. § 1983. In addition, plaintiff complains of a second act of retaliation under § 1983 by Muller, allegedly made in response to plaintiff's filing of the December 12, 1997 grievance. On January 9, 2001, Muller moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Because plaintiff has failed

to establish either of his retaliation claims, defendant's motion for summary judgment is granted in its entirety. [1]

*FACTS*

On December 12, 1997, plaintiff filed a grievance against correction officers Madura and Muller, alleging that they had spread rumors that plaintiff had been illegally selling supplies from the ILC—an inmate organization within the facility—to other inmates. *See* Ex. A. Furthermore, plaintiff claims that he "encountered several confrontations with other inmates due to such rumors; in which could have ended in physical conflict." *See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such rumors with the intention of provoking such "confrontations." *Id.* Plaintiff does not deny that he was found in possession of ILC supplies, but he alleges that he was in charge of issuing such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled that plaintiff's grievance was baseless. *See* Ex. A. The Superintendent stated that prison officials had found "excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff appealed the Superintendent's findings, and on January 28, 1998, the New York State Department of Correctional Services ("DOCS") Central Office Review Committee ("CORC") upheld the Superintendent's denial of the grievance.

Plaintiff alleges that a little over a month after he filed the December 12, 1997 grievance, Muller retaliated against him by filing a meritless Inmate Misbehavior Report. *See* Ex. F. Muller contends that on January 14, 1998, while stationed on the stairwell of Fishkill's A–Floor monitoring inmate traffic, he questioned plaintiff as to the contents of the bag which plaintiff was carrying. Allegedly, plaintiff refused to answer his questions. Furthermore, Muller contends that plaintiff yelled at him. According to defendant, this confrontation blocked inmate traffic in the hallway for fifteen minutes. *See* Ex. G. Muller alleges that he gave plaintiff a direct order to step to the side and to stop yelling. Plaintiff allegedly refused to do so and demanded to see a sergeant "right now." A sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

 **\*2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with search procedures, disobeying a direct order, threatening an

officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a). *See Williams v. Muller,* 2000 WL 487954 at *3 (S.D.N.Y. Apr. 25, 2000). Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]
Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice." [3] *Williams,* 781 F.2d at 323.

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response to a prisoner's exercise of a constitutional right is actionable. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory

charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

## DISCUSSION

### A. Plaintiff's Retaliation Claim for "Spreading Rumors"

Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See Dawes,* 239 F.3d at 492; *see also Graham,* 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical

harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

### B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report

Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. E, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation. [4] *See* Ex. H at 127–28.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well. [5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

**\*5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been

disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing. [6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at *6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C.A. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

---

## Footnotes

1    Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

2    When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

3    Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

4    Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

5    As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

6    Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 30 of 151
Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)
2022 Fair Empl.Prac.Cas. (BNA) 113,126

2022 WL 991978
United States District Court, E.D. New York.

Sean PORTER, Plaintiff,

v.

PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, Office of Inspector General, Huntley Lawrence,
in his individual and official capacity, John Tucci, in
his individual and official capacity, John Kane, in his
individual and official capacity, Thomas L. Bosco, in
his individual and official capacity, Peter Quaglia, in
his individual and official capacity, and William Devita,
in his individual and official capacity, Defendants.

15-CV-3558 (RPK) (SJB)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Valerie M. Cartright, Cartright and Company, Port Jefferson
Station, NY, Albert Darnell Manuel, III, Frederick K.
Brewington, Law Offices of Frederick K. Brewington,
Hempstead, NY, Maria K. Dyson, Goldberg Segalla LLP,
Albany, NY, for Plaintiff.

Kathleen Gill Miller, Christopher Valletta, The Port Authority
of New York and New Jersey, New York, NY, for Defendants
Port Authority of New York and New Jersey, Huntley
Lawrence, John Tucci, Thomas L. Bosco, Office of Inspector
General, John Kane, Peter Quaglia, William Devita.

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

**\*1** Plaintiff Sean Porter brings this action against the Port
Authority of New York and New Jersey, the Office of
Inspector General at the Port Authority, Huntley Lawrence,
John Tucci, John Kane, Thomas L. Bosco, Peter Quaglia, and
William Devita. Invoking 42 U.S.C. § 1983 and other statutes,
Mr. Porter alleges discriminatory treatment, retaliation,
malicious prosecution, false arrest, unconstitutional searches,
selective enforcement, abuse of process, constitutional
harassment, and conspiracy. He also raises state claims of
malicious prosecution and abuse of process and alleges
a violation of the New York State Human Rights law.

Defendants have moved for summary judgment on all claims.
For the reasons stated below, defendants' motion is granted.

**BACKGROUND**

The following facts are taken from the parties' Rule 56.1
statements and relevant portions of the record and are
undisputed unless otherwise noted.

Mr. Porter is an African-American male who was born in
Guyana. Sean Porter Dep. Pl.'s Ex. A at 47:4-9 (Dkt. #88-2)
("Porter Dep."). He was employed at the Port Authority for
nearly twenty years. *Id.* 28:15-23; 52:19-22. Over that time,
Mr. Porter worked his way up to the position of Manager
of Landside Services at John F. Kennedy International
Airport ("JFK"). *Id.* 28:4-23; 53:23-54:8; 63:7-10; 89:20-25;
101:17-22; 102:25; 103:1-6; 111:19-25; 120:13-24.

His allegations center around what he describes as the Port
Authority's discrimination and retaliation against him because
he is an African-American male and because he testified in
criminal and administrative proceedings for Francis Croffie,
an African-American employee in the Port Authority Aviation
Department.

**a. The Croffie Incident**

In 2011, Mr. Croffie had an altercation with a Port Authority
police officer and was arrested. Porter Dep. 257:22-258:25;
Hearing Award in the Matter of Francis Croffie, Defs.' Ex. J
1-18 (Dkt. #81-10) ("Croffie Hearing").

Mr. Porter testified at Mr. Croffie's criminal trial in 2011. *Id.*
259:4-5; Pl.'s Rule 56.1 Statement at 25 ¶ 15 (Dkt. #87) ("Pl.'s
56.1"); Defs.' Rule 56.1 Statement ¶ 32 (Dkt. #80) ("Defs.'
56.1"). His testimony was limited. He explained only that
certain actions Mr. Croffie's took were within the scope of Mr.
Croffie's job responsibilities. Porter Dep. 259:4-262:3.

In June 2012, Mr. Porter testified at an administrative hearing
related to the same incident. Porter Dep. 261:15-262:3;
Croffie Hearing. Again, his testimony was limited to
explaining the scope of Mr. Croffie's job responsibilities.
Porter Dep. 261:15-262:3; Croffie Hearing 19.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 31 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

### b. The Flowers-Lampariello Investigation

In 2013, Mr. Porter investigated a dispute between two of his subordinates, Derek Flowers and Robin Lampariello. Porter Dep. 269:17-270:10. Ms. Lampariello filed a complaint against Mr. Porter and several other Port Authority managers with the Port Authority Inspector General ("IG") alleging that Mr. Porter and the other managers did not conduct a proper investigation. *Id.* 271:19-272:25; John J. Tucci Dep. Pl.'s Ex. B-1 at 27:6-28:8 (Dkt. #88-3) ("Tucci Dep."); Mem. from Michael Nestor to Mary Lee Hannell and Thomas Bosco, Defs.' Ex. K at 3-4 (Dkt. #81-11) ("Lampariello Mem."); Defs.' 56.1 ¶ 39.

**\*2** John Tucci, a Police Investigator with the IG, was assigned to look into Lampariello's complaint about the investigation. Tucci Dep. 10:3-4; 28:18-24. He was supervised by defendant John Kane, a Supervisory Police Investigator. *Id.* 10:20-22; John Kane Dep. Ex. C at 24:1-12 (Dkt. #88-5) ("Kane Dep.").

At the start of his investigation of Lampariello's complaint, Investigator Tucci spoke with Mr. Porter. Tucci Dep. 33:19-34:21. Mr. Porter told Investigator Tucci that he had already completed an investigation of the dispute between Ms. Lampariello and Mr. Flowers. *Id.* 34:6-7. But when Investigator Tucci subsequently asked Mr. Porter for a copy of the documentation that Mr. Porter put together for his investigation of that dispute, Mr. Porter said that he did not have any documentation and denied having originally said that he had completed an investigation. *Id.* 35:11-24; Lampariello Mem. 3-4.

After Investigator Tucci completed his investigation of Ms. Lampariello's complaint, Inspector General Nestor issued a final report. Lampariello Mem. 1. The report concluded that Mr. Porter had not conducted a proper investigation of the dispute between Mr. Flowers and Ms. Lampariello, had refused to share a copy of Mr. Flowers's complaint with Ms. Lampariello, and had failed to advise Ms. Lampariello and others of the status or conclusion of his investigation. Lampariello Mem. 6. Mr. Porter did not receive a reprimand, counseling, or any other disciplinary action as a result of this investigation into his conduct. *Ibid.*; Porter Dep. 355:13-24.

### c. The Florida-Plates Investigation

While investigating how Mr. Porter and others had conducted the initial investigation of the dispute between Mr. Flowers and Ms. Lampariello, Investigator Tucci ran Mr. Porter's name through a database that supplies information such as addresses, vehicles, and license-status. Tucci Dep. 41:23-25, 44:24-45:12; Pl.'s 56.1 at 8 ¶ 43. According to the database, Mr. Porter had numerous vehicles registered out of state and a Florida driver's license. Tucci Dep. 42:3-25. Supervisor Kane, who was overseeing Investigator Tucci's work, approved opening an investigation into Mr. Porter's license plates and driver's license. *Id.* 43:5-44:9.

The investigation revealed the following. Mr. Porter owned four vehicles registered to an address in Florida. *Id.* 45:23-48:1. State Farm insured those vehicles in Florida. *Id.* 46:24-47:17. And Mr. Porter held both New York and Florida driver's licenses. *Id.* 46:1-4, 47:22-25. Along with Investigator Quaglia, Investigator Tucci then went to Mr. Porter's residence in New York, where they observed the Florida-registered vehicles. *Id.* 165:11-166:17; Peter V. Quaglia Dep. Pl.'s Ex. E at 24:19-25 (Dkt. #88-7) ("Quaglia Dep.").

The two investigators interviewed Mr. Porter's brother-in-law, Benton White, about the address that Mr. Porter had used in Florida. Tucci Dep. 92:8-21; Quaglia Dep. 24:24-25:2. Mr. White said that he and his wife, Altina, were the only owners of the Florida property where Mr. Porter's vehicles were registered. Tucci Dep. 93:19-94:94:7.

Mr. Porter has since acknowledged that at the time he registered his vehicles at the Florida address, there was no document showing that he or his wife owned any interest in that property, that he paid any money for the purchase of the property, or that he paid property taxes on the property. Porter Dep. 207:15-209:20.

**\*3** Investigator Tucci and Supervisor Kane then informed three New York prosecutors' offices—the Queens District Attorney, the Suffolk County District Attorney, and the New York State Attorney General—about their findings. Tucci Dep. 57:10-58:17, 59:8-25, 138:17-139:3. All three offices explained that Mr. Porter's vehicle registration and insurance did not render him criminally liable within New York but might within a different jurisdiction. *Id.* 57:15-58:19, 139:4-8. Investigator Tucci also informed State Farm about the results of the investigation, but State Farm indicated that it was not interested in pursuing charges. *Id.* 262:11-263:4.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 32 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

At roughly the same time, Supervisor Kane put Investigator Tucci in contact with Florida Highway Trooper Eric Oleson. *Id.* 51:1-53:3, 56:8-15. Investigator Tucci informed Trooper Oleson about the IG's investigation and asked him to look into Mr. Porter's license plates and insurance. *Id.* 52:22-24.

After conducting his own investigation, Trooper Oleson found that Mr. Porter likely committed title fraud. Eric Oleson Dep. Defs.' Ex. L at 14:2-8, 21:1-22:16 (Dkt. #81-12) ("Oleson Dep."). More specifically, although Mr. Porter had a Florida driver's license and registered his vehicles in Florida, Trooper Oleson was unable to confirm that Mr. Porter had a Florida residence. *Id.* 54:23-55:23. Trooper Oleson called Mr. Porter to discuss his vehicle registrations, but Mr. Porter declined to speak to him and said he wanted an attorney. *Id.* 56:19-57:2. A short time later, Trooper Oleson prepared an affidavit requesting that criminal charges be brought against Mr. Porter for title fraud and perjury. *Id.* 57:5-58:5; Oleson Felony Case Report, Defs.' Ex. N (Dkt. #81-14) ("Oleson Felony Case Report"). Assistant State Attorney Stephanie Powers of the Florida State Attorney's Office approved the request for criminal charges, and a warrant was issued for Mr. Porter's arrest. Oleson Dep. 58:11-14; Pl.'s 56.1 ¶ 64. Mr. Porter surrendered to Florida authorities on December 16, 2014. Porter Dep. 180:8-10, 197:3-5. He was released on bail ten hours later. *Id.* 183:17-18.

Following Mr. Porter's arrest, Mr. Porter's wife, Sevanesa, submitted an affidavit stating that the Florida property that Mr. Porter had listed as his address on his vehicle registration and insurance was purchased with pooled family finances. Affidavit of Sevenesa Porter, Defs.' Ex. O (Dkt. #81-15). Ms. Porter stated that the property was the primary residence for herself and Mr. Porter while he looked for a job in Florida. *Ibid.* Altina White also prepared a written affidavit indicating that Mrs. Porter was one of the owners of the Florida Property. Affidavit of Altina White, Defs.' Ex. P (Dkt. #81-16). After these affidavits were submitted to State Attorney Powers, she dismissed the criminal charges against Mr. Porter. Oleson Felony Case Report, Discovery 079.

While Trooper Oleson was investigating Mr. Porter, Investigators Tucci and Quaglia went into the Port Authority parking lot to see and take pictures of Mr. Porter's license plate and other out-of-state license plates. Tucci Dep. 69:15-70:7; Quaglia Dep. 24:19-22. In the parking lot, they found approximately thirty vehicles with out-of-state license plates. Tucci Dep. 70:8-10.

All but four were from apparently transient users of the lot, whose vehicles did not appear in subsequent checks of the parking lot. *Id.* 171:22-172:10, 209:20-210:10. Investigator Tucci investigated the three cars (other than Mr. Porter's) that were repeatedly sighted there. *Id.* 74:5-75:10. 116:9-25.

One car belonged to Jose Torres, an employee of Swissport —rather than the Port Authority. *Id.* 116:9-18. Investigator Tucci stopped Mr. Torres's car and asked him about the license plates; Mr. Torres admitted that he had out-of-state plates to save money on insurance. *Id.* 118:7-24. Investigator Tucci warned Mr. Torres that he was violating New York law and advised him to reregister his plates, but otherwise took no action. *Id.* 120:13-22.

**\*4** A second car belonged to an Allied Barton security guard —also not an employee of the Port Authority. *Id.* 74:5-8. Investigator Tucci advised the security guard that she was in violation of New York law and suggested she reregister her plates. *Id.* 124:12-23.

The final car belonged to Kim Dickey, a recently hired Port Authority employee whom Investigator Tucci termed a "high-level manager." *Id.* 74:11-25, 75:9-10. But by the time Investigator Tucci checked the registration on Ms. Dickey's vehicle in a database, she had reregistered her vehicle in New York State. *Id.* 75:1-10.

Although Mr. Porter asserts that all three of these cars belonged to Port Authority "employees," Pl.'s 56.1 at 27 ¶ 22, the evidence he cites establishes that Ms. Dickey was the only Port Authority employee, *see* Kane Dep. 126:14-130:18; Tucci Dep. 70:4-10; Quaglia Dep. 27:9-16.

Investigator Tucci acknowledged that no one from Port Authority contacted Mr. Porter about the plates before Trooper Oleson attempted to do so. Tucci Dep. 127:10-129:25.

According to Investigator Tucci, Mr. Porter's investigation was different from those of Mr. Torres and the Allied Barton security guard because Mr. Porter worked for the Port Authority "in a very high-level security position." *Id.* 130:9-14.

### d. Mr. Porter is Passed Over for Promotion to Senior Positions in 2014

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

In 2014—as the Florida investigation was being conducted—Mr. Porter was passed over for promotion to several senior positions that opened after an investigation revealed maintenance problems at JFK. Defs.' 56.1 ¶¶ 77, 81-82; Pl.'s 56.1 at 18 ¶ 77.

The investigation started after two aircraft were damaged by unsecured runway lighting fixtures in 2014. Thomas Bosco Dep. Defs.' Ex. E 83:10-15 (Dkt. #81-5) ("Bosco Dep."). Inspections of lighting fixtures at JFK, Newark, and LaGuardia airports followed. The inspections revealed that the fixtures were in substantially worse repair at JFK than at the other airports, so Director Bosco decided to make significant personnel changes at the senior levels of JFK's structure. *Id.* 85:5-25. He directed JFK's General Manager, Jerry Spampanato, to leave the airport and serve as advisor at headquarters, and he sent defendant Deputy Director Lawrence to act as interim General Manager. *Id.* 86:13-87:5. Spampanato's departure had a cascading effect that left several leadership positions open at JFK, Newark, and LaGuardia. *Ibid.* Director Bosco decided to forgo the application process and make hiring decisions with input from senior staff. *Id.* 87:18-88:15, 96:9-16.

Mr. Porter made Director Bosco, Deputy Director Lawrence, and other senior managers aware that he was interested in a promotion and in the positions of Manager of Operations at JFK and Newark airports in particular. Porter Dep. 249:8-353:25; Pl.'s 56.1 at 19 ¶ 81.

Although Deputy Director Lawrence considered Mr. Porter to be at least minimally qualified for these positions, he did not believe Mr. Porter to be one of the more highly qualified applicants. Huntley A. Lawrence Dep. Pl.'s Ex. D at 167:15-20 (Dkt. #88-6) ("Lawrence Dep."). Director Bosco did not consider Mr. Porter to be even minimally qualified for the positions because Mr. Porter lacked relevant knowledge, background, and experience. Bosco Dep. 90:3-25. Although Mr. Porter believed that he was qualified for the position, Porter Dep. 243:10-11, he never explains why.

**\*5** Director Bosco and Deputy Director Lawrence, who were responsible for hiring decisions, Bosco Dep. 88:14-19, 96:9-16; Lawrence Dep. 169:16-18, testified that Mr. Porter was not hired because the safety issues at JFK required someone with strong experience on the aeronautical side of the airport. Bosco Dep. 99:21-98:9; Lawrence Dep. 164:16-25, 166:3-19.

Deputy Director Lawrence informed Mr. Porter that he would not be receiving a promotion. Porter Dep. 421:4-6; Lawrence Dep. 163:20-166:20; Pl.'s 56.1 at 19 ¶ 82. During that conversation, Mr. Porter recounts Deputy Director Lawrence telling him that "people like [him]" should not drive "the kind of cars [he] dr[o]ve" because he would "seem too flashy." Porter Dep. 240:2-6, 254:13-15. Deputy Director Lawrence remembers it differently. According to him, he told Mr. Porter that driving with Florida plates posed ethical difficulties and did not look good. Lawrence Dep. 164:24-165:14.

The position of Manager of Operations at JFK was filled by April Gasparri, an Asian-American woman who previously worked at LaGuardia airport. Lawrence Dep. 169:1-9; Porter Dep. 243:1-25; Bosco Dep. 99:17-100:3. Ms. Gasparri had substantial experience on the aeronautical side of the airport and with aviation technical services, as well as working with the FAA on safety issues. Lawrence Dep. 169:1-9; Bosco Dep. 99:17-100:3; Pl.'s 56.1 at 19 ¶ 83. Considering the safety issues at JFK and management's consequent desire to bring in someone from outside JFK, Director Bosco and Deputy Director Lawrence believed Ms. Gasparri to be the strongest choice for the job. Bosco Dep. 99:17-100:3; Lawrence Dep. 169:3-171:14; Pl.'s 56.1 at 19 ¶ 83.

#### e. The Lost-and-Found Investigation

In early 2015, Supervisor Kane investigated whether Mr. Porter was adhering to Port Authority policies regarding prisoner property. Kane Dep. 165:7-17; Letter of Reprimand, Defs.' Ex. R 1 (Dkt. #81-18) ("Letter of Reprimand"). As recounted in a reprimand that was ultimately issued to Mr. Porter, JFK's Evidence Custodian had informed Mr. Porter that when prisoner property located in the lost and found was not claimed within six months, a certified letter should be sent to the last known address of the owner advising the owner that the property would be disposed of, and possibly destroyed, if not claimed. Letter of Reprimand 1. Despite being advised of that policy, Mr. Porter failed to inventory lost-and-found items, did not send a thirty-day certified letter to the owner, and directed Port Authority Maintenance to remove all of the prisoner's property. *Ibid.*

Mr. Bosco issued a formal reprimand to Mr. Porter regarding this failure on April 16, 2015. Letter of Reprimand 1. The letter stated that Mr. Porter's behavior called into question his judgment but that no action would be taken apart from the issuance of the letter of reprimand. *Id.* 2. Director Bosco

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 34 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

testified that after giving Mr. Porter the letter, he gave Mr. Porter a pep-talk and told him that he had a future with the Port Authority. Bosco Dep. 44:9-45:2.

### f. The Buddy-Pass Investigation

In April 2015, Supervisory Police Investigators John Kane and Ed Choo, along with Forensic Auditor William Divita, wrote an investigation memorandum regarding whether Mr. Porter had been given Jet Blue "Buddy Passes" by a cousin who worked for Jet Blue. Mem. to file of William Divita, Defs.' Ex. V (Dkt. #81-22) ("Mem. to file of William Divita"). The purpose of the investigation was to determine the circumstances surrounding the issuance of any Buddy Passes. Mem. from Michael Nestor to Norman Burns, Defs.' Ex. W at 1 (Dkt. #81-23) ("Mem to Norman Burns"); Pl.'s 56.1 at 17 ¶ 89. Mr. Porter's cousin, Ossie David, told Port Authority investigators that he had given Mr. Porter "Buddy Passes" on several occasions, but Jet Blue's Buddy-Pass database only recorded Mr. Porter receiving one Buddy Pass. Mem. to file of William Divita. A 2015 final report on this investigation did not recommend a reprimand or other discipline. Mem. to Norman Burns 1 (Dkt. #81-23); Defs.' 56.1 at 17 ¶ 89. But Mr. Porter disputes that he was not reprimanded or disciplined because of the Buddy Pass investigation. Pl.'s 56.1 at 20 ¶ 89.

### g. Mr. Porter is Passed Over for Promotion to General Manager of JFK AirTran

**\*6** Several months after Mr. Porter filed this case, Mr. Porter applied for the open position of General Manager of JFK Air Train. Am. Compl. ¶ 43; Pl.'s 56.1 at 19 ¶ 85; Defs' 56.1 ¶ 85. Mr. Porter was interviewed, Defs.' 56.1 ¶ 85; Pl.'s 56.1 at 19 ¶ 85, but did not score as well as Sanchita Banerjee-Jiminez, the applicant who was ultimately selected for the position. Score Sheet for the Candidates for the Air Train Manager Position, Defs.' Ex T (Dkt. #81-20); Pl.'s 56.1 at 20 ¶ 86. Ms. Banerjee-Jiminez, a female of Indian descent, has a degree in civil engineering. Resume of Sanchita Banerjee-Jiminez. Defs.' Ex. U (Dkt. #81-21). She also had experience as a Manager of Air Train Systems for Bombardier, as an employee of the manufacturer of the JFK Air Train, and as an operator of the Air Train system in Canada. *Ibid.*

### h. Mr. Porter's Miami Beach Trip and the Related Investigation, Arrest, and Conviction

Supervisory Investigator Choo investigated a trip Mr. Porter took to Miami Beach in March 2014. Felony Complaint, Defs.' Ex. Y (Dkt. #81-25). An executive at a cargo-handling company told Supervisor Choo that the executive had paid for Mr. Porter's trip, including his plane tickets, hotel accommodations, a golf round, dinners, lunches, and other activities. *Id.* 1-2. In total, the executive spent over $3,000. *Ibid.* According to Supervisor Choo, Mr. Porter was required to file a financial disclosure for this trip but failed to do so. *Id.* 2-3.

Because his financial disclosure omitted this trip, Mr. Porter was arrested on February 25, 2016 and charged with Offering a False Instrument for Filing in the First Degree—a felony. Defs.' 56.1 at 18 ¶ 94; Pl.'s 56.1 at 21 ¶ 94. He was suspended without pay several weeks later. Porter Dep. 28:9-14.

On September 25, 2017, Mr. Porter was found guilty following a bench trial in New York Supreme Court. Defs.' 56.1 at 18 ¶ 95; Pl.'s 56.1 at 22 ¶ 95. Because of that conviction, Mr. Porter's employment with Port Authority was terminated on March 2018. Defs.' 56.1 at 18 ¶ 96; Pl.'s 56.1 at 22 ¶ 96.

### i. Procedural History

Mr. Porter filed this suit on June 17, 2015. *See* Dkt. #1. The operative pleading in this case is his second amended complaint. *See* Second. Am. Compl. (Dkt. #37). He alleges discriminatory treatment, retaliation because of his race and his protected First Amendment activity in violation of Sections 1981 and 1983 of Title 42. Second Am. Compl. ¶¶ 60-80, 125-134. He further alleges malicious prosecution, false arrest, unconstitutional search, selective enforcement, abuse of process, and constitutional harassment for the Port Authority's investigations and his subsequent arrests in violation of Section 1983. Second Am. Compl. ¶¶ 80-104. And he alleges conspiracy and failure to prevent a conspiracy in violations of Sections 1985 and 1986 of Title 42. Second Am. Compl. ¶¶ 105-124. He also alleges state claims of malicious prosecution and abuse of process and a violation of the New York State Human Rights law. *Id.* ¶¶ 135-155. He brings each claim against all defendants. *Id.* ¶¶ 3-7, 60-155.

2022 Fair Empl.Prac.Cas. (BNA) 113,126

Defendants have moved for summary judgment. *See* Mot. for Summ. J (Dkt. #79).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid.* The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where "the burden of persuasion at trial would be on the non-moving party," the movant "may satisfy his burden of production" either "(1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).

**\*7** In assessing the record, courts consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, [and] interrogatory answers[.]" *Fed. R. Civ. P. 56(c)(1)(A)*. Courts view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation, internal quotation marks, and alterations omitted).

## DISCUSSION

For the reasons outlined below, defendants' motion for summary judgment is granted for each of Mr. Porter's claims.

### I. Retaliation Claims

Defendants are entitled to summary judgment on any claims of retaliation that Mr. Porter brings under Section 1983. *See* Defs.' Mem. of L. in Supp. of Mot. for Summ. J. 9-12 (Dkt. #82) ("Defs.' Mem.") (construing Mr. Porter's retaliation claims as arising under Section 1983 because Section 1981 does not provide a cause of action). [1] "To state a claim under § 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.' " *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (quoting *Feingold v. New York*, 466 F.3d 135, 159 (2d Cir. 2004)). A state employee acting in his official capacity is acting "under color of state law." *Ibid.* (citing *Feingold*, 466 F.3d at 159). Mr. Porter alleges two forms of actionable retaliation. First, he claims that he was retaliated against because of his opposition to racial discrimination at Mr. Croffie's trial and disciplinary hearing. Pl.'s Opp'n 2. Second, he claims that he was retaliated against for exercising his First Amendment right to testify at Mr. Croffie's trial and disciplinary hearing. *Id.* at 2-4. Both claims fail.

### a. Retaliation Based on Protesting Racial Discrimination

Mr. Porter has not set forth evidence from which a factfinder could conclude that any defendant has retaliated against him for opposing racial discrimination. Once the color-of-law requirement is met, a claim for retaliation in violation of Section 1983 parallels a claim for retaliation under Title VII and is reviewed under the burden-shifting approach for such claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Vega*, 801 F.3d at 88, 91; *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). At the first step under the *McDonnell Douglas* framework, "the plaintiff must establish a *prima facie* case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwann,* 737 F.3d at 844 (citation and quotation marks omitted). Once a plaintiff meets this initial burden, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the adverse employment action. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (citation omitted). If the defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's adverse employment action was his protected activity. *Ibid.* (citation omitted).

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 36 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

**\*8** Mr. Porter has failed to make out a *prima facie* case of retaliation for opposing racial discrimination, because he has offered no evidence of defendants' knowledge that he engaged in such opposition. "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's complaint was directed at conduct prohibited by Title VII" or Section 1983. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107-08 (2d Cir. 2011). In other words, here, the defendants must have been on notice that plaintiff's speech or actions were a protest against racial discrimination. Mr. Porter has not offered evidence to support such an inference. He rests his claim of retaliation for opposing racial discrimination on his assertion that he suffered adverse employment action after he "testified at Mr. Croffie's criminal trial and disciplinary hearing about the Port Authority's racial discrimination." Pl.'s Opp'n 3. But Mr. Porter's testimony at Mr. Croffie's trial and hearing was not about racial discrimination—instead, it was limited to explaining Mr. Croffie's job responsibilities. Porter Dep. 259:4-262:3. Defendants could not have inferred from the testimony—or any surrounding circumstance that Mr. Porter has alleged—that his testimony on that subject amounted to opposition to racial discrimination. *See, e.g.*, *Ottley-Cousin v. MMC Holdings, Inc.*, No. 16-CV-00577 (MKB), 2019 WL 1994488, at \*13 (E.D.N.Y. May 6, 2019); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.*, *LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). Summary judgment is accordingly granted to defendants on Mr. Porter's race-based retaliation claim.

### b. Retaliation Based on First Amendment Activity

Mr. Porter has also failed to put forth evidence from which a reasonable jury could infer that any defendant retaliated against Mr. Porter for his exercise of First Amendment rights. To succeed on a First Amendment retaliation claim under Section 1983, a plaintiff "must demonstrate by a preponderance of the evidence that the [speech or conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [speech or conduct] and the adverse employment action." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)) (internal quotation marks omitted). "Should a plaintiff demonstrate these factors, the defendant has the opportunity to demonstrate by a preponderance of

the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct." *Ibid.* (quoting *Blum*, 18 F.3d at 1010) (internal quotation marks omitted).

Even assuming that Mr. Porter's testimony at his trial was protected speech, and that Mr. Porter was subjected to adverse employment actions, *see* Pl.'s Opp'n 2-3, Mr. Porter has not put forward evidence from which a jury could find a causal connection between his testimony and the adverse action. To establish the causal-connection element of a *prima facie* case, a plaintiff must put forward evidence of a "causal connection ... sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum*, 18 F.3d at 1010 (internal quotation marks omitted)). This causal connection can be demonstrated "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). But "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.'" *Ibid.* (alteration omitted) (quoting *Morris*, 196 F.3d at 111).

Mr. Porter has not set out evidence from which a factfinder could conclude that he established his *prima facie* case with respect to causal connection. He offers no direct evidence that any of the defendants took adverse action against him because of his testimony at Mr. Croffie's trial or administrative hearing, such as emails, internal memos, or testimony. Instead, he relies on the temporal proximity between his testimony and the commencement of the Florida-plates investigation. Pl.'s Opp'n 4. But that investigation did not come close enough in time to Mr. Porter's testimony to support an inference of causal connection. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (citations omitted), but "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line," *Clarke v. N.Y.C. Dep't of Educ.*, No. 18-CV-06783

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 37 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)
2022 Fair Empl.Prac.Cas. (BNA) 113,126

(AMD) (SJB), 2021 WL 123358, at *9 (E.D.N.Y. Jan. 13, 2021) (quoting *Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522 (CPS), 2006 WL 842914, at *15 (E.D.N.Y. Mar. 28, 2006) (collecting cases)) (alteration omitted). Mr. Porter's trial testimony came before his administrative hearing testimony. Porter Dep. 257:22-258:25. And his June 2012 administrative hearing testimony was over nine months before the commencement of Investigator Tucci's Florida-plates investigation in March or April 2013. *Id.* 257:22-258:25, 261:15-262:3; Croffie Hearing 4; Tucci Dep. 44:10-14. Accordingly, too much time passed to support any inference that the Mr. Porter's testimony was causally connected to Investigator Tucci's investigation. Defendants are therefore entitled to summary judgment on Mr. Porter's First Amendment-based retaliation claim, as well.

## II. Section 1983 Failure-to-Promote Claims

**\*9** Mr. Porter claims that defendants deprived him of equal protection of the law, in violation of Section 1983, by failing to promote him on account of his race or as retaliation for opposition to racial discrimination at Mr. Croffie's trial and hearing. Pl.'s Opp'n 22-25. Although Mr. Porter's complaint speaks vaguely of different "promotions," Second Am. Compl. ¶ 20, his briefing addresses promotions to only two positions: Director of Operations and Air Train Manager at JFK. *See* Pl.'s Opp'n 22-24. Consequently, Mr. Porter has abandoned his failure-to-promote claims except as to these two positions. *See, e.g., Pierre v. City of New York*, No. 17-CV-5782 (JGK), 2020 WL 353538, at *7 (S.D.N.Y. Jan. 21, 2020), *aff'd*, 844 F. App'x 411 (2d Cir. 2021) (citing *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 352-53 (S.D.N.Y. 2017)). Claims of discriminatory treatment under Section 1983 are evaluated under the burden-shifting framework of *McDonnell Douglas*. *Ruiz*, 609 F.3d at 491 (citations omitted). To establish a *prima facie* case in the context of such a claim, Mr. Porter must show "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Id.* at 492 (citations omitted).

Mr. Porter has failed to establish a *prima facie* case related to the two promotional decisions he challenges, because a reasonable factfinder could not infer from the record that the promotional decisions took place under circumstances giving rise to an inference of discrimination or retaliation. To support an inference of retaliatory intent, Mr. Porter repeats his allegations about the supposedly retaliatory investigations that followed his testimony at Mr. Croffie's trial and hearing.

Pl.'s Opp'n 23-24. But as noted above, Mr. Porter has failed to put forward evidence that those investigations were retaliatory. As previously explained, the license-plate investigation came too long after Mr. Porter's testimony for temporal proximity to supply an inference that the license-plate investigation was retaliation for Mr. Porter's testimony. *See* pages 17-18, *supra*. It follows even more strongly that temporal proximity cannot provide a causal link between Mr. Porter's testimony and promotion decisions made two or three years after the testimony occurred. And no direct evidence suggests that the investigations were retaliatory, either. *See* pages 17-18, *supra*.

To support an inference that the promotion decisions reflected racially discriminatory intent, Mr. Porter points to a disputed portion of a conversation in which Deputy Director Lawrence told Mr. Porter that he would not be promoted to Director of Operations. Pl.'s Opp'n 23-24; Porter Dep. 421:4-6; Lawrence Dep. 163:20-166:20. Deputy Director Lawrence recalls telling Mr. Porter that his use of out-of-state license plates reflected poorly on Mr. Porter's ethical judgment; Mr. Porter recalls Deputy Director Lawrence telling Mr. Porter that people like him should not drive such flashy cars. Lawrence Dep. 163:20-166:20; Porter Dep. 240:2-6, 254:13-15. The Court accepts Mr. Porter's account for purposes of defendants' summary judgment motion, because Mr. Porter is the non-moving party. *Tracy*, 624 F.3d at 95.

But a reasonable factfinder could not infer that Mr. Porter was the victim of racially discriminatory failures to promote based on this single remark. Even on Mr. Porter's telling, Deputy Director Lawrence's remark did not refer to Mr. Porter's race, but rather spoke of "people like" Mr. Porter. Porter Dep. 239:23-240:6. Mr. Porter therefore premises his inference of discriminatory animus on the assertion that when Deputy Director Lawrence was speaking of people like Mr. Porter, he must have been referring to Mr. Porter's "race and color," Pl.'s Opp'n 10, as well as his gender, *id.* 24. But Mr. Porter offers nothing to explain why Deputy Director's Lawrence alleged remark about "people like" Mr. Porter is most reasonably understood as a reference to people of Mr. Porter's race and gender, as opposed to, for instance, employees or security officials at Port Authority. *See id.* 10 (asserting, without explanation, that "[b]ut for Porter's race and color, that conversation might seem unfathomable"). A single remark that is "vague" and "susceptible to any number of benign meanings," is not adequate to establish a prima facie case of prohibited discrimination. *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008); *see, e.g., Senese v.*

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

*Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 768-69 (E.D.N.Y. 2018) (finding remark that plaintiff, "as a man in the school," had "to be that much more careful than anybody else" too vague to warrant discriminatory inference); *Gilmore v. Lancer Ins. Co.*, No. 08-CV-0628 (JFB) (WDW), 2010 WL 87587, at *10 (E.D.N.Y. Jan. 7, 2010) (finding female decisionmaker's comment that plaintiff was "well built and things like that" too vague to show gender discrimination). In sum, Mr. Porter has failed to make out a *prima facie* case that he was denied promotions as an act of prohibited retaliation or based on his race.

### III. Section 1983 Hostile Work Environment and Selective Enforcement Claims

**\*10** Defendants are entitled to summary judgment on Mr. Porter's claims that he suffered a hostile work environment and selective enforcement. Mr. Porter posits that he was subjected to these harms in retaliation for exercising his First Amendment rights by testifying at Mr. Croffie's hearing and trial. Pl.'s Opp'n 10-12, 20-22. But Mr. Porter has failed to provide an evidentiary basis from which a reasonable finder of fact could infer that he suffered the harms he alleges because of his protected speech.

Start with the hostile-work-environment claim. Hostile-work-environment claims are actionable under Section 1983, s*ee Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225-27 (2d Cir. 2004), though an individual defendant may only be liable when "his own actions are independently sufficient to create a hostile work environment," *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014). In order to establish such a claim, a plaintiff must show not only that he was subjected to a hostile work environment, *see Patterson*, 375 F.3d at 227, but also that the "subjection to a hostile environment ... occur[red] because of [the plaintiff's] ... protected characteristic" or activity, *Gordon v. City of New York*, 612 F. App'x 629, 631 (2d Cir. 2015) (internal quotation marks omitted). Here, the protected activity that Mr. Porter alleges is his testimony at Mr. Croffie's trial and hearing, and the actions he alleges constituted a hostile work environment are defendants' investigating him, failing to promote him, and ultimately terminating his employment. Pl.'s Opp'n 20-22. Assuming that such actions can undergird a hostile-work-environment claim, Mr. Porter's claim fails because he offers only unsustainably weak circumstantial evidence that the actions he characterizes as hostile were the result his testimony at Mr. Croffie's trial and hearing. *See* pages 17-18, *supra.* The alleged mistreatment that Mr. Porter cites did not come close enough in time to the protected activity to support

an inference of causation based on temporal proximity. And Mr. Porter points to no direct evidence that the conduct of which he complains was motivated by retaliation. Like other district courts facing similar circumstances, I conclude that Mr. Porter's hostile-work environment claim cannot survive summary judgment due to this deficiency. *See, e.g., Moses v. City of New York*, No. 06-CV-5974 (JSR), 2007 WL 2600859, at *2 (S.D.N.Y. Aug. 28, 2007) ("[P]laintiff's allegations of hostile workplace fail because she has introduced nothing to allow a finder of fact to link the harassment she alleges—primarily the harsh reviews she received from her superiors-to her age, race, color, or gender."); *Parekh v. Swissport Cargo Servs., Inc.*, No. 08-CV-1994 (CPS), 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009).

The same basic deficiency is fatal to the selective-enforcement claim. *See* Second Am. Compl. ¶ 111; *see also* Pl.'s Opp'n 10-12. To establish an equal protection violation based on selective enforcement, a plaintiff must show that he was treated differently from other "similarly situated individuals," and that the differential treatment was "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzarro*, 394 F.3d at 86 (citation omitted). Here, Mr. Porter asserts that he was subject to differential treatment in retaliation for exercising his First Amendment rights at Mr. Croffie's trial and hearing. Pl.'s Opp'n 10-12. Specifically, he claims, defendants subjected him to "severe punitive action" for filing false and inaccurate financial disclosures but did not take similar action against "other employees found to have filed false or inaccurate disclosures." *Id.* 11.

**\*11** But Mr. Porter provides insufficient details to establish that these were "similarly situated" employees who were treated differently. *Berg v. Kelly*, 897 F.3d 99, 113 (2d Cir. 2018) (citation and internal quotation marks omitted). The only evidence Mr. Porter points to is a brief written by his criminal defense attorneys in his criminal trial arguing that the prosecution's informant only targeted Mr. Porter—and not any other Port Authority employees. *See* Letter to Honorable Mark Dwyer, Defs.' Ex. O at 4-5 (Dkt. #88-17). Yet that brief does not appear to describe any particular Port Authority employees who had filed inaccurate disclosures in the past or include key facts such as what other positions those employees held; what precisely they failed to disclose; and how investigators came to learn of the deficiency. Without specific evidence supporting the claim that there were other similarly situated employees who were treated differently, Mr.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 39 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

Porter cannot survive summary judgment. *See, e.g., Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7-9 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 50 (2d Cir. 2017) (granting summary judgment on selective enforcement claim where plaintiff showed that comparator had been treated differently but failed to establish any other facts suggesting that the comparator was similarly situated to plaintiff) (collecting cases).

## IV. Malicious Prosecution Claims

Mr. Porter brings two malicious prosecution claims: one under Section 1983 and one under New York law.[2] "[C]laims for malicious prosecution under § 1983 are 'substantially the same' as claims for 'malicious prosecution under state law.' " *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)). "The elements of a malicious prosecution claim" under Section 1983 "are '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in plaintiff's favor.' " *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (quoting *Posr v. Court Officer Shield #207*, 180 F.3d 409, 417 (2d Cir. 1999)). Similarly, under New York law, the elements of a malicious prosecution claim are "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations and internal quotation marks omitted); *Broughton v. State*, 335 N.E.2d 310 (N.Y. 1975) (same). Here, defendants are entitled to summary judgment on both the federal and state malicious prosecution claims because there is no genuine dispute that defendants did not initiate the prosecution of Mr. Porter, and because probable cause existed for Mr. Porter's prosecution.

### a. Initiation

Mr. Porter has not adduced evidence from which a jury could find that any of the defendants initiated his criminal prosecution. To "initiate" a prosecution in the Section 1983 context, "a defendant must do more than report the crime or give testimony. He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Manganiello*, 612 F.3d at 163 (quoting *Rohman*, 215 F.3d at 217). The same standard applies in New York. *See ibid.*; *Robles v. City of New York*, 961 N.Y.S.2d 533, 534 (N.Y. App. 2013) (citations omitted).

Here, there is no evidence that Investigator Tucci or any of the other defendants played a role in the criminal investigation beyond providing information to Trooper Oleson, who conducted his own investigation and independently made the decision to file a criminal complaint. Defs.' 56.1 at 12 ¶¶ 62, 64; Pl.'s 56.1 at 13-14 ¶¶ 62, 64. None of the defendants brought formal charges or prepared a criminal complaint. Nor is there evidence that any of the defendants created false information and gave it to prosecuting authorities. Furthermore, there is no evidence that any of the defendants induced Trooper Oleson or Assistant State Attorney Powers to bring charges. Thus, there is no material dispute of fact as to whether Investigator Tucci—or any other defendant— initiated the prosecution. Defendants are therefore entitled to summary judgment on the malicious prosecution claims. *See Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 532 (S.D.N.Y. 2015); *Bonds v. City of New York*, No. 12-CV-1772 (ARR) (MDG), 2014 WL 2440542, at *6 (E.D.N.Y. May 30, 2014); *Struthers v. City of New York*, No. 12-CV-242 (JG), 2013 WL 2390721, at *10 (E.D.N.Y. May 31, 2013).

**\*12** Mr. Porter argues in his brief that Investigator Tucci initiated the investigation because he "venue-shopp[ed]" the investigation to different offices and "pushed" Trooper Oleson to press charges. Pl.'s Opp'n 13. Yet the record does not support these assertions. To be sure, Investigator Tucci passed the results of his investigation to a number of law enforcement offices in New York. Tucci Dep. 57:10-11, 59:8-25, 138:17-139:3. And when these offices told him that criminal liability would not lie in New York but might in a different jurisdiction, *id.* 57:15-58:19, 139:4-8, Investigator Tucci forwarded the results to Trooper Oleson in Florida, *id.* 52:22-24. But no evidence supports Mr. Porter's assertion that Investigator Tucci "pushed" Trooper Oleson to press charges. As *Berry*, *Bonds*, and *Struthers* illustrate, merely passing information obtained in an investigation to another who begins a criminal prosecution does not amount to initiating a prosecution. *See Berry*, 137 F. Supp. 3d at 532; *Bonds*, 2014 WL 2440542, at *6; *Struthers*, 2013 WL 2390721, at *10. Accordingly, Mr. Porter's malicious-prosecution claim fails because none of the defendants initiated the prosecution.

### b. Probable Cause

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 40 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)

2022 Fair Empl.Prac.Cas. (BNA) 113,126

Even if Investigator Tucci did initiate the prosecution, probable cause supported the arrest and prosecution of Mr. Porter. "Because lack of probable cause is an element of a malicious prosecution claim, 'the existence of probable cause is a complete defense to a claim of malicious prosecution.' " *Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello*, 612 F.3d at 161-62 (citations and quotation marks omitted)); *see Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983) (same). "Probable cause, in the context of malicious prosecution, has [ ] been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury*, 721 F.3d at 95 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)); *see Colon*, 455 N.E.2d at 1250 (same). Here, Assistant State Attorney Powers relied on Trooper Oleson's felony complaint to bring charges against Mr. Porter. Oleson Dep. 58:11-14; Pl.'s 56.1 ¶ 64. In that complaint, Trooper Oleson explained that an investigation revealed that Mr. Porter owned four vehicles registered and/ or titled in Florida and possessed an active Florida driver's license. Oleson Felony Case Report 5. When Mr. Porter had most recently renewed his Florida driver's licenses, he swore that he was a full-time resident of Florida. *Ibid.* Trooper Oleson conducted a residence search for the Florida address associated with Mr. Porter's vehicles, and that search revealed that the residence was owned by Altina and Benton White —not Mr. Porter. *Id.* 6. Moreover, no tax record or other documentary information indicated that Mr. Porter had any ownership interest in the property. *Ibid.* Further, Mr. Porter acknowledges that at the time of the investigation, there was no document showing that he or his wife owned any interest in, paid any part of the purchase price for, or paid property taxes on the Florida property. Porter Dep. 207:15-209:20.

Trooper Oleson's felony complaint also explains that he received a copy of Mr. Porter's work history from Investigator Tucci indicating that Mr. Porter was a full-time New York resident who also possessed a New York State driver's license. Oleson Felony Case Report 6. After learning that Altina and Benton White lived in New York, Trooper Oleson asked Investigator Tucci to interview them. *Id.* 7. In that interview, Benton White stated that he and his wife were the sole owners of the Florida property and, to the best of his knowledge, no one else owned any interest in the property. *Ibid.* While Trooper Oleson had attempted call Mr. Porter to discuss his vehicle registrations, Mr. Porter declined to speak to him. Oleson Dep. 56:19-57:2. Taking all this evidence together, a reasonably cautious person would infer from this undisputed history that Mr. Porter was likely guilty of the crimes with

which he was charged. *See Stansbury*, 721 F.3d at 95; *Colon*, 455 N.E.2d at 1250.

**\*13** Mr. Porter's arguments to resist this conclusion lack merit. First, Mr. Porter argues that "the number of other Offices that outright told Tucci that this was not prosecutable is enough to warrant a 'cautious man' to stop there." Pl.'s Opp'n. 14. But the various New York prosecution offices never said that Mr. Porter's conduct was not prosecutable; they said that it was not prosecutable *in New York*—but it might be in a different jurisdiction. Tucci Dep. 57:15-58:19, 139:4-8. In any event, when the evidence of a crime is in fact strong enough to warrant a reasonable person's inferring a suspect's guilt—as it is in this case—it does not matter to the probable-cause analysis whether certain law enforcement officers viewed the strength of the evidence differently.

Second, Mr. Porter argues that defendants lacked probable cause because they were aware of facts indicating his innocence. Pl.'s Opp'n 14. To be sure, probable cause may be lacking where police investigators "have not made a complete and full statement of facts ... [or] misrepresented or falsified evidence[.]" *Boyd*, 336 F.3d at 76 (citations and internal quotation marks omitted). But Mr. Porter has not put forward evidence that Investigator Tucci or Trooper Oleson ignored exculpatory material or that they misrepresented or falsified evidence. Indeed, Mr. Porter himself acknowledges that no public documentation existed at the time of the investigation to exonerate him. Porter Dep. 207:15-209:20. And he declined to be interviewed by Trooper Oleson prior to the filing of the felony complaint. Oleson Dep. 56:19-57:2. In fact, only two pieces of exculpatory evidence appear in the record: the affidavits of Mr. Porter's wife and her sister Ms. White. And both were written and filed with Florida prosecutors *after* Mr. Porter's arrest. *See* Affidavit of Sevenesa Porter; Affidavit of Altina White. Accordingly, Mr. Porter's malicious-prosecution claim fails for the independence reason that probable cause existed for his prosecution.

### V. Section 1983 **False Arrest**

Mr. Porter claims that he was falsely arrested in both Florida and New York, in violation of Section 1983 and the Fourth Amendment. *See* Second Am. Compl. ¶¶ 82-86. To prevail on a claim for false arrest under Section 1983, a plaintiff must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ashley*

2022 Fair Empl.Prac.Cas. (BNA) 113,126

*v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (quoting *Jocks*, 316 F.3d at 134) (internal quotation marks omitted). While "liability may not be premised on merely furnishing information to law enforcement authorities ... one who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest." *Wright v. Musanti*, 887 F.3d 577, 587 (2d Cir. 2018) (citation, internal quotation marks, and alteration omitted). "[T]he existence of probable cause is an absolute defense to a false arrest claim." *Ashley*, 992 F.3d at 136.

Defendants are entitled to summary judgment on Mr. Porter's false arrest claims under these standards. Mr. Porter's false-arrest claims related to his arrest in Florida fail because no defendant initiated his arrest and because probable cause existed for his arrest. His false-arrest claims related to his New York arrest likewise falters because his conviction at trial establishes probable cause.

### a. Florida Arrest

Mr. Porter's false-arrest claim based on his Florida arrest for title fraud and perjury fails because (1) the defendants did not actively participate in that arrest and (2) the arrest was supported by probable cause.

Mr. Porter's claim for false arrest fails because none of the defendants procured or participated in his confinement. First, plaintiff has not pointed to evidence from which a jury could infer that Investigator Tucci detained Mr. Porter or procured his arrest. *See* Defs.' 56.1 at 11-12 ¶¶ 57-64, Pl.'s 56.1 at 11-12 ¶¶ 57-64, 28-29 ¶¶ 23-25. While Investigator Tucci furnished Trooper Oleson with information related to Mr. Porter's license plates and asked him to look into whether a crime was committed, Tucci Dep. 52:22-24; Oleson Dep. 19:6-20:15, 42:2-10; Kane Dep. 181:20-182:10, Investigator Tucci denies ever suggesting that Mr. Porter should be prosecuted, Tucci Dep. 56:8-22, and plaintiff has not adduced evidence to the contrary.

 **\*14**  Similarly, Supervisor Kane never attempted to persuade or influence Florida officials to arrest or prosecute Mr. Porter. Indeed, his only contact with Florida officials occurred when he put Investigator Tucci and Trooper Oleson in contact with one another. Tucci Dep. 51:6-53:3, 56:8-15, 65:20-66:7. And while Investigator Quaglia testified to speaking to Florida authorities to ask for a status update on the investigation, he denied requesting any specific type of

action be taken. Quaglia Dep. 52:4-53:12. Absent evidence that these defendants did more than provide information to law enforcement officers, they cannot be liable for false arrest.

Mr. Porter's Florida claim for false arrest fails as to all other individual defendants because there is no evidence suggesting that any of the other defendants so much as spoke to Trooper Oleson, Assistant State Attorney Powers, or any other Florida official.

And even setting aside these deficiencies, Mr. Porter's false arrest claim based on his arrest in Florida would fail because the arrest was supported by probable cause. *See* pages 17-18, *supra*.

### b. New York Arrest

Plaintiff's false-arrest claim based on his arrest in New York for offering a false instrument for filing fails because that arrest was supported by probable cause. *See Ashley*, 316 F.3d at 136. A criminal conviction establishes probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Negrito v. Buonaugurio*, 836 F.App'x 36, 38 (2d Cir. 2020) (same). It is undisputed that Mr. Porter was convicted of offering a false instrument for filing in the first degree. Defs.' 56.1 at 18 ¶ 95; Pl.'s 56.1 at 22 ¶ 95. Accordingly, summary judgment is granted against his false-arrest claim stemming from his New York arrest.

### VI. Section 1983 Unlawful Search

Mr. Porter has failed to set out facts from which a jury could find that Investigator Tucci violated Mr. Porter's Fourth Amendment rights. The Fourth Amendment protects against "unreasonable searches and seizures." Mr. Porter alleges that Investigator Tucci committed an unreasonable search by conducting surveillance of his vehicle in a parking lot and by looking up his plate and vehicle registration in a database without "reasonable suspicion of criminal activity." Pl.'s Opp'n 5-6. But Investigator Tucci did not need reasonable suspicion for those activities. Ordinary visual surveillance from a public place does not amount to a search. *See Kyllo v. United States*, 533 U.S. 27, 32 (2001) (citing *Dow Chemical Co. v. United States*, 476 U.S. 227, 234-235 (1986)); *United States v. Knotts*, 460 U.S. 276, 282 (1983). Similarly, a government employee's search of public records such as vehicle, license plate, or registration records does not violate the Fourth Amendment. *See Doe v. City of New York*, 15 F.3d

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 42 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)
2022 Fair Empl.Prac.Cas. (BNA) 113,126

264, 268 (2d Cir. 1994) (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 493-96 (1975)); *Lisenby v. Lear*, No. 09-CV-410 (DCN), 2013 WL 3762953, at *3 (D.S.C. July 16, 2013) (finding that plaintiff had no privacy interest in vehicle information in a public database), *aff'd*, 563 F. App'x 240 (4th Cir. 2014); *Holder v. City of Allentown*, 151 F.R.D. 552, 554 (E.D. Pa. 1993) (finding that plaintiff had "no reasonable expectation of privacy in the address listed in his motor vehicle registration records—which is of public record and available to anyone who requests the information").

Accordingly, summary judgment is granted to Mr. Porter's unlawful search claim.

### VII. Abuse of Process Claims

Mr. Porter brings abuse-of-process claims under Section 1983 and New York state law. A Section 1983 claim for malicious abuse of process will lie against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). The same standard applies in New York. *Ibid.*

 *15  Mr. Porter has failed to create a genuine dispute of material fact that defendants aimed to achieve a collateral purpose through their use of process. To satisfy the collateral-purpose requirement, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution." *Savino*, 331 F.3d at 77; *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924). That is, "a malicious motive alone" is not sufficient to meet the collateral purpose requirement. *Savino*, 331 F.3d at 77 (quoting *Curiano v. Suozzi*, 63 N.Y. 2d 113, 117 (N.Y. 1984) (internal quotation marks omitted)). "Instead," a plaintiff must "claim that [defendants] aimed to achieve a collateral purpose beyond or in addition to" the purposes of the litigation that the defendants initiated. *Ibid.* Thus, for example, a plaintiff does not state a claim for malicious abuse of process by alleging that city officials who investigated and arrested him had malicious motives for doing so, absent evidence that the officials were seeking to pursue "a ulterior purpose or objective" outside of the prosecution. *Id.* at 77-78.

Both of Mr. Porter's abuse-of-process claims fail because he has not offered evidence from which a factfinder could determine that his arrest was for a collateral purpose.

Mr. Porter alleges that defendants retaliated against him by subjecting him to criminal charges that were baseless. *See* Pl.'s Opp'n 16-17. That allegation amounts only to a claim of improper motive. Courts in this district routinely dismiss abuse-of-process claims where the plaintiff alleges that defendants conducted an investigation because of an improper motive, but the plaintiff does not allege that the defendants sought to achieve "an effect outside the intended scope of operation of the process employed." *Goldring v. Zumo*, No. 14-CV-4861 (BMC), 2015 WL 148451, at *3 (E.D.N.Y. Jan. 12, 2015) (holding that defendant's intent to employ legal process to harm plaintiff's business is not sufficient unless used "to compel some other result") (citing several cases). Mr. Porter's Section 1983 claim for malicious abuse of process fails under these precedents because he fails to allege—much less prove—that any defendant had a collateral purpose in their use of process.

### VIII. Section 1983 Harassment Claim

Defendants are entitled to summary judgment on Mr. Porter's claim for harassment in violation of Section 1983 because Mr. Porter has not adduced evidence from which a jury could conclude that defendants engaged in harassment that violated his substantive due process rights. Second Am. Compl. ¶ 89; Pl.'s Opp'n 17-19. The Second Circuit has held that "a true pattern of harassment by government officials may make out a section 1983 claim for violation of due process of law." *Chalfy v. Turoff*, 804 F.2d 20, 22 (2d Cir. 1986). "*Chalfy* claims are exceedingly difficult to prove." *Bertuglia*, 133 F. Supp. 3d at 637 (quoting *Kastle v. Town of Kent*, No. 13-CV-2256 (VB), 2014 WL 1508703, at *9 (S.D.N.Y. Mar. 21, 2014)). They must involve conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir. 1994) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)) (internal quotation marks omitted). "Generally, defendants in [*Chalfy*] cases either acted illegally, or used their legal authority for a purpose other than that for which it was intended." *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 637-38 (S.D.N.Y. 2015) (quoting *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York*, No. 93-CV-4718 (KMW), 1994 WL 455453, at *3 (S.D.N.Y. Aug. 19, 1994)), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016); *Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 601-02 (S.D.N.Y. 2015) (same).

Mr. Porter has not offered allegations from which a reasonable jury could find that this standard was satisfied. Mr. Porter

Case 9:22-cv-01094-BKS-ML   Document 33   Filed 07/25/24   Page 43 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)
2022 Fair Empl.Prac.Cas. (BNA) 113,126

first points to defendants' decision to refer him to prosecutors and to an insurance company for possible license-plate-related fraud—even though defendants made no comparable referral related to other vehicles with out-of-state plates in the Port Authority parking lot. Pl.'s Opp'n 18. But uncontroverted evidence indicates that those vehicle owners were not similarly situated. Investigator Tucci testified that roughly thirty vehicles were observed in the Port Authority lot had out-of-state licenses. Tucci Dep. 70:8-10. All but four belonged to transients whose vehicles were not present in subsequent checks of the parking lot. *Id.* 171:22-172:10, 209:20-210:10. Of the four non-transient vehicles, two belonged to non-Port-Authority employees, one belonged to Mr. Porter, and one belonged to Ms. Dickey—who, like Mr. Porter, was a "high-level manager." *Id.* 74:5-75:10, 116:9-124:23. Investigator Tucci testified that he treated the non-Port-Authority employees differently than Mr. Porter because they did not work for Port Authority. In contrast, Mr. Porter worked for the Port Authority "in a very high-level security position." *Id.* 130:9-14. Investigator Tucci further explained that he did run a report on Ms. Dickey, who was a relatively new hire, but that by the time he did, she had changed her license plates to New York plates. *Id.* 75:1-10. Mr. Porter does not dispute any of these facts, *see* Pl.'s 56.1 at 27 ¶ 22 (drawing facts primarily from Investigator Tucci's deposition), and he points to no evidence that Investigator Tucci's account was inaccurate or pretextual. In sum, uncontroverted evidence reflects that the other owners of out-of-state vehicles seen in the Port Authority parking lot were not similarly situated to Mr. Porter. Accordingly, Mr. Porter has not put forward evidence from which a factfinder could determine that Investigator Tucci or other defendants acted in an "arbitrary" or "conscience-shocking" manner in referring Mr. Porter for investigation or prosecution relating to possible license-plate fraud. *Interport Pilots Agency, Inc.*, 14 F.3d at 144.

**\*16** Mr. Porter has also failed to offer evidence of other acts from which a jury could find arbitrary or conscience-shocking harassment. Mr. Porter points to the fact that he was investigated and reprimanded for violating a lost-and-found policy regarding prisoner property. Pl.'s Opp'n 18. He does not deny that an evidence custodian had told him about the policy, *see* Letter of Reprimand 1; Pl.'s 56.1 at 17 ¶ 74, but he suggests that defendants' investigation and reprimand amounted to harassment because the policy had not been written down, Pl.'s Opp'n 18; *see* Pl.'s 56.1 at 17 ¶ 74. Alternatively, Mr. Porter argues that defendants harassed him by arresting him, without first "offer[ing him] the

opportunity to correct" his financial disclosures. Pl.'s Opp'n 18. He protests that the Port Authority's "code of ethics" called for the Port Authority to first "inform him" of the mistakes. *Ibid.* But no reasonable factfinder could determine that defendants engaged in arbitrary or conscience-shocking behavior by investigating or reprimanding him for violating a policy, merely because the policy was conveyed orally rather than in writing. Nor could a reasonable factfinder conclude that defendants committed acts that shocked the conscience because they did not offer Mr. Porter "the opportunity to correct" apparent financial-disclosure violations, *ibid.*, before he was arrested for receiving undisclosed payments. Even taking all of Mr. Porter's factual allegations together and viewing them in the light most favorable to him, Mr. Porter paints only a picture of investigators who were "at most a bit overzealous" in investigating a high-ranking employee at the Port Authority. *Chalfy*, 804 F.2d at 22. Because Mr. Porter has failed to adduce facts supporting a claim of conscience-shocking harassment, defendants are entitled to summary judgment on this claim.

### IX. Section 1985 and 1986 Claims

Mr. Porter's claims under Section 1985 and Section 1986 fail. Section 1985 prohibits conspiring to deprive a person of equal protection of the laws or of equal privileges and immunities, based on race "or perhaps otherwise class-based, invidious discriminatory animus." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (citation omitted). To survive a motion for summary judgment on a Section 1985 claim, a plaintiff must therefore "come forward with at least some credible evidence" of such animus. *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (citations omitted); *see Mian*, 7 F.3d at 1088.

Plaintiff has failed to do so. He suggests that his arrests in Florida and New York, Second Am. Compl. ¶¶ 109-111, and his suspension from work, Pl.'s Opp'n 25-28, were motivated by racial animus or constituted retaliation for his testimony in the Croffie matter. But he has proffered no evidence to support these theories. Instead, Mr. Porter "has 'done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race,' " *Grillo*, 291 F.3d at 235 (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)), or to his testimony. That "is not sufficient." *Ibid.*

The failure of plaintiff's Section 1985 claim dooms his Section 1986 claim as well. "[A] § 1986 claim must be predicated upon a valid § 1985 claim." *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (citations omitted). Since Mr.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 44 of 151

Porter v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp. (2022)
2022 Fair Empl.Prac.Cas. (BNA) 113,126

Porter's Section 1985 claim fails, his Section 1986 claim fails too.

### X. *Monell* Claims

Mr. Porter's claims against the Port Authority fail because his claims against the individual defendants fail. Under the *Monell* doctrine, a municipal entity may be held liable under Section 1983 if a constitutional violation was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978); *see Patterson*, 375 F.3d at 226 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989); *Monell*, 436 U.S. at 692-94). Because no constitutional violation was committed against Mr. Porter by the individual defendants, as explained above, *see* pages 13-36, *supra*, no *Monell* claim can lie against the Port Authority*, see Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

### XI. State Discrimination Claim

As Mr. Porter concedes, *see* Pl.'s Opp'n 31, his claim under New York Executive Law 296 must be dismissed because the Port Authority is not bound by single state legislation. *See Dezaio v. Port Auth. of N.Y. and NJ*, 205 F.3d 62, 65-66 (2d Cir. 2000) (affirming that New York and New Jersey's anti-discrimination laws do not apply to the Port Authority because single state legislation will not apply to a bi-state agency). Accordingly, that claim is dismissed.

### CONCLUSION

**\*17** Summary judgment is granted to defendants on all claims.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2022 WL 991978, 2022 Fair Empl.Prac.Cas. (BNA) 113,126

### Footnotes

1    Any retaliation claims that Mr. Porter brings under Section 1981 are dismissed as abandoned. Defendants moved to dismiss plaintiff's Section 1981 claims, invoking the principle that Section "1981 does not provide a separate private right of action against state actors," *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018), such as the Port Authority, *see Sooroojballie v. The Port Authority of New York and New Jersey*, 816 F. App'x 536, 540 (2d Cir. 2020). Since Mr. Porter offered no defense of his Section 1981 claim in his opposition brief, that claim is abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014).

2    Mr. Porter does not specify under which State's laws he brings his state-law claims. The parties, however, assume that New York law applies. *See* Defs.' Mem. 17-20; Pl.'s Opp'n 12-13,15-16. Accordingly, the Court construes Mr. Porter's state claims to be asserted under New York law.

---

**End of Document**                                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4700431
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Araz ALALI, Plaintiff,

v.

Alberto DeBARA, individually, Kyle Wilson,
individually, Edward Austin, individually, George
Marshall, individually, Humberto Morrell,
individually, Matthew Brady, individually,
Anthony Murphy, individually, Robert Gazzola,
individually, Patrick J. Carroll, individually, and
the City of New Rochelle, New York, Defendants.

No. 07-CV-2916 (CS).
|
Oct. 24, 2008.

**Attorneys and Law Firms**

Jonathan Lovett, Esq., Drita Nicaj, Esq., Lovett & Gould,
LLP, White Plains, NY, for Plaintiff.

Lalit K. Loomba, Esq., Peter A. Meisels, Esq., Wilson, Elser,
Moskowitz, Edelman & Dicker, LLP, White Plains, NY, for
Defendants.

## MEMORANDUM DECISION AND ORDER

SEIBEL, District Judge.

**\*1** Before this Court is Defendants' motion for summary
judgment, filed on May 30, 2008, (Doc. 32), and Plaintiff's
motion for further discovery pursuant to Fed.R.Civ.P. 56(f),
filed on October 3, 2008. (Doc. 49.) For the reasons stated
below, Plaintiff's motion is granted and Defendants' motion is
denied without prejudice to renewal following the completion
of discovery.

## I. *Background*

Plaintiff Araz Alali is a police officer of Iraqi national
origin employed by the New Rochelle Police Department
("NRPD"). (Defs. 56.1 ¶ 12.[1]) Plaintiff contends that he
is "the only Police Officer of Middle Eastern descent
who has ever been employed by the City of New
Rochelle." (Pl.Counter.1.[2]) This case (07-cv-2916, "Alali

II") is the second of four related cases Plaintiff has filed
alleging unlawful discrimination and retaliation by the City
and various police officers in its employ on the basis of
Plaintiff's Iraqi national origin.

### A. Alali I

Plaintiff filed his complaint in the first related case
on February 21, 2007, (07-cv-1296, "Alali I"), alleging
that Defendants NRPD Captain Robert Gazzola, NRPD
Commissioner of Police Patrick J. Carroll and the City of New
Rochelle, New York (the "City") subjected him to unlawful
discrimination and retaliation because of his Iraqi national
origin and in retaliation for his filing of a complaint with the
United States Equal Employment Opportunity Commission
("EEOC") on February 13, 2007. (Alali I, Doc. 1, "Mali
I Compl.") Plaintiff asserted violations of: (1) 42 U.S.C. §
1981; (2) 42 U.S.C. § 1983; (3) Title VII, 42 U.S.C. § 2000e,
et seq.,; and (4) Section 296 of the New York State Executive
Law.

The instances of discrimination and retaliation alleged in
Alali I span the period from Plaintiff's February 2002
transfer from the New York Police Department through the
date the Alali I Complaint was filed. Specifically, Plaintiff
claimed that he was repeatedly addressed as: "terrorist";
"Ali Baba"; "Camel Jockey"; and "Ali", and that the Alali
I Defendants were aware of and encouraged such name
calling. (Pl.Counter.¶ 14.) Plaintiff further alleged that he was
repeatedly denied meaningful specialized training routinely
provided to officers of lesser seniority than Plaintiff; forced
to attend a seminar called "Tools for Tolerance Post 911" for
the purpose of humiliating Plaintiff; purposely given false
"below standard" job performance evaluations as a predicate
for barring Plaintiff from working overtime; assigned to
"walking posts" and restricted to issuing parking tickets
in order to degrade Plaintiff; subjected to "investigations"
based on false accusations of wrongdoings; and served with
frivolous disciplinary charges in retaliation for his filing of
the EEOC complaint. (Pl.Counter.¶¶ 14-27.)

Plaintiff was deposed for the purpose of qualified immunity
on June 25, 2007, and July 10, 2007, and on August
2, 2007, the Alali I Defendants moved for summary judgment
on the grounds of qualified immunity and absolute immunity.
(Defs. 56.1 ¶¶ 19, 20.) In opposition, Plaintiff's counsel
filed an affirmation submitting that the motion should be
denied pursuant to Fed.R.Civ.P. 56(f) with leave to renew
following the completion of discovery. (Pl. 56.1 ¶ 21.[3])

By memorandum and order dated January 31, 2008, the Court (Brieant, J.) granted the Alali I Defendants' motion for summary judgment on the grounds that: (1) Carroll and Gazzola were protected by the doctrine of absolute immunity against discrimination claims based upon the preferment of disciplinary charges against Plaintiff; (2) Carroll and Gazzola were protected by the doctrine of qualified immunity from Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983, as well as New York State Executive Law § 296; and (3) Plaintiff failed to state a claim against the City under 42 U.S.C. §§ 1981 and 1983, or under Title VII, 42 U.S.C. § 2000e. (Alali I, Doc. 19.) Plaintiff filed a notice of appeal on February 29, 2008. (Alali I, Doc. 21.)

**B. Alali II**

**\*2** Plaintiff commenced the present case on April 11, 2007. In the Alali II complaint, Plaintiff alleges that Defendants Gazzola, Carroll, NRPD Lieutenant Alberto DeBara, NRPD Sergeant Kyle Wilson, NRPD Sergeant Edward Austin, NRPD Lieutenant George Marshall, NRPD Sergeant Humberto Morrell, NRPD Sergeant Matthew Brady, NRPD Deputy Police Commissioner Anthony Murphy (collectively, the "Individual Defendants") and the City subjected Plaintiff to unlawful retaliation for his filing of the EEOC complaint and the Alali I Complaint. (Doc. 1, "Alali II Compl.") Plaintiff asserts three causes of action in this case; (1) against the City for retaliation in violation of Title VII, 42 U.S.C. § 2000e, et seq.; (2) against all Defendants for retaliation in violation of 42 U.S.C. §§ 1981, 1983; and (3) against all Defendants for retaliation in violation of Section 296 of the New York State Executive Law.

The instances of retaliation alleged in Alali II span the seven-week period from Plaintiff's filing of the Alali I complaint on February 21, 2007, through his filing of the Alali II complaint on April 11, 2007. Plaintiff alleges that all Defendants became aware of the Alali I lawsuit early in this period and that they punished him with further degradation and adverse employment action in retaliation. (Alali II Compl. ¶ 18; Pl. Counter. ¶ 39.) Plaintiff alleges that, at roll call on February 21, 2007, and in the presence of a number of Plaintiff's co-workers, DeBara assigned Plaintiff to a fixed hospital post to watch a prisoner and that DeBara advised Plaintiff that the reason he was doing so was "because he could" (Alali II Compl. ¶ 18; Pl. Opp'n 8[4]; Pl. Counter. ¶ 40) and that, in response to Plaintiff's inquiry as to why he was assigned to the fixed hospital post, Wilson, in the presence of several civilian members of the Police Department, responded, "Get

the fuck out of my face now Raz. Not another word, get out of my face." (Alali II Compl. 18; Pl. Opp'n 8; Pl. Counter. 41.) DeBara later allegedly informed Plaintiff that he would primarily be assigned to a "utility car" going forward, and in the event that utility car services were not required, then he would be assigned to directing traffic, watching suicidal prisoners, performing civilian dispatch work, and transporting prisoners to the County jail. (Alali II Compl. ¶ 18; Pl. Opp'n 8-9; Pl. Counter. ¶ 42.)

Plaintiff further contends that, at roll call on March 7, 2007, in the presence of a number of Plaintiff's co-workers, DeBara assigned Plaintiff to a fixed, foot patrol post in the snow, and when Plaintiff inquired as to why he was given the assignment instead of the probationary officers, he was alleged advised by DeBara, "because we can, we could put you anywhere Bin Laden." (Alali II Compl. ¶ 18; Pl. Opp'n 9; Pl. Counter. ¶ 43.) Plaintiff claims that he asked Morell, who was serving as "desk officer" on March 7, 2007, why he was assigned to foot patrol in the snow, and that Morrell allegedly responded, "because even though you are the most talented police officer you are not above scrutiny and I don't like you, ok, so hurry up and go outside. It's really cold out-bundle up." (Alali II Compl. 18; Pl. Opp'n 9; Pl. Counter. 45.) On March 8, 2007, Morrell and Austin allegedly advised Plaintiff that he was routinely going to be given "undesirable assignments" because he was "a below standards officer" and that Morrell further advised, in Austin's presence, that Gazzola and Marshall had both directed him and other supervisors to give Plaintiff "bad assignments" by reason of his "below standards" rating-a rating which Plaintiff contends was "a descriptive falsely given to Plaintiff by reason of his skin color, national origin and/or ethnicity." (Alali II Compl. ¶ 18; Pl. Opp'n 9; Pl. Counter, ¶ 46.)

**\*3** At roll call on April 7, 2007, Austin allegedly assigned Plaintiff to perform the civilian functions of dispatching police vehicles from the NRPD's radio room, and when Plaintiff inquired why he was given this assignment despite the availability of four probationary officers, Austin allegedly responded, "It looks like you are going backwards like the good old times." (Alali II Compl. ¶ 18; Pl. Opp'n 10; Pl. Counter, ¶ 49). Plaintiff claims that, in connection with his assignment to the radio room, Brady told him, "you better get a good lunch at 800 [hours] since you won't be able to leave the [radio] room, good luck." (Alali II Compl. ¶ 18; Pl. Opp'n 10; Pl. Counter. ¶ 49.) Plaintiff also alleges that Wilson assigned him to work with civilian employees on April 8, 2007, despite the availability of four probationary officers,

and when questioned as to why he was given this assignment, Wilson allegedly responded, "You are an Arab and its Easter. Camel jockeys don't celebrate Easter." (Alali II Compl. ¶ 18; Pl. Opp'n 10; Pl. Counter. ¶ 50.)

On May 24, 2007, Defendants filed a motion to dismiss the Alali II complaint for failure to state a claim. By memorandum and order dated July 19, 2007, this Court (Brieant, J.) denied Defendants' motion to dismiss on all grounds, concluding that: (1) Plaintiff's claims in this action are not improperly duplicative of Plaintiff's claims in Alali I because the Alali II complaint alleges a continuing series of new and additional instances of discrimination and retaliation; (2) Plaintiff's assertions that he was assigned to inferior posts stated facts sufficient to state a claim of adverse employment actions for the purposes of a motion to dismiss; (3) Defendants Gazzola, Carroll and Murphy were not entitled to absolute immunity; and (4) the claim against the City could not be dismissed because of Plaintiff's allegations concerning "the three policy making Defendants," Murphy, Gazzola, and Carroll. (Doc. 24.)

Following a pretrial conference on December 7, 2007, the late Judge Brieant, to whom this case was initially assigned, [5] entered a civil discovery plan and scheduling order dated December 11, 2007. (Doc. 27, the "Scheduling Order.") The Scheduling Order required Defendants, if they wanted to assert the defense of qualified immunity, to depose Plaintiff within 30 days of the Scheduling Order concerning all facts relevant to the issue of qualified immunity and then, within 30 days thereafter, file a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) or for summary judgment pursuant to Fed.R.Civ.P. 56, limited to the issue of qualified immunity, with Plaintiff's version of the events assumed true for the purposes of the motion.

At Defendants' request and with Plaintiff's consent, Judge Brieant extended the deadline for Plaintiff's deposition on qualified immunity (Doc. 28.); extended the deadline for Defendants' filing of a summary judgment motion on qualified immunity (Doc. 29.); and extended the deadline for the completion of discovery to 90 days after this Court's decision on qualified immunity. (Doc. 31.) Accordingly, Plaintiff's deposition was taken on March 14, 2008, and continued on April 4, 2008, and Defendants moved for summary judgment on May 30, 2008. (Doc. 32.) Opposition papers [6] were filed on August 15, 2008. (Doc. 42.) Reply papers were filed on September 17, 2008. (Doc. 45.) Oral argument was heard on September 26, 2008, and, at the

Court's request, on October 3, 2008, Plaintiff's counsel Drita Nicaj filed an affidavit in support of Plaintiff's motion for further discovery pursuant to Fed.R.Civ.P. 56(f). (Doc. 49, "Nicaj Aff.") Defendants filed a memorandum of law in opposition to Plaintiff's motion for further discovery on October 10, 2008. (Doc. 50, "Defs.56(f) Opp'n.") Discovery was stayed in this case and all related cases pending this Court's decision on Defendants' summary judgment motion. [7]

## II. *Discussion*

### A. The Preclusive Effect of Alali I

*4  As a threshold matter, this Court must determine the preclusive effect, if any, of Judge Brieant's order granting the Alali I Defendants' motion for summary judgment. [8] Defendants contend that the Alali I summary judgment order is binding on Plaintiff in the instant action "because the factual and legal issues raised in Alali I are identical, the issues were necessarily decided on the merits and [Plaintiff] had a full and fair opportunity to litigate the Court's decision." (Defs.Mem.14. [9] ) Plaintiff argues that Judge Brieant's order denying Defendants' motion to dismiss Plaintiff's claims in Alali II renders the doctrines of collateral estoppel and res judicata inapplicable. (Pl. Opp'n 3, 30. [10] )

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288-289 (2d Cir.N.Y.2002) (citations omitted). Collateral estoppel applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Id.* (quoting *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d. Cir.1998)). Claims adjudicated through summary judgment are regarded as final judgments on the merits. *Colonial Acquisition Partnership v. Colonial at Lynnfield, Inc.,* 697 F.Supp. 714, 718 n. 5 (S.D.N.Y.1988). "Collateral estoppel applies once final judgment is entered in a case, regardless of whether an appeal from that judgment is pending." *Christopher D. Smithers Found, Inc. v. St. Luke's-Roosevelt Hosp. Ctr.,* 00 Civ. 5502(WHP), 2003 U.S. Dist. LEXIS 373, at *6, 2003 WL 115234 (S.D.N.Y. Jan. 13, 2003) (citing *Chariot Plastics, Inc. v. United States,* 28 F.Supp.2d 874, 881 (S.D.N.Y.1998)). Although the Alali I summary judgment order is a final judgment on the merits, it does not

have a collateral estoppel effect on Plaintiff's allegations of retaliatory conduct occurring subsequent to the filing of Alali I because those facts were not before the Court and therefore the specific issues they raise were never litigated or decided. *See El v. City of New York,* 04 Civ. 1591(LMM), 2007 U.S. Dist. LEXIS 46443, at * 16-17, 2007 WL 1834692 (June 26, 2007) (collateral estoppel inapplicable to summary judgment order where plaintiff alleged facts in subsequent action not before the Court in prior action).

The doctrine of res judicata is equally inapplicable to the retaliatory conduct alleged in the Alali II Complaint. "Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action." *Marvel Characters,* 310 F.3d at 286-87 (citations omitted). Whether a claim that was not raised in the previous action could have been raised therein "depends in part on 'whether the facts essential to support the second were present in the first.' " *Id.* (quoting *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992)). Consequently, claim preclusion "does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 139 (2d Cir.2000). Therefore, the Alali I summary judgment order has no res judicata effect on Plaintiff's allegations of retaliatory conduct occurring after the date the Alali I complaint was filed. *See id.* ("The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events; [a] plaintiff may simply bring a later suit on those later-arising claims.")

**\*5** The question of the collateral estoppel effect of Alali I on the issue of absolute immunity in this case follows a more winding path to the same conclusion. Tracing the chronology of the orders at issue, first, on July 19, 2007, Judge Brieant denied Defendants' motion to dismiss Plaintiff's claims in this case against Gazzola, Carroll and Murphy, reasoning that their alleged agreement to prefer disciplinary charges against Plaintiff was akin to the situation where an official acts as a supervisor of public employees and therefore did not give rise to absolute immunity from liability. Second, on January 31, 2008, Judge Brieant granted Defendants' summary judgment motion in Alali I, dismissing Plaintiff's claims against Gazzola and Carroll on the grounds that their "decision to initiate disciplinary proceedings against Plaintiff based on multiple acts of misconduct is entitled to absolute immunity." Unsurprisingly, Defendants contend that this Court is bound by the Alali I order (Defs.Mem.14-15.),

while Plaintiff argues that the Alali II order controls. (Pl. Opp'n 31 n. 11.)

Fortunately, I need not venture much further into this thicket because the alleged frivolous disciplinary charges are not at issue in this case. Although Plaintiff's Alali II Complaint does refer to the disciplinary charges (Alali II Compl. ¶ 16), those allegations were already made in the Alali I Complaint. (Alali I ¶ 13.) Accordingly, Plaintiff's references in the Alali II Complaint and in his opposition papers to the frivolous preferment of disciplinary charges-as well as the other specific allegations previously asserted in Alali I-are construed as relevant in this case for background purposes only. *See Curtis,* 226 F.3d at 139 ("[P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant[s] at the same time."). Indeed, Plaintiff himself lists the disciplinary charges among the facts which culminated in the filing of Alali I (Pl. Opp'n 4-6) rather than including it in the material facts of Alali II. (Pl. Opp'n 8-11.) Plaintiff's counsel confirmed this distinction at oral argument, stating that, "with respect to the issues in this claim, in this case, there are no assertions of preferring of disciplinary charges." (Summ. J. Hr'g Tr. 22, Sep. 26, 2008.) With this point now clarified, it is clear that Judge Brieant's decision in Alali I that Gazzola and Carroll have absolute immunity from liability for their preferment of disciplinary charges against Plaintiff has no preclusive effect on the distinct alleged retaliatory conduct at issue in this case. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 394 (2d Cir.2006) ("[T]he critical inquiry is not the official position of the person seeking absolute immunity, but the specific action for which that person seeks immunity.").

## B. Qualified Immunity and the Need for Additional Discovery

A government official sued in his individual capacity is entitled to qualified immunity: (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was "objectively legally reasonable ... in light of the legal rules that were clearly established at the time it was taken." *Munafo v. Metro. Transp. Auth,* 285 F.3d 201, 210 (2d Cir.2002) (internal citations omitted).[11] On a motion for summary judgment, the plaintiff must first make out a prima facie case of discrimination or retaliation. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). The burden of

proof at the prima facie stage is *de minimis. Id.* If the plaintiff meets this burden, the defendant must offer a legitimate non-retaliatory reason for its actions. *Id.* If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is a mere pretext for retaliation. *Id.*[12]

**\*6** To establish retaliation, Plaintiff must show that: (1) he was engaged in an activity protected under anti-discrimination statutes; (2) Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took adverse action against Plaintiff based upon his protected activity; and (4) there is a causal connection between Plaintiff's protected activity and the adverse action taken by defendants. *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 105 (2d Cir.2001). Finally, while individuals are not subject to liability under Title VII, *Wrigthen v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000), a Plaintiff seeking to hold an individual personally liable for retaliation under Sections 1981 and 1983, 42 U.S.C. §§ 1981, 1983, must demonstrate that the defendant was "personally involved" in the retaliatory conduct at issue. *Ifill v. UPS,* No. 04 Civ. 5963(LTS)(DFE), 2005 U.S. Dist. LEXIS 5230, at \*8, 2005 WL 736151 (S.D.N.Y. Mar. 29, 2005) (citing *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir.2000)).

Defendants argue that Plaintiff has failed to establish the awareness of protected activity and causal connection elements of his prima facie case. Defendants' further argue that Plaintiff has failed to demonstrate that certain Defendants had any personal involvement in the alleged retaliatory conduct at issue. In addition to opposing on the merits, Plaintiff has filed a motion for further discovery pursuant to Fed.R.Civ.P. 56(f).

A party resisting summary judgment on the ground that it needs additional discovery pursuant to Rule 56(f) "must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.N.Y.2003) (internal quotation marks and citations omitted). "Fed.R.Civ.P. 56(f) provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the

motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 386 (2d Cir.2001). Accordingly, "summary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " *Hellstrom v. United States Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (internal quotation marks omitted) (alterations in original) (emphasis in original). The nonmoving party "should not be 'railroaded' into his offer of proof in opposition to summary judgment" and "must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (internal quotations and citations omitted); *Hellstrom,* 201 F.3d at 97 ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.")

**\*7** However, "[e]ven where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.,* 265 F.3d 97, 117 (2d Cir.2001). Courts are particularly reluctant to allow additional discovery in the face of a summary judgment motion where the requests are "put forth by parties who were dilatory in pursuing discovery." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1139 (2d Cir.1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 927 (2d Cir.1985)); *see Nat'l Union,* 265 F.3d at 117 (denying motion for further discovery where, after 17 month investigation followed by 11 months of formal document discovery, plaintiff sought "opportunity to explore the possibility" of alternative cause of production line flaw that was not supported by existing evidence); *Bilal v. Best Buy Co.,* No. 06-CV-4015 (KMK), 2008 U.S. Dist. LEXIS 53468, at \*14 (S.D.N.Y. June 30, 2008) (denying motion for additional discovery where the plaintiff waited until three weeks before the close of discovery and eight months after filing his complaint to make any discovery requests or notice any depositions).

Plaintiff's motion seeks further discovery as to "Defendants' motives and knowledge" concerning Plaintiff's filing of a charge of discrimination with the EEOC and filing of Alali I. (Nicaj Aff. ¶ 3.) Plaintiff claims that he "has

been prevented from developing the evidence which in good faith he believes will demonstrate the retaliatory and/ or discriminatory motivations of Defendants which is in Defendants' possession, custody and/or control." (Nicaj Aff. ¶ 4.). Defendants argue that Plaintiff's motion for further discovery should be denied because he "has not described what this evidence is or how he intends to obtain it," and, therefore, his request is no more than a "bare assertion" that is "based on speculation as to what potentially could be discovered." (Defs.56(f) Opp'n 1, 3.) Specifically, Defendants argue that Plaintiff's deposition testimony "offers only rank speculation that the Individual Defendants were aware of the EEOC charge and the commencement of Alali I at the time they allegedly engaged in retaliatory conduct." (Defs.56(f) Opp'n 2.)

In a retaliation action based on the filing of a prior discrimination complaint, the plaintiff must establish that each defendant was personally aware of the prior complaint at the time he engaged in the alleged retaliatory conduct at issue. *See Richards v. New York City Police Dep't,* 97 Civ. 5828(RPP), 1999 U.S. Dist. LEXIS 7221999 WL 33288 (S.D.N.Y. Jan. 22, 1999) (plaintiff's "vague allegation" that it was "common knowledge" that she filed prior discrimination complaints held insufficient to establish knowledge on the part of those allegedly retaliating against her). Unsubstantiated speculation that an individual with awareness of a prior complaint "must have" informed a defendant of the prior complaint based merely on their relationship with one another is insufficient to establish awareness. *Montanile v. NBC,* 211 F.Supp.2d. 481, 488 (S.D.N.Y.2002).

**\*8** Here, Plaintiff's argument that Defendants Wilson, Austin, Marshall, Morrell, and Brady [13] were aware of the EEOC complaint or the Alali I complaint at the time of their alleged retaliatory conduct is based exclusively on Plaintiff's deposition testimony that "the whole department was talking about it" and that "[t]here was talk in the radio room and the locker room among all the other officers." (Alali Dep. 121-22., Mar. 14, 2008.) This alone is insufficient to establish (or determine that Plaintiff cannot establish) the awareness element of Plaintiff's prima facie case against these individuals. [14] Accordingly, further discovery is necessary. In this regard, this case is distinguishable from *Montanile,* where summary judgment was granted *after* the plaintiff had the opportunity to depose the defendant and the defendant testified that she had no knowledge of the plaintiff's complaint prior to firing her. 211 F.Supp.2d. at 488.

Further, although insufficiently vague to survive a motion for summary judgment at the close of discovery, Plaintiff's testimony that he overheard officers talking in the radio room and locker room about his prior complaints distinguishes this case from the utter lack of any evidentiary basis for establishing awareness in *Richards.* 1999 U.S. Dist. LEXIS 722, at *27-28, 28 n. 3, 1999 WL 33288 ("Plaintiff testified repeatedly that she was depending on 'a rule of thumb,' 'that it's automatic,' that 'when you ... go outside the Police Department' you are retaliated against ... and she refused to identify any person who mentioned or specifically manifested knowledge of her [prior complaint].")

Despite Defendant's claim that Plaintiff has failed to identify what evidence he seeks or how he intends to obtain it, it is clear that Plaintiff intends to obtain evidence of the Individual Defendants' motives and knowledge through depositions of them and others. This Court will not hold Plaintiff to a high standard of precision in describing what information he hopes to obtain because the information sought is at least largely in the Defendants' possesion, and Plaintiff has not had the opportunity to develop the record through discovery. *See Hellstrom,* 201 F.3d at 97 (reversing grant of summary judgment in First Amendment retaliation case where plaintiff was precluded from taking deposition of defendant to support his claim that employer was motivated to deter him because of his protected speech); *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 374 (reversing "over-hasty" and "premature" grant of summary judgment in an employment discrimination case where plaintiff had insufficient opportunity "to explore the motivations and reasons for terminating her employment"); *Fitzgerald v. Henderson,* 251 F.3d 345, 362 (2d Cir.2001) (observing that where the district court denied the plaintiff any opportunity to conduct discovery and considered a partial summary judgment motion filed two months after the filing of the complaint, "faulting [plaintiff] for failure to make a showing of ... matters that would ... be beyond her personal knowledge [ ] was incompatible with the court's denial of discovery").

**\*9** *Bill Diodato Photography, LLC v. Kate Spade, LLC,* 388 F.Supp.2d 382 (S.D.N.Y.2005), and *Delena v. Verizon N.Y. Inc.,* 02-CV-0372C(F), 2006 U.S. Dist. LEXIS 53576, 2006 WL 2224424 (W.D.N.Y.Aug.2, 2006), on which Defendants rely, are distinguishable. In *Kate Spade,* the Court denied the plaintiff's motion for additional discovery on the grounds that the evidence sought "could not alter the analysis" as to the viability of the plaintiff's claims. 388 F.Supp. at 395. For the reasons stated above, it is clear that new

evidence regarding the Individual Defendants' awareness of the prior complaints could alter the analysis of Plaintiff's claims. Further, additional discovery was denied in *Delena* on multiple grounds not present here, including that the plaintiff sought disclosure of evidence previously denied by the Court prior to the close of discovery; the plaintiff had ample opportunity to pursue the evidence sought during discovery; the plaintiff failed to demonstrate how the evidence sought would create a genuine issue of material fact; and the plaintiff was already in possession of evidence sufficient to establish the facts she claimed the additional evidence would support. *Delena,* 2006 U.S. Dist. LEXIS 53576, at *5-8, 2006 WL 2224424.

Finally, Defendants appropriately do not argue that Plaintiff was dilatory in failing to notice depositions prior to opposing summary judgment. To the contrary, when Defendants wrote to the Court on January 29, 2008, requesting an extension of the deadline to take Plaintiff's deposition testimony for the purposes of their summary judgment motion, they cited "circumstances beyond [Plaintiff's counsel's] control." (Doc. 28.) Discovery is not closed in this case and it is clear that the parties intended discovery to commence should Plaintiff's claims survive Defendants' summary judgment motion on qualified immunity grounds. Indeed, Judge Brieant granted Defendants' request that the discovery cutoff in this action be extended to a date 90 days after this Court's decision on qualified immunity. (Doc. 31.)

For the reasons stated above, Plaintiff's motion for additional discovery is granted. Depositions should clarify the facts of the case as they relate to the elements of Plaintiff's claims against each of the Individual Defendants. Should Defendants decide to renew their motion for summary judgment at the close of discovery, I will expect Plaintiff's opposition to cite to specific facts in support of his claims against each Individual Defendant, including but not limited to: that Defendant's awareness of the prior complaints, that Defendant's personal involvement in the alleged retaliatory conduct; and individualized evidence, if any, of that Defendant's retaliatory animus. Vague "group pleadings" will not be sufficient to survive summary judgment.

### III. *Conclusion*

It is hereby **ORDERED** that Plaintiff's motion for further discovery pursuant to Fed.R.Civ.P. 56(f) is **GRANTED,** and that Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is **DENIED** without prejudice to renewal following the completion of discovery.

**\*10** The Parties shall have until January 26, 2009 to complete discovery. The parties are directed to appear for a subsequent conference on February 13, 2009 at 9:30 a.m.

The Clerk of Court is respectfully directed to terminate the pending motion. (Doc. 32.)

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4700431

---

### Footnotes

1    "Defs. 56.1" refers to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, filed on May 30, 2008. (Doc. 33.)

2    "Pl. Counter." refers to Plaintiff's Counter-Statement of Material Facts in Dispute, filed on August 15, 2008. (Doc. 43.)

3    "Pl. 56.1" refers to Plaintiff's Response to Defendants' Statement Pursuant to 56.1, filed on August 15, 2008. (Doc. 43).

4    "Pl. Opp'n" refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed on August 15, 2008. (Doc. 42.)

5     This case was reassigned to the undersigned on August 5, 2008. (Doc. 40.)

6     In his opposition papers Plaintiff alleges, for the first time, additional purported instances of retaliatory conduct that occurred after April 11, 2007, the date on which the Alali II complaint was filed. These allegations include an instance on April 20, 2007, concerning the alleged failure of the NRPD to provide back-up to assist Plaintiff in an arrest, Morrell's alleged theft of $300 from Plaintiff's memo book on May 30, 2007, and Plaintiff's being suspended without pay on August 31, 2007. (Pl.Counter.¶¶ 53-63). This Court will not consider these allegations in deciding this motion because it is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment. *Kearney v. County of Rockland,* 373 F.Supp.2d 434, 440-441 (S.D.N.Y.2005) (collecting cases); *Southwick Clothing LLC v. GFT (USA) Corp.,* No. 99 Civ. 10542, 2004 U.S. Dist. LEXIS 25336, at *20-21, 2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in Plaintiff's opposition papers, and hence such new allegations and claims should not be considered ....").

7     Alali II was consolidated with Alali III (07-CV-9912) and Alali IV (08-cv-4273) for pretrial purposes. (Doc. 47.) Alali III, filed on April 11, 2007, concerns Plaintiff's allegations that the City subjected him to discriminatory treatment on the basis of his national origin, ethnicity and/or color and retaliated against him following the filing of Alali I and Alali II, (Alali III, Doc. 1). Plaintiff commenced Alali IV on May 6, 2008, alleging that the City subjected him to disparate treatment by imposing a sixty-day suspension without pay, which Plaintiff claims was motivated by reason of his national origin, assertion of his rights pursuant to Title VII, and/or his whistle-blowing with regard to departmental corruption. Alali IV also includes Plaintiff's claim that the prospective exercise of his First Amendment rights was chilled by Defendant's actions. (Alali IV, Doc. 1).

8     Federal law is applied in determining the preclusive effect of a federal judgment. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.N.Y.2002).

9     "Defs. Mem." refers to Defendants' Memorandum of Law in Support of Motion for Summary Judgment, filed on May 30, 2008. (Doc. 38.)

10     "Pl. Opp'n" refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed on August 15, 2008. (Doc. 42).

11     "Because the immunity not only protects against a judgment for damages but also is in part an entitlement not to be forced to litigate, early resolution of the qualified immunity defense is encouraged, and a defendant may properly move for summary judgment dismissing the plaintiff's claim on that basis where there are no genuinely disputed factual issues material to the defense." *Munafo,* 285 F.3d at 210 (internal citations omitted).

12     This framework applies to all four claims in this case. *See, e.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (burden shifting framework applies to both § 1981 and Title VII); *Weinstock,* 224 F.3d at 42 n.l (identical standards apply to employment discrimination claims brought under Title VII and New York Executive Law § 296); *Thomas v. New York City Health & Hosps. Corp.,* 02 Civ. 5159(RJH), 2004 U.S. Dist. LEXIS 17694, at *54 n. 7, 2004 WL 1962074 (S.D.N.Y. Sept. 1, 2004) ("While *McDonnell Douglas* and *Burdine* involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., courts have held that discrimination and retaliation claims brought under 42 U.S.C. §§ 1981 and 1983 follow the same analysis.")

13     The awareness element is not at issue for Carroll and Gazzola because they were identified as perpetrators of alleged discrimination in Alali I. *See Uddin v. City of New York,* 427 F.Supp.2d 414, 427 (S.D.N.Y.2006) (defendant's knowledge of prior discrimination lawsuit established where defendant was alleged discriminator in prior action). This element is also not at issue regarding DeBara because Plaintiff testified that he discussed

the Alali I lawsuit with DeBara at the time DeBara assigned Plaintiff to a fixed hospital post. (Alali Dep. 33-34, Mar. 14, 2008.) In a letter to the Court dated September 26, 2008, Plaintiff claims that Murphy's awareness is established by a letter from Plaintiff's counsel regarding the EEOC Complaint that was faxed to Carroll and Murphy's office on February 12, 2007. (Doc. 48.)

14    The Court recognizes that Defendants did not file their motion for summary judgment on the basis of qualified immunity prematurely, but rather acted in accordance with the Scheduling Order.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2004 WL 1962074
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Barbara THOMAS, John Arceo,
and Nelson Cintron, Plaintiffs,
v.
NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION and Frank Taormina, Defendants.

No. 02 Civ. 5159(RJH).
|
Sept. 2, 2004.

OPINION

HOLWELL, J.

**\*1** Plaintiffs Barbara Thomas ("Thomas"), John Arceo ("Arceo"), and Nelson Cintron ("Cintron") (collectively "plaintiffs") brought this action against their current employer, the New York City Health and Hospitals Corporation ("HHC"), and their former supervisor, former HHC employee Frank Taormina ("Taormina") (collectively "defendants"), alleging hostile work environment, disparate treatment, and retaliation in violation of 42 U.S.C. §§ 1981 and 1983; New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYHRL"); [1] and the New York City Human Rights Law contained in Article 8 of the New York City Administrative Code ("NYCHRL"). Defendants moved for summary judgment, and also moved to strike three of the declarations submitted by plaintiffs in opposition to the motion for summary judgment. Defendants' motion to strike is denied, and their motion for summary judgment is granted in part and denied in part, for the reasons set forth below.

BACKGROUND

Unless otherwise noted, the following facts are not in dispute. [2] All three plaintiffs are non-white, and are and were at all periods relevant to this action employed as security officers at Jacobi Medical Center ("Jacobi"), a hospital operated by HHC, a public corporation. (Defs.' 56.1 ¶¶ 6, 38, 51.) On or about March 10, 1998, Taormina, who is white, became the Director of Hospital Security at Jacobi,

and was plaintiffs' supervisor until he left this position on or about October 8, 2002. (Taormina Decl. ¶ 1.) Plaintiffs allege that they were subjected to disparate treatment, harassment, a hostile work environment, and unlawful retaliation at the hands of Taormina because of their race, skin color, or ethnicity.

*Barbara Thomas*

Thomas, an African–American woman, has been employed by HHC since about October 9, 1990, and was working as a security officer at Jacobi at the time that Taormina became Director of Hospital Security. (Defs.' 56.1 ¶ 6.) She had had no disciplinary problems or unsatisfactory performance evaluations prior to being supervised by Taormina. (Thomas Decl. ¶ 4.) During Taormina's tenure as her supervisor, however, three workplace incidents convinced Thomas that Taormina was discriminating against her because of her race. The first was a verbal altercation between the two on December 10, 1998, arising out of a criminal summons Thomas issued to a Jacobi elevator operator who had allegedly assaulted her and called her a racially offensive name. (Defs.' 56.1 ¶¶ 8—10.) Taormina was unhappy with the form of the summons or the procedure by which Thomas had obtained it, and directed Thomas to void it. (*Id.* at ¶ 12.) A heated argument ensued, during which Taormina, upon hearing that the elevator operator had called Thomas a "black bitch," allegedly said, "I agree." (*Id.* at ¶ 11.) As a result of this exchange, Thomas was suspended from duty and charged with insubordination and falsification of legal documents. (*Id.* at ¶¶ 14—15.) The Office of Labor Relations at Jacobi held a disciplinary proceeding against Thomas on January 13, 1999, at which both Thomas and Taormina testified and at the conclusion of which the hearing officer recommended that Thomas be terminated. (*Id.* at ¶¶ 18—20.) Thomas appealed that recommendation to the City of New York Office of Administrative Trials and Hearings ("OATH"). (*Id.* at ¶ 21.) Pursuant to that appeal, a trial was held on April 7, 2000 at which Thomas was represented at trial and proffered testimony on her own behalf. (*Id.* at ¶ 22.) The presiding Administrative Law Judge ("ALJ") issued a report and recommendation dated June 3, 1999, finding that Thomas had improperly refused to comply with her commanding officer's lawful order and had been insubordinate and verbally abusive, and recommending as a penalty a 15–day suspension. (Goldenberg Decl. Ex. H at 14—15.) The ALJ noted that Thomas' misconduct "would warrant a lengthy suspension despite her unblemished employment record," but that "her supervisor's misbehavior" (*i.e.,* Taormina's being "the first to elevate the volume and hostility level of the

discussion, particularly by endorsing the racial epithet"), was a "mitigating factor." (*Id.* at 13, 15.) The Office of Labor Relations accepted the ALJ's recommendation, and on or about April 18, 2000, the HHC's Personnel Review Board affirmed the determination on appeal by Thomas. (Defs.' 56.1 ¶¶ 25—26.)

**\*2** During the period that Thomas' disciplinary charges were being processed, Thomas filed complaints with the New York State Division of Human Rights and the New York City Commission of Human Rights in connection with the December 10 incident. (*Id.* at ¶ 27—28.)

The second incident involving Thomas arose when Thomas developed an infected ulcer on her foot that required her to visit the emergency room at Jacobi on or about February 25, 2001. (O'Neill Decl. Ex. B at 67, Ex. F.) Thomas subsequently went on medical leave. In a letter dated August 22, 2001, Taormina informed Thomas that since Jacobi's records "indicate that you have been absent ... since February 26, 2001," Thomas would have to submit a doctor's note indicating prognosis and date of return to work, or else she would be subject to disciplinary action. (Goldenberg Decl. Ex. M.) Thomas failed to respond to the August 22 letter as required (Goldenberg Decl. Ex. N), although it appears that she had submitted regular "Reports of Continued Disability" to her union during her absence from work, and that each of these forms were signed, stamped and dated by a Jacobi payroll office employee (O'Neill Decl. Ex. F). On or about October 1, 2001, Thomas was charged with Absence Without Official Leave ("AWOL") (Goldenberg Decl. at Ex. O), and in a letter from HHC's Office of Labor Relations ("OLR") dated October 3, 2001, Thomas was directed to contact her department head within three days to explain and document the reason for her absence (*Id.* at Ex. P). Thomas "failed to contact the [OLR] and/or her department regarding her AWOL status." (Goldenberg Decl. Ex. N.) On November 1, 2001, the OLR held a disciplinary conference on the AWOL charge, after which the hearing officer recommended that Thomas be suspended for 30 work days. (*Id.* at Ex. N.) Thomas appealed that recommendation to OATH, but the matter was resolved without a decision on or about January 6, 2004, when Thomas reached an agreement with her employer to serve a suspended five-day suspension on the AWOL charge. (Defs.' 56.1 ¶ 35; Trans. of oral argument, July 14, 2004, 22:19—23:10.) Plaintiffs allege that the AWOL charge in 2001 was Taormina's retaliation against Thomas for complaining to the New York State Division of Human

Rights in March 1999 about Taormina's conduct during the December 10, 1998 incident. (Thomas Decl. ¶ 15.)

The third incident involving Thomas is the change in her tour of duty at Jacobi in early 2001 from the graveyard shift to the day shift. (Defs.' 56.1 ¶ 36; Pls.' 56.1 ¶ 36.) Plaintiffs allege that the tour change was Taormina's further retaliation against Thomas for complaining about Taormina's conduct during the December 10, 1998 incident. (Thomas Decl. ¶ 15; Goldenberg Decl. Ex. D at 103—105.)

*John Arceo*

Arceo, a self-identified minority (Arceo Decl. ¶¶ 22—23) who has worked as a security officer at Jacobi since on or about June 4, 1984 (Defs.' 56.1 ¶ 38), cites three incidents as supporting his claim of employment discrimination. The first incident occurred on or about March 11, 1999, after Arceo participated (with plaintiff Cintron) in the arrest of a patient at Jacobi. (Defs.' 56.1 ¶ 40.) After the incident, Arceo was served with disciplinary charges for, among other things, failing to void Cintron's arrest of the patient so that Taormina had to void it himself, and insubordination for failing to submit a written statement to Taormina about the incident. (*Id.*) The disciplinary charges were all withdrawn and the charges dismissed, upon the unwillingness of one witness to testify and a memo from Taormina to the hearing officer requesting that the charges be dismissed "based on new information received." (Goldenberg Decl. Ex. S.) Arceo filed a grievance with his union about Taormina's "abusive and threatening behavior" immediately after the incident, when Taormina allegedly cursed at him in front of other employees. (O'Neill Decl. Ex. CC.)

**\*3** The second incident was a change in Arceo's tour of duty in or around 1998. (Defs.' 56.1 ¶ 43.) While Arceo's union filed a grievance about the change on his behalf, the grievance was later withdrawn because Arceo was "comfortable on his new tour and [did] not wish to have any further disruption of his lifestyle." (Goldenberg Decl. Ex. U.) Plaintiffs allege that the tour change was Taormina's retaliation against Arceo for reporting on "incompetence and inappropriate behavior" by another employee whom Taormina favored. (Arceo Decl. ¶ 10.)

The third incident arose out of a performance evaluation received by Arceo for the April 1998 to April 1999 period. Taormina wrote a memo dated April 13, 1999, to Arceo's immediate supervisor, Lt. Jesus Roman ("Roman"), informing Ramon that he found the evaluation Roman had

prepared for Arceo "unacceptable" because in it Roman gave Arceo an overall grade of "outstanding," while in Taormina's view (in light of some complaints Arceo had received) a grade of "unsatisfactory" was "a much more accurate evaluation of his performance." (O'Neill Decl. Ex. P.) Roman refused to accede to this instruction. (Roman Decl. ¶ 3.) In a memo with a June 1999 date, Taormina's assistant told Roman that "Frank [Taormina] said give Arceo a satisfactory evaluation, he has been doing good work." (Id. at Ex. Q.) Subsequently, Arceo apparently received an evaluation with a "satisfactory" grade, signed by Roman, Taormina, and Arceo. (Id. at Ex. R.) Arceo did not file an objection to this evaluation rating. (Defs.' 56.1 ¶ 48.)

*Nelson Cintron*

Cintron, a Hispanic man who has worked for HHC as a security officer since on or about January 2, 1979 and had never had any disciplinary charges brought against him prior to being supervised by Taormina (Cintron Decl. ¶ 21), cites as evidence of discrimination several instances in which Taormina brought disciplinary action against him. First, in an incident on March 11, 1999 incident referred to above, Cintron arrested a patient who had assaulted him in the psychiatric ward. (Defs.' 56.1 ¶ 53—54; Cintron Decl. ¶¶ 7—9.) Taormina wanted the arrest voided, and a dispute ensued over the propriety of the arrest. (Taormina Decl. ¶ 13; Cintron Decl. ¶¶ 10—13.) According to Cintron and a then-coworker who witnessed the incident, Taormina acted in a physically aggressive way toward Cintron during this incident and said, "I am going to take to take your job, you fucking Spic." (Cintron Decl. ¶ 10—11; Muniz Decl. ¶¶ 6—7.) Taormina denies having made this statement. (Taormina Decl. ¶ 14.) Cintron was later charged with eight disciplinary offenses resulting from this incident (Defs.' 56.1 ¶ 58.). A hearing was held on the charges (Id. at ¶ 59), and during the hearing and pending the decision, Cintron was suspended without pay (Cintron Decl. ¶ 15). Cintron pled no contest to the charges for the "sole reason" that "I was not receiving any salary during the time I was out," and after pleading no contest "I would then immediately return to work with pay." (Id. at ¶ 16.) Cintron received a penalty of a 27–calendar day suspension. (Defs.' 56.1 ¶ 60.) Cintron filed a complaint with the internal Inspector General's Office of Jacobi about the incident. (Cintron Decl. 17.)

**\*4** Two more charges were preferred against Cintron in mid–2000, accusing him of falsifying his time sheet and acting insubordinately by refusing his supervisor's order to turn over his memo books. (Defs.' 56.1 ¶ 62—63.) Cintron

was found guilty after a hearing and a 30–day suspension was recommended. (Id. at ¶ 64.) A third set of charges was served on Cintron on or about August 23, 2000, in which he was charged with abandonment of post, failure to follow procedure, and being AWOL. (Id. at ¶ 67.) Cintron was found guilty of two of the charges after a hearing, and the hearing officer recommended that he be terminated. (Id. at ¶¶ 68—69 .) Cintron appealed both decisions to OATH, and ultimately entered into a stipulation with HHC pursuant to which he pled guilty to some of the charges and agreed to a 20–day suspension. (Id. at ¶¶ 66, 71.) Cintron believes that the 2000 disciplinary charges were brought against him as retaliation for the March 11 incident and the complaint that Cintron filed regarding Taormina's conduct during that incident. (Cintron Decl. ¶ 17.)

In addition to the disciplinary charges, Cintron cites his tour change in or around March 1999 as another instance of harassment by Taormina, who denied Cintron's request not to be changed even though the change would pose a hardship. (Id. at ¶¶ 4—6.) Cintron alleges that Taormina's treatment of him was racially motivated. (Id. at ¶ 21.)

DISCUSSION

Before examining the parties' arguments and evidentiary submissions in support of and opposition to the summary judgment, the court must resolve issues raised by defendants as to the scope of the allegations and the evidence that the court may consider in deciding this motion.

*A. Motion to Strike*

Defendants move, pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, to strike the declarations of non-parties Jesus Roman, Jonathan Muniz, and Eunice Rodriguez, which plaintiffs submitted in opposition to the summary judgment motion. Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) [of the Federal Rules of Civil Procedure] ... is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1); *see Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.,* 262 F.Supp.2d 50, 61 (S.D.N.Y.2003). Rule 26(a) requires, *inter alia,* that each party to an action provide other parties with "the name ... of each individual likely to have

discoverable information that the disclosing party may use to support its claims or defenses." Fed.R.Civ.P. 26(a)(1)(A).

In support of their argument, defendants submit a portion of a transcript of a pretrial conference with the court purportedly demonstrating plaintiff's violation of the court's directive. However, the transcript makes clear that plaintiffs did make disclosure pursuant to Rule 26(a)(1). (Transcript of Conference before Hon. Shira A Scheindlin, July 29, 2003 (Trans."), 12:18—20.) Defendants wanted to know which of the seventeen individuals identified by plaintiffs would likely provide declarations at the summary judgment stage, so that defendants would know which individuals to depose. (Trans.13:5—9.) The court twice advised defendants' counsel to ask plaintiffs' counsel which of the seventeen he would use. (Trans.15:7—8, 16—18.) The court also directed defendants' counsel to tell plaintiffs' counsel who would provide declarations. (Trans.16:3.)

*5 Defendants do not allege either that the three individuals whose declarations are at issue were not disclosed in plaintiffs' 26(a)(1) materials or that plaintiffs' counsel refused to provide information reasonably sought by defendants. They merely argue that the court ordered plaintiff to specifically identify which of the individuals already disclosed would supply declarations. This, they argue, "would allow defendants to depose these individuals." (Defs.' Mem. of Law in Supp. of Their Mot. to Strike, at 2.) Yet, as the court pointed out at the pretrial conference, defendants were not prevented from deposing identified non-party witnesses (Trans.13:10—11), and they were repeatedly encouraged to ask plaintiffs' counsel whom to depose. Judging solely by this transcript, the court can only conclude that defendants' counsel omitted to ask plaintiffs' counsel to narrow down his list, and that plaintiffs' counsel failed to do so unprompted. The apparent neglect of both sides on this matter does not rise to the level of noncompliance with a court order, and does not justify the court's exclusion of evidence submitted by plaintiff; the court therefore declines to do so. This motion is denied.

### B. Waiver and Claim Preclusion
Some of the incidents alleged in the complaint involving plaintiffs Thomas and Cintron were the subject of an "Improper Practice Petition" [3] filed in or around December 1999 against HHC, Jacobi, and Taormina by plaintiffs' union on behalf of Thomas, Cintron, and other HHC employees. (Goldenberg Decl. Ex. A.) This petition was withdrawn and

the claims settled by stipulation in or around September 2001. (*Id.* at Ex. B.) The stipulation provided, in part:

> The Union hereby waives any rights which it may have had heretofore and agrees not to bring action whether at law, in equity, or in any other proceeding arising by virtue of the Rules and Regulations, the New York City Collective Bargaining Law, the collective bargaining agreement or any statute which they many have or which they may have had heretofore in connection with the underlying matters set forth in [the Improper Practice Petition].

(*Id.* at 2.) According to defendants, this provision operates as a waiver to preclude plaintiffs "from asserting any action at law, even a federal claim such as the one at bar, which arose in connection with the underlying matters." (Defs.' Mem. at 13.)

Defendants' argument is unpersuasive for several reasons. First, while defendants are correct when they state that a waiver can operate to preclude assertions of federal claims based on transactions or occurrences that were the subjects of the waiver, this rule does not apply to the instant case. Defendants cite *Abramson v. Pennwood Investment Corp.,* 392 F.2d 759 (2d Cir.1968), in support of their contention, but this case is clearly distinguishable for the reason that the waiver in that case was included in a settlement submitted as a proposal to the state court, which appointed a referee, held a hearing, and entered judgment finding the proposed settlement fair and reasonable and affirming it in all respects. *Abramson v. Pennwood,* 392 F.2d at 761. Essential to the *Abramson* court's decision was the fact that the state court had approved the release of the claim; the court held that "the state court determination that the settlement was fair and reasonable is binding on appellant." *Id.* at 762. Courts that have followed *Abramson* have consistently identified the state court adjudication as necessary to a waiver's preclusive effect. *See, e.g., TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982) ("[W]e have recognized the authority of a state court to approve a settlement that releases a claim within the exclusive jurisdiction of the federal courts."); *Gabelli v. Sikes Corp.,* No. 90 Civ. 4904, 1990 WL 213119, at *5 (S.D.N.Y. Dec. 14, 1990) ("The Second Circuit has explicitly held that although a state court cannot adjudicate a federal claim, it is within its powers to approve the release of that claim as a condition of settlement of the state action."). There is nothing in the record to suggest that the Improper Practice Petition was ever submitted to, much less approved by, any tribunal, and therefore the court finds no legal basis for finding plaintiffs' federal claims waived by this settlement.

**\*6** A second problem with defendants' argument is that the waiver contained in the stipulation purports to bind only the union. Defendants cite *Monahan v. New York City Department of Corrections,* 10 F.Supp.2d 420 (S.D.N.Y.), *aff'd,* 214 F.3d 275 (2d Cir.2000), for the proposition that "it is well settled that union members are in privity with their union, and prior settlement by that union precludes litigation of the same issues." (Defs.' Mem. at 13.) Assuming for the sake of argument that a decision that has not been overseen by a court may have preclusive effect in federal court—and both *Abramson* and *Monahan* indicate that it may not, *see Monahan,* 214 F.3d at 285—86—the claims at issue in the instant action are not of the kind that a union's waiver may preclude. The Supreme Court has stated that "an employee's rights under Title VII are not susceptible of prospective waiver." *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51—52, 94 S.Ct. 1011, 1021 (1974). In so holding, the Court distinguished between the interests underlying the union's role as "collective-bargaining agent to obtain economic benefits for union members" and "individual's right to equal employment opportunities" protected by Title VII. *Gardner–Denver,* 415 U.S. at 51. The Second Circuit has read *Gardner–Denver* to extend beyond Title VII to apply to other federal statutory rights. *Rogers v. New York Univ.,* 220 F.3d 73, 75 (2d Cir.2000). Because the court finds that the union was operating in its capacity as collective-bargaining agent when it entered into the stipulation settling the petition, that stipulation cannot operate as a waiver of the federal or state law claims plaintiffs bring here to vindicate their individual rights.

Finally, while an employee may be able to expressly waive statutory discrimination claims as part of a voluntary settlement of a grievance procedure initiated under a collective bargaining agreement, any such waiver must be "voluntary and knowing." *Gardner–Denver,* 415 U.S. at 52, fn 15. Contrary to defendants claim (Defs.' Reply Mem. at 4), there is no express waiver of discrimination claims in the stipulation of settlement signed by the union. Furthermore, since discrimination claims were not asserted in the union's improper practice position and the plaintiffs herein did not execute the stipulation of settlement or participate in settlement discussions, there is no evidence that any implied or imputed waiver was knowing and voluntary.

*C. Statute of Limitations*

Defendants assert that the three-year statutes of limitations applicable to 42 U.S.C. §§ 1981 and 1983, as well as to plaintiff's state law claims, bar claims for events that occurred more than three years before the filing of the complaint on February 13, 2002. They contend that the allegations regarding the December 10, 1998 incident involving Thomas are therefore time-barred. Plaintiffs respond that the claim regarding the December 10, 1998 incident is not barred for two reasons: first, because it falls within the continuing-violation exception, which exempts claims from the time limit when they are part of an ongoing "policy or mechanism" of discrimination. *Butts v. City of New York Dep't of Hous., Pres. & Dev.,* 990 F.2d 1397, 1404 (2d Cir.1993); and second, because the Supreme Court has held, in an opinion issued this term, that certain employment discrimination claims arising under the Civil Rights Act of 1991's amendment to section 1981 are now subject to the four-year federal "catch-all" statute of limitations rather than to the analogous state statute. *Jones v. R.R. Donnelley & Sons Co.,* 124 S.Ct. 1836, 1846 (2004).

**\*7** The court does not concur with plaintiffs that a "policy or mechanism" of discrimination has been shown here, since plaintiffs allege only discrete acts that the Supreme Court in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), held do not constitute a continuing violation. Under settled Second Circuit law, employment actions such as "discriminatory transfers, job assignments and non-promotions, and failures to compensate adequately" are discrete, isolated discriminatory acts that do not constitute a continuing violation. *Bailey v. Synthes,* 295 F.Supp.2d 344, 354 (S.D.N.Y.2003). Tour changes and disciplinary actions such as those alleged by plaintiffs would fall under this rubric as well, since "several incidents of discrimination, even if similar, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Vernon v. Port Auth. of N.Y. and N.J.,* 154 F.Supp.2d 844, 851 (S.D.N.Y.2001) (citing *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993)). Whether Taormina's position at HHC gave him, as plaintiffs would have it, a "final decision making authority" is irrelevant to this point, since the acts alleged do not constitute a policy or mechanism, no matter what their provenance.

The Supreme Court's decision in *R.R. Donnelley* is significantly more persuasive as to the viability of Thomas' section 1981–based claims than a continuing-violation argument. Although *R .R. Donnelley* pertained to petitioners' claims of hostile work environment, wrongful termination, and failure to transfer, the rule articulated therein applies to all claims made cognizable under section 1981 by the

1991 Act's amendment thereto. As the *R.R. Donnelley* Court recounts, the 1991 Act overturned *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which had held that "racial harassment relating to the conditions of employment is *not actionable* under § 1981." *Patterson,* 491 U.S. at 171; *R.R. Donnelley,* 124 S.Ct. at 1846 (emphasis in original). The 1991 Act expanded the remedial scope of section 1981's crucial "make and enforce contracts" language to encompass the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The generality of the language clearly suggests that allegedly discriminatory adverse employment actions of all scope would also be covered, and therefore would be subject to the four-year statute prescribed in *R.R. Donnelley.* None of plaintiffs' claims based on section 1981 are time-barred. [4]

*D. HHC's Liability under §§ 1983 and 1981*

Plaintiffs have alleged that both HHC and Taormina in his official and individual capacities are liable under 42 U.S.C. § 1983. In order to establish a section 1983 claim against a municipal corporation such as HHC, plaintiffs "must prove that the constitutional wrong complained of resulted from [HHC's] official policy, custom, ordinance, regulation, or decision." *Rookard v. Health and Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Under *Monell,* a municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Curry v. City of Syracuse,* 316 F.3d 324, 330 (2d Cir.2003). An exception to this rule occurs when the act complained of constitutes a decision made by an individual who possessed "final policymaking authority in the particular area involved." *Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1163 (E.D.N.Y.2003) (citing Supreme Court and Second Circuit authority).

**\*8** The logic of plaintiffs' case for *Monell* liability of HHC based on the allegedly unconstitutional acts of Taormina is difficult to follow. The argument appears to run that Taormina created an unofficial policy within the security department at Jacobi of mistreating and harassing minority employees. Although Taormina is the only person at HHC who is alleged to have participated in this alleged policy, his very actions set policy because, plaintiffs contend, he is a policymaker. However, plaintiffs have offered no evidence to suggest that Taormina "possesse[d] final authority to establish municipal policy with respect to the action ordered," *Pembaur*

*v. City of Cincinnati,* 475 U.S. 469, 481—82, 106 S.Ct. 1292, 1299 (1986), nor that Taormina "established a policy fairly attributable to the municipality," *Rookard v. Health and Hosps. Corp.,* 710 F.2d 41, 45 n. 3 (2d Cir.1983). The undisputed evidence as to the job responsibilities of the Director of Security at Jacobi demonstrates that while the job entails responsibility for the "day to day operation of the Hospital Police Department" and "latitude for independent judgment and initiative," the only involvement the Director of Security has in policy is to "assess Department's current Policies/Procedures and recommend systemic changes where appropriate." (O'Neill Decl. Ex. DD.) It is well settled that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 482—83 (citing *Okla. City v. Tuttle,* 471 U.S. 808, 822—24, 105 S.Ct. 2427, 2435—2436 (1985)). Since Taormina is not a policymaking official, there is no basis for concluding that Taormina's acts, assuming for the moment that they are unconstitutional, would make HHC liable under section 1983.

Furthermore, as defendants point out, section 1983 provides the "exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor ." *Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2723 (1989). Absent section 1983 liability pursuant to *Monell* and its progeny, HHC cannot be held liable under section 1981. HHC is entitled to summary judgment as to both the section 1981 and the section 1983 claims against it.

The fact that Taormina's actions cannot give rise to *Monell* liability does not imply a bar against holding Taormina liable in his individual capacity under sections 1981 and 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Municipal employees acting in the performance of their duties are considered to be acting under color of state law, see *Burtnieks v. City of New York,* 716 F.2d 982, 986 (2d Cir.1983), and may be held liable, subject to qualified immunity. State actors sued in their individual capacity may be immune from liability only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Since the right to be free from racial discrimination and harassment in the workplace is clearly established and widely recognized, Taormina would not be entitled to immunity and could be held liable if he were found to have committed such acts against plaintiffs.

*E. Liability under NYHRL and NYCHRL*

**\*9** The contours of liability under state and local law differ from those under federal law. The NYHRL makes it unlawful "[f]or an employer ..., because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). The NYCHRL makes it unlawful for an "employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(1). While the NYCHRL clearly provides for liability not only of an employer, but also for "an employee or agent thereof," the NYHRL's reference only to "employer" has been read to provide for a more limited scope of liability. *See Murphy v. ERA United Realty,* 251 A.D.2d 469, 471 (2d Dep't 1998). Under the NYCHRL, Taormina could clearly be held liable if found to have engaged in discriminatory actions against plaintiffs; under the NYHRL, however, direct liability can be imposed on an employee only if he is shown to have an ownership interest in the employer or "any power to do more than carry out personnel decisions made by others." *Patrowich v. Chem. Bank,* 63 N.Y.2d 541, 473 N.E.2d 11, 483 N.Y.S .2d 659 (1984). Courts in this circuit have generally regarded the second prong of the *Patrowich* liability test as covering "only supervisors who, themselves, have the power to hire and fire employees," *Perks,* 251 F.Supp.2d at 1160 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995)). However, given that the claims in this action deal not with allegations of unlawful hiring or firing practices, but primarily with disciplinary and other personnel actions which Taormina himself initiated, Taormina may be held liable under section 296(1) of the NYHRL if found to have violated plaintiffs' rights, since his

power in the area of employee discipline evidently transcends mere implementation of others' decisions when it comes to initiating discipline.

By contrast, however, and for substantially the same reasons that HHC cannot be held liable under the federal statutes, HHC is not subject to liability under the state or municipal causes of action. No unlawful policy or practice on the part of HHC has been alleged or shown, and "an employer cannot be held liable for an employee's discriminatory acts [under state and city law] unless the employer became a party to it by encouraging, condoning, or approving it." *Duviella v. Counseling Serv. of E. Dist. of New York,* No. 00–CV–2424, 2001 WL 1776158, at *16 (E.D.N.Y. Nov. 20, 2001) (quoting *Ponticelli v. Zurich Am. Ins. Group,* 16 F.Supp.2d 414, 433 (S.D.N.Y.1998) (alteration in original). No evidence of encouragement, condonation, or approval has been adduced. Accordingly, HHC is entitled to summary judgment as to the claims under NYHRL and NYCHRL. [5]

**\*10** As defendant HHC is entitled to have all claims against it dismissed based on the foregoing analyses, the court now proceeds to consider the arguments for summary judgment as to defendant Taormina.

*F. Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). In reviewing the record, the district court must assess the evidence in "a light most favorable to the nonmoving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247—48 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322—23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).

The Second Circuit has cautioned against granting summary judgment in a discrimination case when the employer's intent is in question. "Because direct evidence of an employer's discriminatory or retaliatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1210, 1224 (2d Cir.1994)) (citations and internal punctuation omitted). However, even where an employer's intent is in issue, "purely conclusory allegations of discrimination, absent any concrete particulars, are insufficient" to defeat a motion to dismiss. *Cameron v. Cmty. Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir.2003) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Pocchia v. NYNEX Corp .,* 81 F.3d 275, 280 (2d Cir.1996)) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) and citing cases).

*G. Merits of the Claims*

1. Hostile Work Environment

**\*11** Hostile work environment claims are cognizable under 42 U.S.C. §§ 1981 and 1983. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000); *Meckenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 384 (S.D.N.Y.1999). The standards for evaluating employment discrimination claims brought under state and city human rights laws are the same as those employed in assessing federally-based claims. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996); *Tomka,* 66 F.3d at 1304 n. 4. To establish a hostile work environment claim, a plaintiff mush show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted), and "must demonstrate either that a single incident was

extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment," *Cruz,* 202 F.3d at 570 (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003) (quoting *Alfano v. Costello,* 294 F.3d 365, 374 (2d. Cir.2002)). *See also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.") Moreover, when a race-based hostile work environment claim is made, the plaintiff must offer evidence that the conduct at issue was prompted by plaintiff's race. *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir.1999) (citing *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 580 (2d Cir.1989)).

The Supreme Court has prescribed a "totality of the circumstances" inquiry for determining whether a hostile work environment exists. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. The *Harris* Court also noted that determining whether a work environment is hostile requires both an objective and a subjective inquiry. *Id.* at 22.

Taking the totality of the circumstances into account, the court finds that the evidence offered by plaintiffs does not create an issue of triable fact as to the existence of a hostile work environment. It is true that the record evidences that Taormina could be antagonistic to those with whom he worked, and both parties have presented evidence that Taormina had problems controlling his anger. (Rodriguez Decl. ¶¶ 4—6; Goldenberg Decl. Ex. H, at 13, 15.) Further, Taormina allegedly expressed racial hostility on two occasions. Nevertheless, viewing the evidence in a light most favorable to plaintiffs, plaintiffs do not create a fact issue as to whether Taormina's conduct toward plaintiffs created a workplace that was permeated with discriminatory animus sufficiently severe to alter the conditions of plaintiffs' employment.

**\*12** Plaintiffs allege that Taormina endorsed one racial epithet made about Thomas and uttered one toward Cintron. However, they do not allege that Thomas was aware of Taormina's comment toward Cintron prior to this litigation,

nor that Cintron knew of Taormina's ratification of the offensive comment toward Thomas, nor in fact that Arceo was aware of either comment. While hostile acts need not be addressed directly to an employee or even conducted in her presence in order to give rise to a hostile work environment, there must be evidence that the employee knew about the acts if a hostile work environment claim is to survive summary judgment. *Torres v. Pisano,* 116 F.3d 625, 633 (2d Cir.1997); *see also Gibson v. Jacob K. Javits Convention Center of N.Y.,* No. 95 Civ. 9728, 1998 WL 132796 (Mar. 23, 1998) (plaintiff must allege awareness of allegedly offensive conduct in order to survive motion to dismiss). Accordingly, the hostile work environment claims of each plaintiff shall be evaluated separately.

*Barbara Thomas*

The first alleged act of racial hostility occurred during the December 10, 1998 episode during which Taormina allegedly endorsed the elevator operator's calling Thomas a "black bitch." Thomas further testifies that after Taormina changed her tour, she "suffered severe stress as he harassed me during that time by following me around and constantly insulting me. His conduct made my work environment very hostile and stressful." (Thomas Decl. ¶ 16.) Finally, she asserts, "I never witnessed [Taormina] subjecting the Caucasian officers to the same harassment and discriminatory treatment as the minority officers." (Thomas Decl. ¶ 18.) Plaintiffs do not allege that Taormina's conduct after the tour change had a racial aspect. The Second Circuit has unambiguously stated that only conduct prompted by plaintiff's race contributes to a hostile work environment claim. *See Richardson,* 180 F.3d at 440; *see also Alfano,* 294 F.3d at 374 (cautioning that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination"). Moreover, Thomas' allegation about disparate treatment is purely conclusory, and does not specifically identify any harassment of other minority officers that would contribute to her hostile work environment claim. Therefore, the only specific relevant conduct alleged by Thomas is Taormina's endorsement of a racial epithet. [6]

Plaintiffs have cited no precedent, and the court can find none, for the proposition that a single or even a few racial epithets uttered in a context like the one presented here would suffice to create a hostile work environment. *See Schwapp,* 118 F.3d at 110 ("For racist comments, slurs, and jokes to constitute a hostile work environment ... there must be a steady barrage

of opprobrious racial comments."). Discriminatory conduct must be severe or pervasive for such an environment to arise. The Second Circuit has repeatedly stated that incidents of harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry,* 115 F.3d at 149; *accord Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998), *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986). On the other hand, a single incident of harassment can establish a hostile work environment if it is severe enough. *See Tomka,* 66 F.3d at 1305 (finding rape of plaintiff by three coworkers sufficiently severe to alter working conditions and constitute actionable discrimination). Although "there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim," *Richardson,* 180 F.3d at 439 (citing *Harris,* 510 U .S. at 22), as a general rule, isolated instances of racially hostile name-calling and offensive remarks alone are ordinarily not severe enough to alter the conditions of employment.

**\*13** One case in which a single incident of verbal harassment was found to create a hostile work environment, *Howley v. Town of Stratford,* 217 F.3d 141 (2d Cir.2000), is clearly distinguishable. In that case, the critical incident occurred at a meeting of the firefighters' benevolent association, of which plaintiff was a member. At the meeting, a subordinate of plaintiff launched into a vicious and obscene tirade against her before the assembled group, in which he called plaintiff a series of vituperative and sexually explicit names and graphically suggested that she had performed sexual acts in order to attain her position as a lieutenant in the fire department. The court, in finding that plaintiff's hostile work environment claim should not have been dismissed on summary judgment found relevant the length and volume of the diatribe and the number of witnesses; it also noted:

> in an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, of diminishing the respect accorded the officer by

subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters.

*Id.* at 154.

Cases construing hostile work environment claims have distinguished *Howley* on its facts, and in particular on its reliance on the adverse impact of the incident on the plaintiff's ability to lead. *See Wood v. Sophie Davis Sch., No. 02 Civ. 7781, 2003 WL 22966288, at *8 (S.D.N.Y. Dec. 15, 2003)* (distinguishing *Howley* because "[i]n this case, not only is plaintiff not in a profession where absolute obedience and respect is crucial, but [plaintiff's] statement was not nearly as violent, accusatory, and graphic as was the tirade in *Howley*" ); *O'Dell v. Trans World Entm't, 153 F.Supp.2d 378, 387 (S.D.N.Y.2001)* (distinguishing *Howley* on the ground that plaintiff had not alleged, and no evidence had been adduced, that her credibility or authority had been impugned or tarnished). Likewise, in this case, plaintiffs have not alleged or shown that Taormina's endorsement of the racial epithet regarding Thomas was sustained or graphic, nor crucially that his conduct affected Thomas' working conditions. Therefore, there is nothing to set these allegations apart from the cases finding that "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to give rise to a hostile work environment. *Harris, 510 U.S. at 21* (citations and internal punctuation omitted). *See Lopez v. S.B. Thomas, 831 F.2d 1184, 1189 (2d Cir.1987)* (finding no hostile work environment when the main incident alleged involved plaintiff's supervisor "burst[ing] into degrading and lewd obscenities directed toward him"); *Stembridge v. City of New York, 88 F.Supp.2d 276, 286 (S.D.N.Y.2000)* (seven incidents, including two instances of racial epithets uttered by supervisors toward plaintiffs, over three years do not establish a hostile work environment); *Carter v. Cornell Univ., 976 F.Supp. 224, 232 (S.D.N.Y.1997)* (six race-related disparaging comments over three years do not create a hostile work environment) *Williams v. Port Auth. of N.Y. & N.J., 880 F.Supp. 980, 991—92 (S.D.N.Y.1995)* (five racial slurs uttered by supervisors in plaintiff's presence over the course of two years did not establish hostile work environment); *Pagan v. New York State Div. of Parole, No. 98 Civ. 5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003)* (finding that four instances of racially derogatory remarks by

supervisor in the span of several months did not amount to a hostile work environment).

**\*14** In finding that plaintiff Thomas has failed to raise a triable issue of fact as to whether Taormina's conduct created a hostile work environment, the court is mindful that the Second Circuit regards expressions of racial hostility by an employee's supervisor as especially pernicious. It has frequently cited *dicta* from the Seventh Circuit in support of this position. That court affirmed the district court's finding that a supervisor's use of a racial epithet *contributed* to a hostile work environment, even though the plaintiff himself and other employees also used that word in the workplace. In so holding, the court said, "Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive work environment' than the use of an unambiguously racial epithet ... by a supervisor in the presence of his subordinates." *Rodgers v. Western–Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993)* (quoting *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986)*) (citation omitted). Notably, the *Rodgers* court affirmed the district court's finding that the employer maintained a hostile work environment based on several racially hostile acts, rather than a "single act." Of the courts in this district and in the Second Circuit that have cited *Rodgers* approvingly on this point, this court can find none which has found that a supervisor's use or, as in this case, endorsement of a racial slur regarding the plaintiff on one occasion created a genuine issue of material fact as to whether the plaintiff was subjected to a hostile work environment.

There is no reason in this case to disturb the well-settled "line between 'sporadic racial slurs' and a 'steady barrage of opprobrious racial comments,' " *Pimentel v. City of New York, No. 00 Civ. 0326, 2001 WL 1579553, at *9 (S.D.N.Y. Dec. 11, 2001)* (quoting *Schwapp, 118 F.3d at 110)* (summary judgment granted in full on reconsideration, *see Pimentel v. City of New York, 2002 WL 977535, at *1 (S.D.N.Y. May 14, 2002)*), that marks the boundary between viable and non-viable hostile work environment claims. The court in *Pimentel* used the facts in *Richardson* to exemplify this line: plaintiff Richardson had brought suit complaining of a hostile work environment in two correctional facilities at which she worked. The trial court denied summary judgment as to Richardson's claims about the environment at Auburn Correctional Facility, where she was subjected to frequent racist speech from her supervisors, but granted summary judgment as to her claims about the environment at Cayuga Correctional Facility, where plaintiff alleged fifteen incidents

of harassment, only three of which involved racial slurs. *Pimentel,* 2001 WL 1579553, at *9. The court finds that Taormina's conduct toward Thomas falls into the clearly delineated area in which a hostile work environment cannot as a matter of law be established.

*John Arceo*

**\*15**  Arceo has not alleged having witnessed or even learned of any conduct by Taormina that would give rise to a hostile work environment claim. His allegations involve several run-ins with Taormina that he claims were prompted by Taormina's antipathy toward him, but he does not allege that that antipathy is due to his race. Rather, Arceo states that Taormina acted in retaliation for reports Arceo filed against other officers, and for a grievance he filed against Taormina. While Arceo alleges a belief that "Taormia [sic] targeted myself and the other plaintiffs because we were minorities" (Arceo Decl. ¶ 22), states that "I never witnessed him subjecting the Caucasian officers to the same harassment and discriminatory treatment as the minority officers" (*Id.*), and asserts that "[a]ny minority officers he [Taormina] did not subject to such conduct and behavior, was because there were some minority officers which were favorable to Taormina in that, they never with [sic] him and took part in his harassment of other minorities" (*Id.* at ¶ 23), these allegations are of the vague, conclusory, and argumentative sort that will not suffice as a matter of law to prove discrimination or harassment. The allegation that "Taormina's behavior was abusive subjected [*sic* ] me to a great deal of stress" that required Arceo to seek mental health assistance (*Id.* at ¶ 24) will not save Arceo's claim, since it is well settled that incidents showing that a supervisor disliked an employee and was rude or unfair to him do not, without more, prove a claim of hostile work environment. *See Manessis v. New York City Dep't of Transp.,* No. 02 Civ. 359, 2003 WL 289969, at *5—8 (S.D.N .Y. Feb. 10, 2003).

*Nelson Cintron*

Cintron alleges that Taormina called him a racially offensive name and acted in a physically threatening manner toward him during the events of March 11, 1999. This incident appears more serious than that involving Thomas, because of the physical intimidation involved and the fact that the epithet was allegedly voiced directly by Taormina rather than merely endorsed by him. However, looking at the totality of the circumstances in the light most favorable to Cintron, the court is unable to say that these distinctions can, as a matter of law, constitute a difference that would render this single

incident severe enough to create a hostile work environment. The expression of racial hostility, while despicable, was not protracted or graphic as in *Howley.* Further, Cintron has not alleged or shown that Taormina's slur altered the conditions of his employment so as to justify the court's deviation from the line of cases finding sporadic use of racial comments by supervisors insufficient to create a hostile work environment.

Cintron alleges that following the March 11, 1999 incident, Taormina brought further disciplinary charges to harass him and that Taormina's use of a racial slur showed that Taormina's alleged harassment was race-related. It is well settled, however, that if an incident is not sufficient to create a hostile work environment, then it cannot ground an inference that other facially race-neutral incidents had a discriminatory motivation. *Manessis,* 2003 WL 289969, at *8 (citing *Alfano,* 294 F.3d at 377; *Pimentel,* 2001 WL 1579553, at *10).

 **\*16**  Because the evidence is insufficient to raise a triable issue of fact, summary judgment is granted as to each of the plaintiffs' hostile work environment claims.

2. Discrimination and Retaliation Claims

In employment discrimination and retaliation cases, courts apply the three-step burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). [7] *See Terry,* 336 F.3d at 138, 141. According to this three-step analysis, the plaintiffs are first required to make out a *prima facie* case. To establish a *prima facie* case of employment discrimination, the plaintiffs must show 1) membership in a protected class, 2) qualification for the position and/or satisfactory job performance, 3) an adverse employment action, and 4) that the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.2001); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997); *Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 30 (2d Cir.1997).

"To establish a *prima facie* case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Terry,* 336 F.3d

at 141 (citing *Quinn,* 159 F.3d at 769 (internal punctuation omitted).

Second, once plaintiffs have made out their *prima facie* case, defendant Taormina must articulate some legitimate and nondiscriminatory or non-retaliatory reason for his action. *McDonnell Douglas,* 411 U.S. at 802—03, 93 S.Ct. at 1824. Third, the burden ultimately shifts back to plaintiffs, who must produce evidence sufficient to raise an issue of fact as to whether Taormina's justification was merely a pretext for discrimination or retaliation. *Quinn,* 159 F.3d at 769; *McDonnell Douglas,* 411 U.S. at 807, 93 S.Ct. at 1827.

a. Discrimination Claims

The test for a *prima facie* case of discrimination is not intended to be difficult to meet. *Mandell v. County of Suffolk,* 316 F.3d 368, 378 (2d Cir.2003); *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001). Here, plaintiffs easily satisfy the first two prongs of the test. First, all of them, as non-white, are members of a protected class. Second, they all have had long careers with HHC with few disciplinary problems before Taormina's arrival at Jacobi, and therefore have shown that their job performance has been satisfactory.

Some of the incidents plaintiffs allege constitute adverse employment actions, particularly the disciplinary proceedings brought against Thomas and Cintron, inasmuch as those proceedings resulted in unpaid suspensions. See *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include ... reduction in pay, and reprimand."). Others, including the tour changes, the charges filed but later withdrawn against Arceo, and Arceo's "satisfactory" performance evaluation, do not constitute adverse employment actions. An adverse employment action is a "materially adverse change in the terms and conditions of employment," *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal citations omitted), which "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d 43, 51 (2d Cir.2002). Plaintiffs have not alleged any incidents involving Arceo that can, in isolation, be considered adverse employment actions. While the Second Circuit has recognized the possibility that "a combination of seemingly minor incidents" can satisfy this prong if they "reach a critical mass," *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002), a plaintiff alleging an adverse employment action that is not among the actions judicially recognized as coming under this rubric "must show that (1)

using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Id.* Even when viewed in the light most favorable to him, Arceo has not shown that he suffered an adverse employment action from the combination of the tour change, the withdrawn disciplinary charge, and the "satisfactory" rating. Accordingly, Arceo's discrimination claim is dismissed.

**\*17** While the showing is not strong, plaintiffs Thomas and Cintron have adduced evidence from which a reasonable factfinder could infer discrimination. Most of plaintiffs' allegations lack substantiation, are merely conclusory and speculative, and cannot create an inference of discrimination. Plaintiffs state, for example, that Taormina's conduct toward Thomas was racially motivated; but aside from the statement cited in Section F(1) *supra,* the record contains only unsubstantiated assertions to support this claim, namely Thomas' statements during her deposition that Taormina hadn't "done it to any Caucasians that we have there," "every single incident has been with a minority," "he ha[d] not done it to any other people except for minorities and the other Caucasians, he didn't bother them at all," and "he didn't like me and I'm African American." (Goldenberg Decl. Ex. D at 96, 108.) Similarly, Cintron testified in his deposition that he believed Taormina's actions were discriminatory because "[Taormina's] white and I'm Hispanic." (Goldenberg Decl. Ex. W at 60.) These conclusory statements cannot form the basis of a *prima facie* case of discrimination. However, Thomas has alleged that Taormina verbally ratified another's use of an offensive racial remark toward her, and Cintron has alleged that Taormina directed a loathsome racist epithet toward him. Such acts have been found to create an inference of discrimination. *See de la Concha v. Fordham Univ.,* 5 F.Supp.2d 188, 192 (S.D.N.Y.1998) (finding an inference of discrimination created when supervisor used racial slurs such as "spic" toward employee).

Plaintiffs Thomas and Cintron having adduced facts creating an inference of discrimination, and thereby having made out a *prima facie* case, the burden shifts to Taormina to articulate legitimate, non-discriminatory reasons for the alleged adverse employment actions. This he has done. Thomas was charged with and ultimately found guilty of being AWOL, based upon her eight-month absence and after she had been sent multiple written warnings that her absence was being treated as AWOL. (Defs.' 56.1 ¶¶ 29—34.) Disciplinary charges were brought against Cintron on three separate occasions, and each

set of charges was enumerated and explained in each Notice and Statement of Charges served on Cintron. (*Id.* at ¶¶ 58, 62, 67.) Cintron pled no contest to all but two of the thirteen charges. (*Id.* at ¶¶ 60, 66, 71.)

Since defendant has produced legitimate, non-discriminatory justifications for the adverse employment actions, it falls to plaintiffs to show that an unlawful discriminatory reason played a motivating role in Taormina's conduct. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446—47 (2d Cir.1999); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993). As has been noted, the evidence of such motivation may be modest. However, in light of the racial animus expressed in abhorrent remarks directed toward Thomas and Cintron during the incidents that gave rise to the adverse actions taken against them, the court cannot say as a matter of law that no reasonable trier of fact could find that racial discrimination motivated the disciplinary actions Taormina initiated against Thomas and Cintron. *See Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 181 (2d Cir.1992) ("Even a highly-probative statement like 'You're fired, old man' still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision. But juries have always been allowed to draw such inferences."). Therefore, Taormina is not entitled to summary judgment as to Thomas and Cintron's claims arising from these incidents.

### b. Retaliation Claims

**\*18** In order to make out a *prima facie* case of retaliation, plaintiffs must show that they participated in a protected activity that defendant knew about, and that they suffered an adverse employment action as a result. Since Arceo's and Thomas' tour changes do not constitute adverse employment actions, and since plaintiffs have abandoned their retaliation claims as to Cintron (Pls.' Opp. at 16), only Thomas' retaliation claim regarding the AWOL disciplinary charges remain. Thomas alleges that on or about March 12, 1999, she filed a complaint with the New York State Division of Human Rights about Taormina's actions toward her, and that Taormina filed the AWOL disciplinary charges against her in or around March 2001. Thomas' filing of the complaint constitutes protected activity; see *Cruz,* 202 F.3d at 566 ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."); *Quinn,* 159 F.3d at 759 (recognizing filing a complaint with a state agency as a protected activity). The court assumes, although

it is not alleged, that defendant was aware of the complaint. However, the two-year gap between the protected activity and the allegedly retaliatory act fatally attenuates plaintiffs' causal claim. Retaliatory intent may be inferred from an adverse employment action that follows closely on the heels of the protected activity. *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). By the same token, when no other evidence of a causal connection exists, a lack of temporal proximity can defeat a claim of retaliation. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). However, I can find no evidence that any court in our jurisdiction has drawn an inference of causality from an adverse action that followed a protected activity by two years. Moreover, the Supreme Court has stated that the two events must be "very close" in time to create an inference of a causal relationship, and has found a gap of 20 months between protected activity and adverse action—four months less than in this case—to "suggest[ ], by itself, no causality at all." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 274, 121 S.Ct. 1508, 1511 (2001). In the absence of either temporal proximity or any other evidence of causality, the court cannot agree with plaintiffs that "Taormina's AWOL charges can be inferred as direct [or even indirect] retaliatory evidence." (Pls.' Opp. at 16—17.) Therefore, Thomas' remaining retaliation claim cannot survive.

### CONCLUSION

For the foregoing reasons, defendants' motion is hereby GRANTED as to all plaintiffs' claims except those discrimination claims against Taormina arising from Thomas' suspension resulting from the December 10 incident and from Cintron's suspension arising from the March 11 incident. As to those two claims, summary judgment is DENIED.

**\*19** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1962074

## Footnotes

1    Prior to filing this action, plaintiff Thomas filed a verified complaint on or about March 12, 1999 with the New York State Division of Human Rights, and another on or about March 22, 1999 with the City of New York Commission on Human Rights, complaining about some of the incidents alleged in the instant complaint. (Declaration of Asst. Corp. Counsel Abigail Goldenberg in Support of Defendants' Motion for Summary Judgment ("Goldenberg Decl. ¶ ___"), Exs. K—L.) Plaintiff Cintron filed a verified complaint on or about March 12, 1999 with the State of New York Division of Human Rights regarding one of the incidents at issue here. (*Id.* at Ex. FF.) Because the New York State legislature has enacted an "election of remedies" provision that limits the ability of individuals to bring suit based on violations of the Human Rights Law, Thomas' and Cintron's claims under this law are barred to the extent that they repeat allegations brought in their complaints to the local human rights commissions. The election of remedies provision reads in relevant part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... unless such person had filed a complaint hereunder or with any local commission on human rights ... provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.... A complaint filed by the equal employment opportunity commission to comply with the requirements of 42 U.S.C. § 2000e–5(c) and 42 U.S.C. § 12117(a) and 29 U.S.C. § 633(b) shall not constitute the filing of a complaint within the meaning of this subdivision.

> N.Y. EXEC. LAW § 297(9) (McKinney 1993). The import of this provision has been succinctly articulated in prior case law: "[A] person claiming to be aggrieved by an unlawful discriminatory practice may seek relief either from a court of appropriate jurisdiction or from the [New York State Division of Human Rights] or any local commission on human rights, but not both." *Clements v. St. Vincent's Hosp. & Med. Ctr.,* 919 F.Supp. 161, 164 (S.D.N.Y .1996); *see Moodie v. Fed. Reserve Bank,* 58 F.3d 879, 882–83 (2d Cir.1995) (citing *Marine Midland Bank, N.A. v. New York State Div. of Human Rights,* 75 N.Y.2d 240, 245, 552 N.Y.S.2d 65, 66, 551 N.E .2d 558, 559 (1989); *Pan Am. World Airways, Inc. v. New York State Human Rights Appeal Bd.,* 61 N.Y.2d 542, 548, 475 N.Y.S.2d 256, 259, 463 N.E.2d 597, 600 (1984). The election applies equally to HRL claims brought in New York courts and to such claims brought as pendent claims in federal courts. *See Collins v. Mfrs. Hanover Trust Co.* 542 F.Supp. 663, 672—73 (S.D.N.Y.1982). The election of remedies restriction does not affect claims brought under federal law.

2    The facts are drawn from the following documents, and are cited as indicated herein: Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts ("Defs.' 56.1 ¶ ___"); Defendants' Annotated Statement of Facts ("Defs.' Ann. ¶ ___"); Declaration of Frank Taormina ("Taormina Decl. ¶ ___"); Declaration of Asst. Corp. Counsel Abigail Goldenberg in Support of Defendants' Motion for Summary Judgment ("Goldenberg Decl. ¶ ___") and attached exhibits; Plaintiffs' Rule 56.1 Statement ("Pls.' 56.1 ¶ ___"); Declaration of Michael G. O'Neill ("O'Neill Decl. ¶ ___") and attached exhibits; Declaration of Barbara Thomas ("Thomas Decl. ¶ ___"); Declaration of John Arceo ("Arceo Decl. ¶ ___"); Declaration of Nelson Cintron ("Cintron Decl. ¶ ___"); Declaration of Jesus Roman ("Roman Decl. ¶ ___"); Declaration of Jonathan Muniz ("Muniz Decl. ¶ ___"); and Declaration of Eunice Rodriguez ("Rodriguez Decl.").

3    An Improper Practice Petition is a complaint that alleges violations of the New York City Collective Bargaining Law, New York City Administrative Code tit. 12, ch. 3, by those bound by it, *e.g .,* a public employer. It is filed with the Board of Collective Bargaining. N.Y.C. ADMIN. CODE § 12–306.

4    Neither side has briefed or adduced evidence as to the tolling implications of plaintiff Thomas' filing of complaints with the New York State Division of Human Rights and the New York City Commission on Human

Rights regarding the December 10 incident. Subject to certain exceptions, the filing of such complaints tolls the three-year statute of limitations on claims filed under the New York State Human Rights Law and the New York City Human Rights Code. *Martinez–Tolentino v. Buffalo State Coll.,* 277 A.D.2d 899, 899, 715 N.Y.S.2d 554, 555 (4th Dep't 2000); N.Y. C.P.L.R. 204(a); N.Y.C.Code § 8–502. Since her state law claims are barred by the "election of remedies" statute, *see* note 1 *supra,* the court declines to determine whether the non-federal claims are tolled.

5    Both the NYHRL and the NYCHRL provide, in identical language, for employee liability under an aiding or abetting theory. *See* N .Y. Exec. Law § 296(6), N.Y.C. Admin. Code § 8–107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."). However, under New York law, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *DeWitt v. Lieberman,* 48 F.Supp.2d 280, 293 (S.D.N.Y.1999) (citing *Murphy v. ERA United Realty,* 674 N.Y.S.2d 415, 417 (2d Dep't 1998).

6    Plaintiffs also submit declarations from non-parties, who allege that (1) "[t]o the best of my knowledge and upon information I have received from officers under my supervision Frank Taormina treats the minority officers different" (Roman Decl. ¶ 5); (2) "I have witnessed Mr. Taormina's volatile behavior only towards minority employees" (Rodriguez Decl. ¶ 6); and (3) that "I have received several complaints from various minority officers regarding Frank Taormina's inappropriate and unprofessional behavior" (*Id.* at ¶ 7). The statements of the non-party declarants are not even admissible to the extent that they are not based on personal knowledge and constitute hearsay. Even if they were fully admissible, however, the statements would need to be supported by citations to specific instances of disparate or abusive treatment of minority employees in order to create a genuine issue of material fact from which a reasonable factfinder could conclude that plaintiffs' workplace was "permeated with discriminatory intimidation, ridicule, and insult." See *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) (finding no genuine issue of material fact where plaintiff failed to offer "concrete particulars" as to alleged discrimination).

7    While *McDonnell Douglas* and *Burdine* involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* courts have held that discrimination and retaliation claims brought under 42 U.S.C. §§ 1981 and 1983 follow the same analysis. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747 (1993) (assuming that the *McDonnell Douglas* framework applies to § 1983 employment discrimination claims); *Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989) (applying Title VII analysis to employment discrimination claims brought under § 1983); *Hudson v. Int'l Bus. Machs. Corp.,* 620 F.Supp. 351, 354 (2d Cir.1980) (applying Title VII framework to discrimination claims under § 1981); *Taitt v. Chem. Bank,* 849 F.2d 775, 777 (2d Cir.1988) (applying *McDonnell* analysis to retaliation claims brought under § 1981); *Domenech v. City of New York,* 919 F.Supp. 702, 706 (S.D.N.Y.1996) (applying *McDonnell Douglas* to retaliation claim brought under § 1983).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 69 of 151

KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Darnell v. Pineiro,  2nd Cir.,  February 21, 2017

2015 WL 13401929
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Scott MYERS, Plaintiff,

v.

Charles BUCCA, et al., Defendants.

6:15-CV-553 (DNH/ATB)
|
Signed 12/07/2015

**Attorneys and Law Firms**

Scott Myers, Catskill, NY, pro se.

Crystal R. Peck, Syma S. Azam, Bailey, Johnson PC, Albany, NY, Nannette R. Kelleher, Martin Harding & Mazzotti, LLP —Niskayuna Office, Niskayuna, NY, for Defendants.

### ORDER and REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** On May 14, 2015, I issued an Order and Report-Recommendation in this case, recommending that four defendants be dismissed with prejudice, three defendants be dismissed without prejudice, and that plaintiff be given the opportunity to amend his complaint with respect to the remaining defendant and to those defendants who were dismissed "without prejudice." (Dkt. No. 5). Plaintiff filed objections to my Order and Report-Recommendation in addition to filing a Proposed Amended Complaint. (Dkt. 9— Proposed Amended Complaint; Dkt. Nos. 6, 10—Objections and Supplement to Objections). The plaintiff's "Supplement" to his objections is 198 pages long and contains a great deal of background information about his claims. (Dkt. Nos. 10-10-3).

On November 10, 2015, Judge Hurd adopted my Order and Report-Recommendation over plaintiff's objections and remanded the matter to me for consideration of plaintiff's Amended Complaint. (Dkt. No. 14). In the interim, plaintiff has made a motion to "supplement" his amended complaint. (Dkt. No. 13). This motion to "supplement" contains

approximately 248 additional pages which plaintiff states "support the 'Nexus Plus' and other aspects of this civil rights claim." [1] (Dkt. No. 13).

Plaintiff also filed a "Motion for Ruling on Accrual," which the court interpreted as another part of plaintiff's objections to my Report-Recommendation. (Dkt. No. 12). It does not appear that the document was considered by Judge Hurd because the docket number is not cited in his Order approving my Report-Recommendation. In the "Motion for Ruling on Accrual," plaintiff is attempting to argue that the claims, which have been dismissed as beyond the statute of limitations, should have accrued later and should not be dismissed based on the time-bar. (*Id.*) Because Judge Hurd adopted my Recommendation in its entirety, the Motion for Ruling on Accrual may be moot. However, in fairness to the pro se plaintiff, I will consider all the documents that plaintiff has filed in support of his attempt to amend his complaint, particularly because, in the Proposed Amended Complaint, plaintiff has attempted to resurrect his time-barred claims. [2] The court is also considering all the documents filed by plaintiff in this analysis because some of the documents contain information that is helpful to understanding what plaintiff's claims may be. [3]

### I. Sufficiency of the Amended Complaint

#### A. Legal Standards

**\*2** As I stated in my prior Order and Report-Recommendation, when a plaintiff seeks to proceed in forma pauperis ("IFP"), in addition to considering the financial criteria for proceeding without the payment of fees, the court must also consider the sufficiency of the allegations set forth in the complaint or any amended complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 70 of 151

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's amended complaint under the above standards.

### B. Application

Plaintiff's amended complaint is broken down into seven "claims." (Amended Complaint "AC" Causes of Action ("COA") ¶¶ 1-7, CM/ECF pp.3-12). [4] Plaintiff has named several of the same defendants that he named in the original complaint: Charles Bucca, Esq. (the Assistant District Attorney in Greene County); Greg Seeley (Sheriff of Green County); Michael Spitz (Superintendent of Greene County Jail); Bobby Haines (Sergeant, Greene County); and Patrolman Rowell. Plaintiff has also named two new defendants: Kenny Leis (a Greene County Jail Lieutenant) and Laura Mercante (a Greene County Mental Health Counselor).

Although plaintiff has amended his complaint, he still includes some of the defendants and some of the claims that Judge Hurd dismissed with prejudice. His claims are long and rambling, with continued reference to the effect of 9/11 on his family, his marriage, and the rest of his life. His "motion to supplement" contains a variety of transcripts; and what appear to be presentence reports, or parts of presentence reports. The court will examine each of the claims separately in case any of plaintiff's new or amended claims/defendants can survive initial review.

### 1. Claim 1

Plaintiff states that his first claim is one for "malicious prosecution" as the result of his September 3, 2004 arrest in the Town of Hunter for, inter alia, reckless endangerment. (AC—COA ¶ 1). Plaintiff raised this issue in his original complaint, stating that his allegedly improper prosecutions began with this 2004 arrest, [5] which plaintiff refers to as the "Williams Lumber event." In his amended complaint, he now states that his conviction was "reversed," citing a June 18, 2015 letter from the current Greene County District Attorney who allegedly wrote " 'the People formally withdraw the charges against Mr. Myer[s].' " *Id.* Plaintiff states that his damage claims as a result of these events include the "final collapse" of his ex-wife. Plaintiff repeats that his ex-wife was seven months pregnant at the time of the terrorist bombings on September 11, 2001, that she was of Middle Eastern heritage, and that Assistant District Attorney Charles Bucca had a conflict of interest when he prosecuted plaintiff, referring to the prosecution as "an attack by domestic government." (*Id.*) Plaintiff alleges that he is currently incarcerated and suffers from Post Traumatic Stress Syndrome ("PTSD").

**\*3** It unclear from the amended complaint which defendant plaintiff is associating with this "claim." If plaintiff is still attempting to sue former ADA Bucca, he may not do so. Judge Hurd dismissed plaintiff's case against defendant Bucca with prejudice based on absolute immunity. Defendant Bucca's involvement was clearly prosecutorial, whether or not he had a "conflict of interest." Prosecutors are afforded absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the Grand Jury).

Although absolute immunity is defeated when the prosecutor is engaging in investigative functions, [6] plaintiff does not cite any "investigative functions" that defendant Bucca allegedly performed during the prosecution of the Williams Lumber event. [7] The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless

of the motivation for that decision. *Scloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989).

In the first claim, in addition to ADA Bucca, plaintiff mentions a "plain clothes" detective Caputo; three unknown and unnamed officers; "Chief Jennifer Thorpe-Reihh," who only brought plaintiff's daughter back to his ex-wife; and two judges. Plaintiff makes no claims against any of these individuals, and to the extent that his complaint could be read to name any of the officers who were involved in the arrest as defendants in a malicious prosecution claim, the claim is still barred by the statute of limitations.

The statute of limitations for section 1983 actions is the "general" statute for personal injury actions in the state in which the cause of action arose. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). In New York, it is well settled that the applicable statute of limitations is three years under N.Y. C.P.L.R. § 214(5). *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). A malicious prosecution claim accrues when the conviction in question is invalidated. *Othman v. City of New York*, No. 13-CV-4771, 2015 WL 1915754, at *5 (E.D.N.Y. Apr. 27, 2015) (citing *Wallace v. Kato*, 549 U.S. 384, 392-94 (2007)). *See also Heck v. Humphrey*, 512 U.S. 477 (1994). In this case, plaintiff alleges that in 2015, the current District Attorney withdrew "the charges" against plaintiff. The court assumes that plaintiff is arguing that because the charges were withdrawn in 2015, the statute of limitations began to run in 2015, and his claim is timely.

However, a review of the documents that plaintiff has submitted as his "supplement" shows that the conviction resulting from his September 3, 2004 arrest was reversed on April 20, 2006. (Dkt. No. 13 at 224). Plaintiff has actually circled the date. (*Id.*) Any malicious prosecution claim would have accrued on April 20, 2006, and the statute of limitations would have run on April 20, 2009. Thus, even assuming that plaintiff was suing someone who was not protected by absolute immunity or who was acting under color of state law, any malicious prosecution claim resulting from the September 4, 2004 arrest is time barred.

**\*4** Plaintiff argues that the 2015 letter from the current Greene County District Attorney extends the statute of limitations. (AC ¶ 1, CM/ECF p.3). In his supplemental objections to my previous recommendation, plaintiff included the letter to which he is referring. (Dkt. No. 10-1 at CM/ECF p.22). The letter was written to Hunter Town Justice

Simon and states that Greene County District Attorney Joseph Stanzione was "in receipt" of then-County Court Judge Lalor's Order, reversing plaintiff's conviction.[8] The letter further states that "upon reviewing the file a determination has been made that the people will not proceed any further with the prosecution of this matter. In fact, the People formally withdraw the charges against Mr. Myer." (*Id.*) Plaintiff argues that since the charges were not "formally" withdrawn until June of 2015, the statute of limitations should not start to run until June 18, 2015.

Plaintiff's argument is unavailing. As stated above, the statute of limitations for malicious prosecution begins to run when the plaintiff's conviction is invalidated. Plaintiff's claim for malicious prosecution would have accrued upon the reversal of the conviction by Judge Lalor. Plaintiff would have been able to bring his action at that time. The fact that, in 2015, the District Attorney decided that he would not re-try plaintiff does not change the fact that the statute of limitations began running in 2006 when the conviction was reversed. Thus, in addition to dismissing the claim against defendant Bucca based on absolute immunity, plaintiff's first claim must be dismissed as barred by the statute of limitations.

### 2. Claim 2

Plaintiff states that his second claim involves a June 28, 2009 arrest in the town of Saugerties (Ulster County), where he was charged with Driving While Intoxicated ("DWI"). (AC COA ¶ 2 at CM/ECF p.4). The charges were dismissed after trial. (Dkt. No. 13 at 224). Plaintiff again attempts to name ADA Bucca as a defendant because plaintiff claims that ADA Bucca was the prosecutor in Greene County, but he "interfered" with the Ulster County prosecution by "provoking" the prosecution from Greene County. Although plaintiff states that ADA Bucca's interference with a prosecution that was "outside" his jurisdiction deprives him of absolute immunity, there is no basis for plaintiff's statement. In any event, the court notes, and plaintiff agrees, that the June 28, 2009 arrest and subsequent prosecution are the subjects of one of plaintiff's claims in another Northern District of New York case which is currently pending. *Myers v. The People of the State of New York (Dep't of Motor Vehicles)*, No. 1:14-CV-1492 (LEK/CFH).

In 14-CV-1492, plaintiff originally named the Town of Saugerties, the District Attorney of Ulster County, Town Justice Daniel Lamb, Officer Gambino, Sheriff of the Town of

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 72 of 151

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

Saugerties, and Attorney Michael Catalanotto.[9] Magistrate Judge Christian Hummel recommended dismissal of the District Attorney, the Town Justice, and Attorney Catalanotto based on absolute immunity for the judge and the district attorney and based on the failure to act under color of state law by the public defender. (Dkt. No. 9 at 5-7 in 14-CV-1492). There is a pending motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), filed by the remaining defendants in that case. (Dkt. No. 34 in 14-CV-1492).

Plaintiff may not now add a claim in this case, relating to 14-CV-1492, against ADA Bucca. If plaintiff is correct, and ADA Bucca's alleged intra-jurisdictional conduct deprived him of his absolute immunity for the Ulster County malicious prosecution allegations,[10] plaintiff should have moved to amend 14-CV-1492. He should not be attempting to re-assert claims against ADA Bucca in this action. It does not appear that Claim 2 makes any other allegations against any defendant named in this amended complaint. Because Claim 2 essentially repeats claims from 14-CV-1492, and plaintiff is attempting to re-assert claims against ADA Bucca after Judge Hurd dismissed him from this case with prejudice, Claim 2 must be dismissed.

### 3. Claim 3

**\*5** Claim 3 "includes all aspects of the arrest and prosecution of February 14, 2010." (AC ¶ 3, CM/ECF p.4). To the extent that plaintiff still tries to include ADA Bucca and DA Terry Wilhelm in this claim, he may not do so. Judge Hurd has already dismissed this case against ADA Bucca and DA Wilhelm with prejudice, and plaintiff has not come forward with any additional facts showing that ADA Bucca's conduct was "investigatory" rather than "prosecutorial."[11] Plaintiff is also still attempting to name the director of Probation, Alan Frisbee and a new probation officer Glen Lubera.[12] Other than mentioning that plaintiff was charged with two probation violations, which resulted in one year incarceration, it is completely unclear what claims he is attempting to make against these probation officers.[13] Alan Frisbee is the Director of the Probation Department and does not appear to have been involved in plaintiff's individual case.[14] In addition, Judge Hurd dismissed the claims against the probation officers with prejudice.[15] To the extent that plaintiff is now attempting to name Officer Lubera, the claim must be dismissed based upon absolute immunity.

Plaintiff also appears to be attempting to re-assert his false arrest claims from the 2010 arrest. (AC ¶ 3 at p.5). As I stated in my previous decision, the statute of limitations has run on the February 2010 arrest, and plaintiff has not asserted any facts in his amended complaint that would change this court's findings relative to that claim. Thus, to the extent that plaintiff continues to assert false arrest, that claim may not proceed as against any defendant.

This court also interpreted plaintiff's complaint against defendant Rowell as one for malicious prosecution, which could proceed because the statute of limitations for malicious prosecution begins to run on the date the conviction is reversed, while the statute of limitations for false arrest begins to run on the date of the arrest. *Othman v. City of New York*, No. 13-CV-4771, 2015 WL 1915754, at *5 (E.D.N.Y. Apr. 27, 2015) (citing *Wallace v. Kato*, 549 U.S. 384, 392-94 (2007)). Because plaintiff was convicted of the DWAI offense on April 26, 2012, any reversal of the conviction would have occurred after that date, which would be within the three-year statute of limitations. Plaintiff alleges in claim three that Judge Koweek reversed the DWAI conviction which resulted from the February 14, 2010 arrest by defendant Rowell.[16] (AC ¶ 3 at p.6). Plaintiff claims that the reversal was based on speedy trial grounds, which generally[17] qualifies under the malicious prosecution standard as a "termination in favor of the accused." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417-18 (2d Cir. 1999) (citing *Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997)). Thus, as I stated in my prior recommendation, plaintiff's malicious prosecution claim against defendant Rowell may proceed.

**\*6** The last paragraph in Claim 3 states that the "harm" to plaintiff includes "all aspects of local law enforcement," and therefore, the Sheriff of Greene County should be liable for "supervising or not supervising his subordinate Rowell, as a habit and method." (AC ¶ 3, CM/ECF p. 6). In my prior recommendation, I noted that plaintiff had not properly alleged the personal involvement of defendant Seeley based upon plaintiff's conclusory allegations of inadequate supervision. (Dkt. No. 5 at 29-30). In fact, in plaintiff's original complaint defendant Seeley was not named in the malicious prosecution section. He was named in relation to the alleged inadequate conditions at Greene County Jail. (*Id.*) Plaintiff has not alleged sufficient personal responsibility by Seeley with respect to the potential malicious prosecution claim. Thus, Claim Three may proceed only as against defendant Rowell, and should be dismissed as to any of the

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 73 of 151

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

other defendants named therein (Bucca, Frisbee, Lubera, and Wilhelm).

### 4. Claim 4

Claim 4 names ADA Bucca, DA Wilhelm, Sergeant Haines, and Laura Mercante. (AC ¶ 4, CM/ECF pp.6-8). Plaintiff alleges injuries resulting from an arrest by defendant Haines at plaintiff's ex-wife's home on August 4, 2010. (AC ¶ 4, CM/ECF p.6). To the extent that plaintiff is again attempting to name ADA Bucca and DA Willhelm, the claim must be dismissed based upon absolute immunity for the prosecutors. The court will continue the analysis as it relates to the arresting officer—defendant Haines and as to Mental Health Counselor Mercante.

Plaintiff was charged with a variety of crimes as a result of the August 4, 2010 arrest, but all charges were dismissed on January 26, 2012. (AC ¶ 4, CM/ECF pp.6-7). The only named defendant that could be held liable on either false arrest or malicious prosecution is the arresting officer—defendant Haines.[18] Plaintiff claims that although Haines arrested him on the charges, plaintiff was innocent of those charges, and Haines had insufficient training in psychology, pointed a gun at plaintiff, maintained a derogatory file, and incarcerated plaintiff after arresting him. (AC ¶ 4, CM/ECF p.7). Even assuming that plaintiff stated a proper false arrest claim against defendant Haines,[19] any claim for false arrest would have accrued on the date of the arrest—August 4, 2010, and any claim for malicious prosecution would have accrued on January 26, 2012, the date that plaintiff states his charges relating to the August 4, 2010 arrest were dismissed. The statute of limitations on the false arrest claim would have expired on August 4, 2013, and the statute of limitations for the malicious prosecution claim would have expired on January 26, 2015.

Plaintiff signed his original complaint on April 22, 2015 and filed the action on May 4, 2015. Even allowing the earlier date to be the date of filing,[20] plaintiff filed this action two years after the expiration of the statute of limitations for the false arrest claim and more than three months after the expiration of the statute of limitations for the malicious prosecution claim. Thus, plaintiff's Claim 4 must be dismissed unless, plaintiff is able to take advantage of equitable tolling.

**\*7** The doctrine of equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances. *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). In order to apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 159 (2d Cir. 2004)).

Plaintiff has shown no extraordinary circumstances to justify equitable tolling in this case. Plaintiff has been filing lawsuits related to his many arrests and prosecutions for quite some time. Plaintiff states that he has filed state court actions relative to these prosecutions and has sued many of the same defendants in both state and federal court. In fact, on December 10, 2014, plaintiff filed his federal action in this court against the Town of Saugerties, the DA of Ulster County, a Town Justice, a police officer, and defense counsel, alleging similar causes of action as alleged in this case. *Myers v. Dep't of Motor Vehicles*, No. 1:14-CV-1492 (LEK/CFH). Plaintiff cannot complain now that he was unaware of his causes of action or could not file this action sooner. There is absolutely no basis for plaintiff to take advantage of equitable tolling to the extent that the claim raises false arrest and/or malicious prosecution.

Finally, plaintiff appears to name Laura Mercante, a Mental Health Counselor at the Greene County Jail. It is completely unclear what plaintiff is attempting to raise against this defendant. Plaintiff alleges that after the charges[21] "[t]he details of the interaction of Myers with his son ... required that GC Mental Health Counselor Laura Mercante act as mandated reporter and requires [sic] a state evaluation of [plaintiff's two children]," but she "failed." (AC ¶ 4, CM/ECF p.7). Plaintiff also alleges that defendant Mercante delayed in turning over some documents and "avoided the request to appear at trial." Her education was inadequate, and she apparently failed in her "professional obligations" with respect to incidents that did not even remotely involve plaintiff. (*Id.*)

None of these factual allegations state a claim, and in any event are likely barred by the three-year statute of limitations. First, plaintiff may only assert his own constitutional rights. It is unclear why the Mental Health Counselor at the Greene County Jail would be responsible for examining plaintiff's children, but plaintiff has not stated how her alleged failure to do so violated his constitutional rights.

Case 9:22-cv-01094-BKS-ML Document 33 Filed 07/25/24 Page 74 of 151

*Myers v. Bucca, Not Reported in Fed. Supp. (2015)*

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees' right to adequate medical/mental care. *Mayo v. County of Albany,* 357 Fed.Appx. 339, 341 (2d Cir. 2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994) [22], should be applied to constitutional medical care claims of pretrial detainees under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir. 2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). The court in *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 Fed.Appx. at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n.4. [23]

**\*8** Plaintiff alleges that defendant Mercante should have evaluated plaintiff's children because she was a "mandated reporter." A plaintiff only has standing to seek redress for injuries done to him, but not for injuries done to others. *Jonakin v. NYC Dep't of Corrections,* No. 11-CV-4807, 2013 WL 5519998, at \*9 (E.D.N.Y. Sept. 30, 2013) (citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166 (1972)). In *Jonakin,* the court dismissed for failure to state a claim, allegations by plaintiff that his fiancee's rights were violated when she attempted to come to the jail and visit him. *Id.* Nor can this pro se plaintiff represent his children's rights. *See Cheung v. Youth Orchestra Foundation of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir. 1990) (a pro se litigant cannot represent anyone other than himself, not even his own children).

It also appears that plaintiff is attempting to claim that defendant Mercante resisted sending mental health documents to plaintiff, although she ultimately appears to have done so, and then she "avoided the request" to appear at plaintiff's subsequent criminal "trial"—(Case No. 11-100). [24] Plaintiff's allegations against defendant Mercante are so vague and conclusory that they cannot withstand initial review. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987) (conclusory allegations are insufficient to state a constitutional claim). Thus, plaintiff's Claim 4 may be dismissed in its entirety.

### 5. Claim 5

Plaintiff states that Claim 5 involves "failures by the Greene County Sheriff's office," and he names Sheriff Seeley; Jail Superintendent Spitz; and Jail Lieutenant Leis as defendants. (AC ¶ 5, CM/ECF pp.8-10). In my prior report, I recommended that the vague claims regarding jail conditions be denied without prejudice to plaintiff submitting an amended complaint which detailed the constitutional violations he was attempting to raise against these defendants. In Claim 5, plaintiff has attempted to do so.

Plaintiff describes three disciplinary reports that he received while he was a pretrial detainee at the Greene County Jail in late 2013 and early 2014. Plaintiff notes that the description of these reports was taken from his 2014 Presentence Report which he has included in his supplemental documents. [25] (Dkt. No. 13 at CM/ECF p.104). Probation Officer Baeckmann states in her report that she interviewed Jail Lieutenant Kenneth Leis for "information regarding [plaintiff's] behavior while in the Greene County Jail." (*Id.*)

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and if so, determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir. 1996). The Supreme Court has held with respect to convicted prisoners, that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995).

**\*9** Pretrial detainees may not be subjected to "punishment" prior to an adjudication of guilt, and the Second Circuit has determined that the *Sandin* analysis does not apply to a pretrial detainee. *Johnson v. Maha,* 460 Fed.Appx. 11, 14 (2d Cir. 2012) (citing *Benjamin v. Frasier,* 264 F.3d 175, 188 (2d Cir. 2001)). A pretrial detainee need not meet the stringent "atypical and significant" standard because the detainee's interest in freedom from unjustified infliction of pain and injury is more substantial. *Benjamin,* 264 F.3d at 188-90. *See also Iqbal v. Hasty,* 490 F.3d 143, 146 (2d Cir. 2007), *rev'd*

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 75 of 151

*on other grounds Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (the Second Circuit holds that *Sandin* does not apply to pretrial detainees); *Best v. New York City Dep't of Correction*, 14 F. Supp. 2d 341, 347 (S.D.N.Y. 2014) (same).

Therefore, in the case of a pretrial detainee, the court must determine whether the condition imposed on the inmate was for a legitimate purpose or for the purpose of punishment. *LaRock v. Amato*, No. 9:12-CV-503, 2013 WL 5466410, at *12 (N.D.N.Y. Sept. 30, 2013) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)). This determination will turn on whether an alternative purpose may be assigned to the restrictions, and whether the restrictions appear excessive in relation to the alternative purpose. *Id.* If a restriction or condition is not reasonably related to a legitimate goal, or if it is arbitrary or without purpose, then the court may infer that the condition is a "punishment" that may not be inflicted upon pretrial detainees without due process. *Id.*

A pretrial detainee is entitled to the due process procedures outlined in *Wolff v. McDonnell*, 418 U.S. 539 (1974). These procedures include a disciplinary hearing and written notice of the charges at least twenty-four hours in advance of that hearing; the opportunity to present witnesses and documentary evidence before an impartial hearing officer as long as doing so will not jeopardize prison safety and security; and a written statement including evidence relied on by the hearing officer in reaching his or her decisions and the reasons for the disciplinary action. *See Wolff*, 418 U.S. at 564–66.

In this case, although plaintiff has described the three disciplinary tickets that he received, he only implies that he was innocent of the charges or that the charges were somehow false. He does not indicate how he believes that the hearing officer [26] or any other defendant violated his procedural due process rights. In fact, plaintiff never mentions who the hearing officers were or whether he had a hearing. Plaintiff claims that, as a result of the disciplinary determinations, he was moved to a basement cell and was denied "privileges" for 30, 30, and 90 days, respectively. (AC ¶ 5 at CM/ECF p.8).

Inmates have "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997). "The inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." *Velez v. Burge*, 483 Fed.Appx. 626, 628 (2d Cir 2008) (summary order).

The first disciplinary report states that on September 9, 2013, plaintiff was charged with interfering with an employee's duties and becoming "loud and boisterous." (AC ¶ 6, CM/ECF p.8). Plaintiff justifies his behavior by stating that the "event" occurred because one of the jail employees was upset about another inmate's suicide and "screamed" at plaintiff that he would never get his legal copies no matter how many times he asked. (*Id.*) Plaintiff mentions that a specific court order required the jail officials to provide plaintiff legal copies "which was intentionally frustrated by Leis, Spitz, and Seeley." [27] (*Id.*)

**\*10** The second disciplinary infraction occurred on November 6, 2013. Plaintiff was charged with violating the visitation rules by "passing a letter to his visitor." (Dkt. No. 13, CM/ECF p.104). The amended complaint essentially explains plaintiff's behavior by stating that he and his visitor were reading the obituary of a friend, and plaintiff claims that defendant Spitz, who observed the visit on a closed-circuit device from his office "asked his staff to chase [plaintiff's visitor] out of the jail." However, plaintiff does not indicate how his due process rights were subsequently violated. Finally, the last disciplinary violation occurred on February 2, 2014, when plaintiff was accused of tampering with a security light by covering it with toothpaste and interfering with an employee's duties. (AC ¶ 5, CM/ECF p. 8-9). Plaintiff claims that the charge was "specious" because the toothpaste provided to indigent inmates is clear. (*Id.* at 9). Plaintiff claims that one of the officers was simply told to "get something on" plaintiff. (*Id.*) Once again, plaintiff never states how his due process rights were violated, only that the charges may have been "false." Thus, to the extent that the amended complaint can be read as attempting to allege procedural due process violations, relating to plaintiff's disciplinary hearings it may be dismissed. [28]

Claim 5 may also be read to allege a denial of access to courts by defendants Seeley, Spitz, and Leis. Plaintiff claims that his calls to the public defender were blocked, he was denied the opportunity to meet directly with the public defender, and he was denied a "timely notary," which "delayed and compromised his defense." (AC ¶ 5 at CM/ECF p.9). Plaintiff claims that the inability to speak privately with his attorney caused him to mistrust counsel and decide to proceed pro se in his criminal trail. Plaintiff alleges that these "limitations" are known to, and accepted by, defendants Seeley, Spitz, and Leis. While the appointment of counsel generally prevents plaintiff from claiming that his access to courts was denied

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 76 of 151

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

by prison officials, in this case, plaintiff claims that he ultimately proceeded pro se in his criminal action because of the defendants' actions.

It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828. The Supreme Court later clarified that "[b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). The *Lewis* court explained, "the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). Finally, the actual injury requirement is not satisfied by the frustration of "just any type of legal claim;" it must be litigation that is related to attacking the inmate's sentence directly or collaterally, or to challenge the conditions of his confinement. *Shine v. Hoffman*, 548 F. Supp. 2d 112, 118 (D. Vt. 2008) (quoting *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006)) (quoting *Lewis v. Casey*, 518 U.S. at 355)).

**\*11** In Claim 5, plaintiff makes various allegations about the denial of access to courts. To the extent that he claims he alleges that he lost his "housing case," resulting in a loss of the property in his apartment, there is no constitutional claim stated because, even assuming an injury, the injury was not to litigation related to his conviction, sentence, or conditions of confinement. [29]

With respect to plaintiff's claim that the defendants' actions affected his attorney client privilege, prevented him from calling his attorney, caused him to proceed pro se, and deprived him of an "effective defense," a finding in plaintiff's favor would necessarily affect his conviction. The offense related to this access to court claim has not been reversed or overturned, thus the claim would be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). *See Croft v. Greenhope Services for Women, Inc.*, No. 13 Civ. 2996, 2013 WL 6642677, at \*5 (S.D.N.Y. Dec. 17, 2013) (citing *Heck, supra*). In *Heck*, the Supreme Court held that a section 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486-87. Because the criminal conviction associated with plaintiff's access to courts claim has not been reversed, Claim 5 may not proceed. [30]

### 6. Claim 6

In Claim 6, plaintiff continues to complain about his 2004 arrest/conviction and attempts to sue ADA Bucca. However, plaintiff also alleges that defendant Bucca told plaintiff's ex-wife in 2010 to alert Bucca if she received any letters from plaintiff and subsequently "call[ed] for" plaintiff's arrest, transformed Bucca's actions from prosecutorial to investigatory, depriving him of absolute immunity.

**\*12** To the extent that plaintiff is suing ADA Bucca relative to the 2004 arrest and conviction, this court has already recommended dismissal above and will not repeat the analysis. With respect to ADA Bucca's alleged actions in 2010, plaintiff has failed to allege any facts that would change this court's finding regarding his immunity, and in any event, any action taken by defendant Bucca in October of 2010 would be barred by the three year statute of limitations. [31] As stated above, this court finds that equitable tolling would not apply.

Plaintiff argues that a June 15, 2015 letter from the Greene County District Attorney's Office stating that plaintiff's successful appeal "leaves open the decision to recharge and retry," which according to plaintiff "opens up" the statute of limitations for the 2004 arrest and alleged malicious prosecution. (AC ¶ 6, CM./ECF p.11). As stated above, the fact that plaintiff could have been retried until the District

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 77 of 151

Attorney formally withdrew the charges in 2015, does not "reopen" the statute of limitations for malicious prosecution on a conviction that was reversed in 2006. Thus, Claim 6 may not proceed.

### 7. Claim 7

Claim 7 expands upon and repeats plaintiff's claims against defendant Mercante. Plaintiff alleges that her education is inadequate, she did not bring the proper documents to court until ordered to do so by the judge, did not fulfill her responsibilities in 2010 after plaintiff's son hit him, and was generally inadequate in all respects affecting other inmates as well as plaintiff and his family. (AC ¶ 7 at CM/ECF 11-12). Plaintiff states that "it is necessary to include Ms. Mercante as a defendant herein since she works collaboratively with the local law enforcement in creating the errors and direct harm to myself and family." (*Id.* at 12). Aside from an obvious statute of limitations problem for any conduct from 2010, plaintiff's claims against Ms. Mercante are completely conclusory and do not state any federal claim. To the extent that plaintiff complains about defendant Mercante's conduct as a trial witness, she would be entitled to absolute witness immunity. Therefore, plaintiff's Claim 7 may not proceed.

### CONCLUSION

**\*13**  The only remaining defendant in this action is defendant Rowell, and the only claim against him is for malicious prosecution in Claim 3. All other allegations are either part of another federal action or do not state a constitutional claim as described above.

**WHEREFORE**, based on the above, it is

**ORDERED**, that plaintiff's second amended complaint is accepted **ONLY** as against **DEFENDANT ROWELL**, and **ONLY** insofar as it alleges **MALICIOUS PROSECUTION IN CLAIM 3**, and it is

**RECOMMENDED**, that all other claims as against all other defendants be **DISMISSED PURSUANT TO 28 U.S.C. §**

1915(e)(2)(B)(ii) **FOR FAILURE TO STATE A CLAIM**, and it is

**ORDERED**, that the Clerk shall issue a summons and forward it, along with a copy of the second amended complaint, to the United States Marshal for service upon the defendant Rowell, and it is further

**ORDERED**, that a formal response to plaintiff's second amended complaint be filed by the defendant Rowell or defendant's counsel as provided in the Federal Rules of Civil Procedure, subsequent to service of process on the defendant, and it is

**ORDERED**, that any paper sent by a party to the Court or the Clerk shall be accompanied by a certificate setting forth the date a true and correct copy of it was mailed to all opposing parties or their counsel. **Any letter or other document received by the Clerk or the Court which does not include a certificate of service which clearly states that an identical copy was served upon all opposing parties or their attorneys may be stricken by the Court.** Plaintiff shall also comply with any requests from the Clerk's Office for any documents that are necessary to maintain this action. All motions shall comply with the Local Rules of Practice of the Northern District, and it is further

**ORDERED**, that the Clerk serve a copy of this Order upon Plaintiff in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 13401929

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 78 of 151

## Footnotes

1    A review of plaintiff's many submissions reveals that when he refers to "Nexus Plus," he is referring to footnote 18 in my prior report which discusses the concept of "Stigma Plus" as it relates to potential defamation claims under section 1983. (Dkt. No. 5 at 17 n.18). I only mentioned this concept in relation to an alternative holding with respect to the application of qualified immunity to probation officers, in the event that absolute immunity did not apply. However, I made it clear that my ruling was based on absolute immunity, and that the discussion of defamation and "Stigma Plus" was merely in the alternative.

2    At the end of the Proposed Amended Complaint, plaintiff has attached a "Motion to Qualify Date of Action Consistent with Denied State Cases." (AC CM/ECF pp.13-23). This section may or may not be part of the Proposed Amended Complaint, but it also appears to argue that plaintiff's claims should not be barred by the statute of limitations.

3    The court does note that on November 25, 2015, plaintiff filed a "Motion to Renew Named Defendants." (Dkt. No. 15). Plaintiff has addressed this motion for reconsideration to Judge Hurd's Order approving my previous Order and Report-Recommendation. (Dkt. No. 14). In reviewing plaintiff's proposed amended complaint, I have actually discussed plaintiff's attempt at re-naming many of the dismissed defendants. Thus, Judge Hurd may consider this Order and Report-Recommendation together with plaintiff's motion for reconsideration in order to determine the ultimate result.

4    The court will refer only to the COAs by the ¶ symbol and the page number that was assigned by the court's electronic filing system ("CM/ECF").

5    On September 3, 2004, plaintiff was arrested after leaving his daughter in a car and then attempting to drive away from the officer. I recommended dismissing plaintiff's false arrest claim as barred by the statute of limitations.

6    *Bernard v. County of Suffolk*, 356 F.3d at 502-503 (citation omitted).

7    Judge Hurd dismissed the claims against defendant Bucca "with prejudice." Plaintiff has not asserted any additional facts that would show that defendant Bucca is not entitled to absolute immunity or change the court's holding in this regard.

8    Although the date of Judge Lalor's order is not written in DA Stanzione's letter, it is clear based upon the listed charges that he was referring to the 2006 reversal of the conviction resulting from the 2004 arrest.

9    Attorney Michael Catalanotto was the Public Defender.

10   This court makes no finding in this regard. It is merely assuming for the sake of argument that the ADA Bucca's alleged conduct in the Ulster County prosecution could have been considered "investigatory," thus depriving him of absolute immunity. Although, ADA Bucca would still be entitled to qualified immunity in any event.

11   Plaintiff complains that ADA Bucca manipulated the location of the prosecution, and plaintiff does not state any specific facts against DA Wilhelm. (AC ¶ 3, CM/ECF pp.4-6).

12   Officer Lubera was discussed in plaintiff's original complaint, but was not named as a defendant. Plaintiff claimed that defendant Frisbee failed to properly train his subordinate probation officers. Plaintiff named Probation Officer Baeckmann as a defendant in the original complaint.

13   Plaintiff may be attempting to claim that he should not have been charged with the probation violations because he was subject to false arrest and malicious prosecution based on the February 14, 2010 arrest, and

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

Case 9:22-cv-01094-BKS-ML   Document 33   Filed 07/25/24   Page 79 of 151

the probation violations were based upon the "police contact and the arrest." (AC ¶ 3 at p.5). However, there is no indication that the probation officers were responsible for the "false arrest" and/or "malicious prosecution," and there is no indication that the procedure relative to the probation violations was unconstitutional.

14   I discussed this in my previous Order and Report-Recommendation. (Dkt. No. 5 at 19). I assumed that plaintiff was attempting to name defendant Frisbee based upon his own conduct and as the supervisor of the other probation officers. (*Id.*) Plaintiff has not made any additional statements in the amended complaint that would change my finding regarding personal involvement. The court does note that Alan Frisbee appears to have been involved in plaintiff's 2004 arrest (Dkt. No. 13 at CM/ECF p.231), when Mr. Frisbee was an probation officer, but not the director. Plaintiff has also submitted a portion of one of his sentencing transcripts, dated April 11, 2014, in which Mr. Frisbee appears in conjunction with a presentence report. (Dkt. No. 13 at 217).

15   In the original complaint, plaintiff alleged that Officer Lubera testified falsely "under oath" while "as a witness for this litigant...." (Compl. ¶ 28). In my Order and Report-Recommendation, I noted that witnesses in both the Grand Jury and at trial are entitled to absolute immunity. *Rehberg v. Paulk,* —— U.S. ——, 132 S. Ct. 1497, 1505-07 (2012). Thus, if plaintiff is now attempting to name Officer Lubera, he would also be entitled to witness immunity as stated in my May 4, 2015 Order and Report-Recommendation.

16   It is unclear when this reversal occurred because in the "supplemental" documents submitted by plaintiff with his second amended complaint, a Presentence Investigation Report, dated April 9, 2014 states that the "disposition" of the February 14, 2010 arrest was still "Convicted at trial. Sentenced to Fine." (Dkt. No. 13 at CM/ECF p.95).

17   In *Berry v. Marchinkowski,* No. 09-CV-4234, —— F. Supp. 3d ——. 2015 WL 5729791, at *31 (S.D.N.Y. Sept. 30, 2015), the court held that there "may be instances where a malicious prosecution defendant can show that the circumstances surrounding a [speedy trial] dismissal are inconsistent with plaintiff's innocence" and would, therefore not qualify as a termination in favor of the accused. Such a determination would have to await further development of the facts in this case.

18   Defendant Haines was the only person that plaintiff cites as responsible for the arrest and prosecution (other than the ADA and the DA who are entitled to absolute immunity). The court will discuss defendant Mercante below, who was clearly not involved in the plaintiff's arrest.

19   The court only makes this assumption for purposes of this Order and Report-Recommendation and makes no findings as to whether a proper claim for false arrest is or could be stated.

20   The Supreme Court has held that an inmate's papers may be deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court. *Houston v. Lack,* 487 U.S. 266 (1988). This rule became known as the "prison mailbox rule," and has been applied to inmates filing complaints for purposes of the statute of limitations. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir. 1993), *modified on other grounds,* 25 F.3d 81 (2d Cir. 1994).

21   Without detailing all of the facts, the August 4, 2010 arrest involved an incident at plaintiff's ex-wife's residence which resulted in plaintiff's son hitting plaintiff.

22   Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

23   As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 80 of 151

Myers v. Bucca, Not Reported in Fed. Supp. (2015)

detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates." 581 F.3d at 71-72 (quoting *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc)).

24      The court is aware that Case No. 11-100 is not the case that was dismissed on January 26, 2012. (*See* Dkt. No. 13 at CM/ECF pp. 94-95). Case No. 11-100 resulted from an arrest for criminal contempt on June 2, 2011. (*Id.* at 94). Plaintiff pled guilty in 11-100, was sentenced to three years probation, but subsequently violated probation and was re-sentenced to a year incarceration. It is unclear what plaintiff means by "trial," because the pre-sentence report that he has attached to his proposed second amended complaint states that plaintiff plead guilty to this charge. This allegation does not affect this court's determination in any way.

25      This is the Presentence Report that was written by defendant Baeckmann on April 9, 2014. This report is part of the reason that plaintiff named Officer Baeckmann as a defendant in his original complaint. (Dkt. No. 13 at CM/ECF pp.96-106).

26      Plaintiff has not included any hearing officers as defendants.

27      This last conclusory allegation by plaintiff is unrelated to any due process claim, and there is no indication how the order was "frustrated" by these three defendants.

28      The court notes that in plaintiff's supplementary objections, he included documents showing that he did get notice of the disciplinary infractions, the opportunity to present evidence at a hearing, and the opportunity to appeal the decisions. (Dkt. No. 10-2 at CM/ECF pp. 2. 34. 63).

29      Plaintiff digresses into a discussion about the theft of his iPhone and the loss of property at the jail. The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post deprivation procedure. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Barnes v. County of Monroe*, 85 F. Supp. 2d 696, 727-28 (W.D.N.Y. 2015) (theft of personal property does not rise to the level of a constitutional violation when the state provides adequate post-deprivation remedies). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996); *Love v. Coughlin*, 714 F.2d 207, 209 (2d Cir. 1983); see also N.Y. Ct. Cl. Act § 10(6) (McKinney 1998). In addition, defendant Haines alleged failure to properly "investigate" plaintiff's stolen telephone claim does not rise to the level of a constitutional violation. Inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (citing *Nieves v. Gonzalez*, No. 05-CV-17, 2006 WL 758615, at *4 (W.D.N.Y. Mar. 2, 2006); *Longi v. County of Suffolk*, No. CV-02-5821, 2008 WL 858997, at *5-6 (E.D.N.Y. Mar. 27, 2008)).

30      Plaintiff argues that the court should stay any claims currently barred by *Heck* because he has pending collateral motions in state court which may invalidate the conviction. This court will not recommend such action because the reversal of plaintiff's conviction, while always possible, is completely speculative.

31      Because the claim is barred by the statute of limitations, the court need not address the issue of absolute immunity. However, the court notes that in *Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997), the Court held that a prosecutor was acting "as an investigator" when he signed a sworn affidavit attesting to the facts supporting an arrest warrant because the prosecutor was acting in a capacity indistinguishable from that of a police officer. In 2002, the Second Circuit distinguished *Kalina* in *Sheehan v. Colangelo*, 53 Fed.Appx. 584, 585-86 (2d Cir. 2002). In *Sheehan*, the prosecutor removed exculpatory facts from the warrant application and resubmitted the application to a different judge. The court stated that even the deliberate suppression of exculpatory evidence falls within the scope of the prosecutor's adversarial duties. *Id.* at 586 (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 & n.4 (1976)). More recently, in *Flagler v. Trainor*, 663 F.3d 543, 549-50

**Myers v. Bucca, Not Reported in Fed. Supp. (2015)**

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 81 of 151

(2d Cir. 2011), the court held that a prosecutor was protected only by qualified immunity for his defamatory statements to the press, and for ordering a domestic violence victim to record telephone calls with her ex-husband, but was entitled to absolute immunity for false statements in conjunction with a material witness application. *Id.* at 547-48. In this case, plaintiff alleges that defendant Bucca told plaintiff's ex-wife to call him if plaintiff attempted to contact her in violation of an existing order of protection. This is not the same as affirmatively recording a conversation which is more in the nature of investigation. Applying for an arrest warrant based on facts attested to by a victim is distinguishable from *Kalina*, in which the prosecutor attested to the facts upon which probable cause was based.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 82 of 151

Myers v. Bucca, Not Reported in Fed. Supp. (2016)

2016 WL 165016
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Scott MYERS, Plaintiff,

v.

Charles BUCCA, et al., Defendants.

6:15-CV-553
|
Signed 01/14/2016

**Attorneys and Law Firms**

APPEARANCES: SCOTT MYERS, Plaintiff, Pro se

### DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Scott Myers brought this civil rights action pursuant to 42 U.S.C. § 1983. On May 14, 2015, the Honorable Andrew T. Baxter, United States Magistrate Judge, advised by Report-Recommendation that four defendants be dismissed with prejudice, three defendants be dismissed without prejudice, and that plaintiff be given an opportunity to amend the complaint with respect to remaining defendant and to those defendants who were dismissed without prejudice. See ECF No. 5. Plaintiff submitted objections to the Report-Recommendation. See ECF No. 10. However, this Court adopted the Report-Recommendation in whole on November 10, 2015. See ECF No. 14. In response, plaintiff submitted a "Motion for Ruling on the Accrual" and a "Motion to Renew." See ECF No. 12; ECF No. 15. Plaintiff has further submitted a motion he characterizes as a "Petition to Pause Pending Related State Appeals." See ECF No. 19.

On December 7, 2015, Judge Baxter advised by Report-Recommendation that plaintiff's second amended complaint be accepted only as to defendant Rowell, and only insofar as it alleges malicious prosecution in Claim 3. See ECF No. 16. Plaintiff submitted objections and a "Motion to Bifurcate," seeking to "preserve objections for Appeal, answer the Order claim by claim, and move to separate, bifurcate, [defendant] Rowell ... " from all other issues raised in his complaint. ECF No. 21, at 1.

In its de novo review, this court has considered plaintiff's various motions regarding accrual, reconsideration, staying the proceedings, and bifurcation. See ECF No. 12; ECF No. 15; ECF No. 19; ECF No. 21. The court construes the motions liberally and concludes that plaintiff's Motion for Ruling on Accrual relates to issues raised by the Motion to Renew, which is best characterized as a Motion for Reconsideration. Thus, these motions will be considered together pursuant to Federal Rule of Civil Procedure 59(e).

The party moving for reconsideration has a heavy burden. See Flaherty v. Filardi, 2009 U.S. Dist. LEXIS 22641, *26-27, 2009 WL 749570 (S.D.N.Y. Mar. 20, 2009). The standard for reconsideration is strict, and "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 256-57 (2d Cir. 1995). " [A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." Id. Courts construe Rule 59(e) narrowly and apply it strictly in order "to avoid repetitive arguments on issues that have been fully considered by the court." Anglo Am. Ins. Grp. v. Calfed Inc., 940 F. Supp. 554, 557 (S.D.N.Y. 1996). Additionally, the movant must demonstrate that "the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court." Range Rd. Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (citation and internal quotation marks omitted). Here, plaintiff has not identified new and intervening case law or overlooked factual issues. Plaintiff is simply unable to meet this burden. Thus, the Motion for Reconsideration must fail. See ECF No. 12; ECF No. 15.

**\*2** Further, the Report-Recommendation addresses the issue of plaintiff's "Motion to Pause Pending Related State Appeals." ECF No. 16, at 28 n. 30. Judge Baxter correctly construed this motion as a Motion to Stay. Id. Because the collateral state court appeals are pending, the court cannot recommend staying any claims. Id. "[T]he reversal of plaintiff's conviction, while always possible, is purely speculative." Id. Therefore, plaintiff's Motion to Stay must also fail. See ECF No. 19.

Finally, as the Report-Recommendation is adopted in whole, plaintiff's motion to bifurcate defendant Rowell is rendered

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 83 of 151

**Myers v. Bucca, Not Reported in Fed. Supp. (2016)**

moot. Per the Report-Recommendation, plaintiff's second amended complaint is accepted only as to defendant Rowell with respect to the claim of malicious prosecution. See ECF No. 16. Thus, only the singular claim against Rowell will proceed and there is no need to bifurcate the claim. Accordingly, plaintiff's Motion to Bifurcate must fail. See ECF No. 21.

Based upon a de novo review of the Report-Recommendation to which plaintiff objected, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Plaintiff's second amended complaint is accepted **ONLY** as against **DEFENDANT ROWELL**, and only insofar as it alleges **MALICIOUS PROSECUTION IN CLAIM 3**;

2. All remaining claims against all other defendants are **DISMISSED PURSUANT TO 28 U.S.C. § 1915(e)(2)(B)(ii) FOR FAILURE TO STATE A CLAIM**;

3. Plaintiff's "Motion for Ruling on the Accrual" is **DENIED** (ECF No. 12);

4. Plaintiff's "Motion to Renew" is **DENIED** (ECF No. 15);

5. Plaintiff's "Petition to Pause Pending Related State Appeals" is **DENIED** (ECF No. 19); and

6. Plaintiff's "Motion to Bifurcate" is **DENIED** (ECF No. 21).

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 165016

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🔴 KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Darnell v. Pineiro,  2nd Cir.,  February 21, 2017

2013 WL 5466410
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary E. LaROCK, Plaintiff,
v.
Michael J. AMATO, Sheriff; Michael
Franko, Jail Administrator, Defendants.

No. 9:12–CV–503.
|
Sept. 30, 2013.

**Attorneys and Law Firms**

Gary E. Larock, Jr., French Camp, CA, pro se.

Law Office of Theresa Puleo, Murry S. Brower, Esq., of Counsel, Albany, NY, for defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action, brought pursuant to 42 U.S.C. § 1983, was referred by this Court to the Hon. Christian F. Hummel, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In his June 4, 2013, Report–Recommendation and Order, Magistrate Judge Hummel recommends that Defendants' motion for summary judgment, Dkt. # 16, be granted with respect to Plaintiff's condition of confinement, access to courts and counsel, and freedom to practice religion claims. Further, Magistrate Judge Hummel recommends that Defendant's motion for summary judgment be denied with respect to Plaintiff's Equal Protection claim and his Procedural Due Process claim regarding his continued placement in Involuntary Protective Custody. No objections to the Report–Recommendation and Order have been filed, and the time to do so has expired. [1]

After examining the record, this Court has determined that the ReportRecommendation and Order is not subject to attack for plain error or manifest injustice.

Accordingly, the Court adopts the Report–Recommendation and Order for the reasons stated therein.

It is hereby ORDERED that Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's Eighth Amendment claims concerning the conditions of confinement; his claims under the First and Sixth Amendments concerning access to courts and counsel; and his First Amendment claim concerning freedom to practice religion are DISMISSED. The motion is DENIED with respect to Plaintiff's Equal Protection and procedural due process claims.

Plaintiff is advised that this action will be dismissed pursuant to Fed.R.Civ.P. 41(b) and Local Rule 41.2 if he fails to prosecute this matter. [2]

IT IS SO ORDERED.

### REPORT–RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Gary LaRock ("LaRock"), who at the relevant time in question was a pretrial detainee in custody at a local jail, brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, the Montgomery County Sheriff and Jail Administrator, violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 16. LaRock has not responded to the present motion. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part. [2]

#### I. Failure to Respond

LaRock did not oppose defendants' motion. "[J]udgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants' provided such notice in the notice of motion, stating that LaRock "must respond by affidavits or as otherwise provided in the rule, setting forth specific

facts showing that there is a genuine issue of material fact for trial." Dkt. No. 16 at 1. Moreover, the Court provided notification to LaRock regarding both the date of his response and the consequences of failing to respond. Dkt. No. 17. Despite such notice, LaRock failed to respond. Because LaRock has not responded to raise any question of material fact, to the extent defendants have pled properly supported facts, such facts as set forth by defendants are accepted as true. *See Cusamano v. Sobek,* 604 F.Supp.2d 416, 452–453, 453 n. 48 (N.D.N.Y.2009); *see also* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

## II. Background

**\*2** Revised in January 2010, Montgomery County Correctional Facility ("Montgomery") had a specific policy regarding administrative segregation for protective custody. Dkt. No. 16–1 at 95, 98. After an inmate had undergone screening and classification, he could be assigned to protective custody, being locked in his cell for twenty-three hours a day for a sixty day period of time. *Id.* at 98. However, the inmate could seek review of said classification, through a written request to the jail administrator, after sixty days provided "there [wa]s no further threat to [the inmate's] safety ...." *Id.* If such a threat remained, the inmate's situation may be re-evaluated every thirty days until such time as the threat dissipated. *Id.*

LaRock arrived at Montgomery on December 18, 2011 as a pretrial detainee upon charges of failure to register as a sex offender. Compl. at 7; Franko Aff. (Dkt. No. 16 at 21–27) § 2.[3] Upon arrival, all inmates are processed and evaluated for placement in the appropriate housing unit consistent with the policy outlined above. Franko Aff. ¶ 3; *Id.* ¶ 6 (explaining that classification officers consider an inmate's "past criminal history ... and information if that person has been in the jail on other occasions," as well as interviewing the inmate). LaRock's classification was determined after evaluating "the charges pending and his past history of [sex based] criminal offenses ... [for which defendants concluded that LaRock] was therefore considered to be vulnerable to injury from inmates housed in the regular population." Franko Aff. ¶ 5; *see also* Dkt. No. 16 at 83–86 (inmate classification form (1) awarding twenty-nine points for a pending charge of a nonviolent felony, sex offense misdemeanor, or federal

charge; (2) awarding twenty points for a prior violent felony or sex offense; (3) various points for substance abuse and prior institutional misconduct; and (4) determining that LaRock required protective custody and close supervision despite a lack of any victimization history "due to previous convictions, safety, [and] security of oneself [and] facility.").

After spending approximately two days undergoing classification, on or about December 20, 2011, LaRock received notification that Classification Officer Payne had administratively segregated LaRock into involuntary "protective custody [hereinafter "IPC"] for his own personal safety." Dkt. No. 16 at 82; *see also* Franko Aff. ¶ 4 (explaining that LaRock was first assigned IPC on December 20th and then reevaluated by Officer Smith on December 26th (Dkt. No. 16 at 83–86) which resulted in an identical classification determination); *cf.* Compl. at 7 (explaining that LaRock received paperwork classifying him to IPC on December 20th but also contending that he spent eight days in classification, presumably referencing the second inmate classification forms he received after Officer Smith's evaluation dated December 26th). LaRock signed the Administrative Segregation Notice Form indicating that he was being placed in IPC for his own protection. Dkt. No. 16 at 82.

**\*3** "In the late fall of 2010 and continuing into the winter and spring of 2011[ ] the inmate population of Montgomery ... was growing[; thus] the Sheriff and [Administrator] began to discuss how the rising population might impact the safety of inmates and ... of corrections officers assigned to the various pods ...." Franko Aff. ¶ 8. Specifically during this time period, there was "a rise in the population of sex offenders[, which] ... was a concern given that sex offenders are often victimized in a correction setting when housed in the general population." Franko Aff. ¶ 9. This also caused a concern for the safety of the correctional staff "who intervene to break up fights and provide a higher level of protection to the vulnerable population." *Id.*

While in IPC, it is undisputed that LaRock was locked in his cell for twenty-three hours a day, with one hour of recreation during which he could use the phone or shower. Compl. at 7; *see also* Franko Aff. ¶ 10 (confirming that the sex offenders were locked down for twenty three hours a day because "[w]hile [defendants] would have liked to have given each of the persons housed at the jail the ability to move about the pod, this was not possible because of the number of persons the facility was housing and ... the then current staffing levels.");

*Id.* ¶ 11 (explaining that IPC inmates "were not given the option to join the general population [yet w]hile in [IPC, inmates] ... were allowed out of their cells for one hour each day for recreation, showers, etc."). During the time period in question, while he was in IPC, LaRock never violated any disciplinary rules and was upset that his confinement was restricted similarly to those who had committed severe disciplinary infractions who then were subjected to restricted access about the housing unit, restricted ability to shower and access various amenities, limited access to the law library, and limited opportunities to communicate freely with their attorney, family and other inmates, and watch television. Compl. at 7–9.

Defendants emphatically state that placement in IPC was not punitive, but prophylactic. Franko Aff. ¶ 14 (explaining IPC placements were "intended primarily to address the conditions at the jail of a higher than normal population of sex offenders who belong to a class of inmates who are most often targeted for victimization."). Further, defendants assert that IPC inmates "were allowed visitation from those outside the jail during a time set aside for [IPC] ... inmates." Franko Aff. ¶ 12; *see also* Dkt. No. 16 at 105 (facility rule book with visitation schedule indicating IPC inmates had visitation between 10:00 and 11:00 a.m. on Monday and Wednesday). Defendants also contend that IPC inmates could participate in educational activities, just not with those inmates in general population, shower during recreation, have access to the law library, and participate in visits with their attorneys. Franko Aff. ¶¶ 13, 17, 18; *see also* Dkt. No. 16 at 104 (facility rule book outlining attorney visitation); *compare* Compl. at 9 (alleging that between January 10, 2012 and February 25, 2012 LaRock requested, yet was denied, law library visitation on nine separate occasions) *with* Franko Aff. ¶ 17 ("LaRock did request access to the law library on a number of occasions and his requests were both denied and allowed during his time in [IPC]."), Dkt. No. 16 at 51 (LaRock requesting, being granted, and then ultimately refusing to make a legal call on March 27, 2012), Dkt. No. 16 at 54 (LaRock requesting and being approved a legal library visit on March 15, 2012), Dkt. No. 16 at 57 (LaRock requesting and being approved a legal library visit on March 7, 2012 from 6:36 p.m. through 6:55 p.m.), Dkt. No. 16 at 60 (LaRock requesting and being approved a legal library visit on February 27, 2012 from 6:02 p.m. through 6:58 p.m.).

**\*4** LaRock authored a grievance on January 23, 2012 regarding his continued placement in IPC. Compl. at 8. LaRock was told by the shift supervisor that IPC placements were not grievable issues and that, instead, LaRock should write to Franko to appeal his classification. Compl. at 8; *see also* Franko Aff. ¶ 15. LaRock wrote to Franko on January 29, 2012, specifically seeking to be placed in general population. Dkt. No. 1–1 at 2; Dkt. No. 16 at 90. LaRock submitted another request to Franko on February 27, 2012 seeking reclassification stating that he had been in IPC for seventy-two days and wished to return to general population. Dkt. No. 1–1 at 3; Dkt. No. 16 at 80. The request was denied, stating reclassification would "not [occur] at this time." Dkt. No. 1–1 at 3,

It is unclear if LaRock submitted another reclassification request, or if Franko independently determined LaRock's status should be reassessed. The latter appears to be true. Franko affirms that LaRock "did appeal his classification to [Franko] and [Franko] asked that Officer Payne review his classification on March 19, 2012." Franko Aff. ¶ 15; *see also* Dkt. No. 16 at 75–78 (inmate classification form completed by Officer Payne on March 19, 2012). Concurrently, "[i]n March of 2012 it was suggested to [Franko] in person, and by mail by a representative of the ... [COC], that the 23–hour a day lock up was not appropriate unless there was an identified safety and security risk." Franko Aff. ¶ 20. As a result, LaRock was reclassified and taken out of IPC. Franko Aff. ¶ 20; Dkt. No. 16 at 82. Franko maintains that defendants "believed that there were such [safety and security] risks identified by the classification process ... [but that nonetheless] Officer Payne overrode the form ...." Franko Aff. ¶ 20.

Defendants assert that during the meeting with the COC, Franko "was informed that [Montgomery's] classification scheme was not incorrect [and] ... th[e] evaluation forms being used did not discriminate ... It was merely suggested that ... Montogomery ... review its procedures to insure that those in protective custody needed to be there." Franko Aff. ¶ 21. LaRock spent approximately three months in IPC custody.

### III. Discussion

In his complaint, LaRock alleges that his Eighth Amendment rights were violated by defendants' discriminatory practice of housing inmates with a present or prior sex offenses in IPC. While stated as an Eighth Amendment claim, such contentions are best analyzed pursuant to an Equal Protection analysis. Furthermore, liberally construing LaRock's complaint, he has alleged a violation of his

Fourteenth Amendment regarding (1) his conditions of confinement and (2) due process procedures for both his initial and continued IPC confinement. Lastly, liberally construing LaRock's allegations, he also proffered claims regarding his access to counsel, the law library, and religious services. Defendants seek dismissal contending that (1) LaRock's conditions of confinement, access to counsel, access to the law library, access to religious services, and Equal Protection claims are meritless and (2) they are entitled to qualified immunity.

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and

that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Access to Counsel

**\*6** "[T]he right to counsel and the right to access to the court are interrelated ... [h]owever, the two rights are not the same." *Benjamin v. Fraser,* 264 F.3d 175, 186 (2d Cir.2001). "[A]ccess claims ... concern[ ] the ability of ... prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement. By contrast ... the Sixth Amendment [confers the] right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense." *Id.* (internal quotation marks, alterations, and citations omitted).

#### 1. Sixth Amendment

"[P]retrial detainees need access to the courts and counsel ... to defend against the charges brought against them." *Benjamin v. Fraser,* 264 F.3d 175, 186 (2d Cir.2001) (citations omitted). Accordingly, the Second Circuit has determined that a pretrial detainee's Sixth Amendment rights are infringed upon when prison regulations "unjustifiably obstruct", "infringe", "unreasonably burden", or "significantly interfered" with the detainee's access to counsel. *Id.* at 187 (quoting *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1989); *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447

(1979); *Wolfish v. Levi,* 573 F.2d 118, 133 (2d Cir.1978); *Cobb v. Aytch,* 643 F.3d 946, 957 (3rd Cir.1981) respectively).

In this case, LaRock states that the twenty-three hours a day he spent in lock down "does not allow [him] the right to contact [his] lawyer when needed .... " Compl. at 7–8. However, in defendants' papers the facility rule book indicates that accommodations can be made, upon request, for attorneys visits for those individuals in IPC. The undersigned liberally construed LaRock's complaint as LaRock's conclusory allegations fail to indicate what counsel he was denied access to and for what purpose the counsel was involved, when his requests were made and how they were handled, or how the defendants' proffered policy obstructed, interfered, unreasonably burdened or infringed upon his Sixth Amendment rights. It is assumed that LaRock refers to his representation regarding his pending criminal matter for failure to register as a sex offender and that he is contending that his ability to communicate with that counsel in pursuing his criminal defense was impeded. However, for the reasons stated above, upon the present record such conclusory claims are insufficient to establish a Sixth Amendment violation.

### 2. First Amendment and Due Process

Pretrial detainees also have a constitutional right for meaningful access to the courts, which may be satisfied pursuant to the appointment of counsel. *Bourden v. Loughren,* 386 F.3d 88, 93 (2d Cir.2004) (citing cases). Such a right "requires that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement ... not be impeded from presenting those defenses and claims for formal adjudication by a court." *Id.* at 96 (citing *inter alia Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Thus,

> **\*7** when a prisoner with appointed counsel claims that he was hindered by prison officials in his efforts to defend himself or pursue other relevant legal claims, he must show that, on the facts of his case, the provision of counsel did not furnish him with the capability of bringing his challenges before the

courts, not that he was denied effective representation in the court.

*Id.* at 98 (citations omitted).

Construing LaRock's claims liberally, there is also the potential that he is contending that defendants denied him meaningful access to the courts. LaRock attempts to allege that defendants restricted LaRock's access to the point where it was an impediment. However, for substantially the same reasons as stated above, LaRock's complaint fails to indicate what he was hindered from completing. LaRock does not make any contentions about his ability to present his defense or how his criminal action proceeded, or failed to proceed, while incarcerated at Montgomery. Nor does LaRock contend that his counsel was incapable of presenting his various defense arguments. Thus, even viewing the facts in the light most favorable to LaRock, he has failed to proffer facts sufficient to support any potential access to the court claim. Accordingly, defendants' motion on this ground is granted.

### C. First Amendment

### 1. Law Library

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) ("Prisoners, including pretrial detainees, have a constitutional right of access to the courts.") (internal quotation marks and citations omitted). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program was subpar in some theoretical sense." *Lewis,* 518 U.S. at 351. Thus, in order to demonstrate an actionable injury, "a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." *Vega v. Artus,* 610 F.Supp.2d 185, 201 (N.D.N.Y.2009) (citations omitted); *see also Lewis,* 518 U.S. at 351–52 (explaining the actual injury requirement).

In this case, LaRock has failed to allege a First Amendment violation. First, despite LaRock's conclusory contentions in his complaint that he was denied his requests to the law library on multiple dates, his inmate file indicates that LaRock was able to go to the law library on several occasions while in IPC and that a request for a legal phone call was granted but never occurred due to LaRock's refusal to participate in the call. Liberally construing all of the facts in the light most favorable to LaRock, it is still doubtful whether he has raised a question of material fact with respect to the first prong of the analysis. Regardless, LaRock has failed to state any type of actual injury which occurred as a result of the apparent discrepancy in access to the law library experienced by those in IPC. LaRock has failed to identify which legal claims were frustrated, if they were meritorious, and how that research would have supported the viability of such claims. In the absence of any evidence that LaRock suffered any actual injury precluding him from pursuing any judicial action, defendants' motion as to any claimed deficiency in LaRock's access to Montgomery's law library should be granted. *See Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

### 2. Religious Services

 **\*8** The First Amendment protects the right to free exercise of religion. *See generally Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)); *see also Nolley v. County of Erie,* No. 07–CV–488S, 2008 WL 859165 (W.D.N.Y. Mar.31, 2008) (applying First Amendment freedom of religion protections to a pretrial detainee) [4] .

To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the

challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (citations omitted). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted); *see also Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) ( "The governing standard is one of reasonableness, taking into account whether the particular regulation ... is reasonably related to legitimate penological interests.") (citations omitted).

> The *Turner* Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin,* 905 F.2d at 574 (citing *Turner v. Safely,* 483 U.S. 78, 89–91 (1987).

"[P]risoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citations omitted). "Confinement in keeplock does not deprive prisoners of this right." *Id.* (citations omitted). While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, ... prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted). The same analysis is undertaken when there is an allegation

that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." *Ford,* 352 F.3d at 595 n. 15 (citations omitted).

**\*9** In this case, even liberally construing LaRock's claim, he has failed to state a First Amendment claim. LaRock's complaint fails to establish the first element in the analysis as LaRock's complaint and motion papers remain silent with respect to what religion LaRock was a member of and, by extension, what sincerely held religious practices were withheld from him during his IPC confinement. LaRock's general and conclusory claims that all IPC inmates were precluded from practicing religion are insufficient to raise a question of material fact. Without establishing a firmly held religious belief or identifying any interference with those practices, the discussion cannot further progress to an evaluation of whether isolating IPC residents from general population religious services was reasonable. *See e.g., Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006) (articulating test that inmates "must show at the threshold that the disputed conduct ... burdens his sincerely held religious beliefs," prior to advancing to the *Turner* test and "legitimate penological interests that justify the impinging conduct ....") (citations omitted). Accordingly, defendants' motion on this ground should be granted.

### D. Conditions of Confinement

LaRock also contends that he was subjected to unconstitutional conditions of confinement since he was locked in his cell for twenty-three hours a day and was only allowed out of his cell for one hour a day to shower, engage in recreation, speak with fellow inmates and watch television.

Claims concerning the conditions of confinement brought by a pretrial detainee, such as LaRock, must be analyzed under the Fourteenth Amendment's Due Process Clause. The Due Process Clause provides that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted). However, the standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) ( "Claims should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Shane v. Winnebego County Dep't of Soc. Servs.,* 489

U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter, medical care, and reasonable safety ....") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment. Therefore, LaRock's conditions of confinement claim will be considered under Eighth Amendment standards.

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1884). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element —that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

**\*10** The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual

punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

In this case, LaRock's claims that he was confined in administrative segregation for twenty-three hours a day, only allowed to shower, visit his family, use the phone, and interact with other inmates during his one hour long recreation, prohibited from wandering around outside of his cell, limited in his ability to watch television, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell, are insufficient to support an Eighth Amendment claim. Generally, administrative segregation conditions, even though "restrictive and ... harsh, [are insufficient to establish Eighth Amendment violations because] they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). LaRock has failed to allege any deprivations of a single, identifiable human need. *See Greene v. Furman,* 610 F.Supp.2d 234, 237 (W.D.N.Y.2009) (holding that inmate's Eighth Amendment claim originating from his confinement in segregation was insufficient to state a constitutional claim as the allegations of denied exercise, showers and haircuts, did not represent atypical treatment, result in physical injury, or establish cruel and unusual punishment). Moreover, to the extent LaRock contends that his inability to program was an Eighth Amendment violation, such contentions are meritless. *See Griffin v. Coughlin,* 743 F.Supp. 1006, 1017 (N.D.N.Y.1990) ("[Inmates] have no eighth amendment right to prison work and educational activities.") (citations omitted). LaRock was given warmth, shelter, clothing, food, and exercise. LaRock was allowed to shower and have two morning visitations throughout the week. LaRock was just upset that he did not have more freedom with his time and movement. However, such claims are insufficient to establish the objective prong of the analysis.

Accordingly, to the extent such Eighth Amendment claims are apparent, defendants' motion should be granted and the claims dismissed.

## E. Fourteenth Amendment

## 1. Due Process [5]

**\*11** The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citations omitted).

As a pretrial detainee, LaRock's "liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty[; thus,] restrictions on pretrial detainees ... may not amount to punishment ...." *Benjamin v. Fraser,* 264 F.3d 175, 188 (2d Cir.2001) (citations and internal quotation marks omitted). Unlike convicted prisoners, who must satisfy the standard of "atypical and significant hardship" outlined in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a pretrial detainee need not meet such a stringent standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial ...." *Id.* at 188–90; *see also Iqbal v. Hasty,* 490 F.3d 143, 146 (2d Cir.2007) *rev on other grounds Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Th[e Second Circuit] has said that *Sandin* does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing

*Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). "Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement." *Shine v. Hofmnn,* No. 06–CV–237, 2009 WL 2179969, at *5 (D.Vt. July 22, 2009) (citing *Kentucky Dep't of Corr.,* 490 U.S. at 459–60).

As previously discussed, the Second Circuit has determined that pretrial detainees may not be subjecting to punishment prior to an adjudication of guilt. *Benjamin,* 264 F.3d at 188 (citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). In determining whether a restriction is punitive, a court may consider

> **\*12** Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable ... and whether it appears excessive in relation to the alternative purpose assigned ....

*Bell,* 441 U.S. at 537–38 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

> Absent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if

a particular condition or restriction of pretrial detention is reasonably related to legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal —if it is arbitrary or purposeless— a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees....

*Id.* at 538–39 (internal quotation marks and alterations and citations omitted); *see also Benjamin,* 264 F.3d at 188 (same).

### i. Initial Placement in IPC

New York regulations require "chief administrative officer[s] of each [local or county] correction facility [to] establish, implement, and maintain a formal and objective system for the consistent classification of all inmates." N.Y. COMP.CODES R. & REGS. TIT. 9, § 7013.1. These detailed regulations provide (1) various classification categories (*Id.* § 7013.4); (2) provisions for a screening instrument which records information regarding the inmate's physical and mental health, criminal history, incarceration history, and any other relevant information (*Id.* § 7013.7); (3) requirements that classification be generally determined within five business days of admission into the facility (*Id.* § 7013.8); and (4) conditions under which an inmate's classification should be changed (*Id.* § 7013.9).

The Montgomery policies regarding classification reference the above regulations. Dkt. No. 16 at 95–112. Specifically, the Montgomery policy states that initial screening and risk assessment will occur and classification will generally occur within five business days. *Id.* at 98 (citing N.Y. COMP.CODES R. & REGS. TIT. 9, § 7013). Additionally, the policy provides that

> INMATES WHO ... HAVE BEEN ASSIGNED TO PROTECTIVE CUSTODY SEGREGATION AFTER THE COMPLETION OR DURING

THEIR CLASSIFICATION SCREENING WILL BE SUBJECT TO A *23 HOUR A DAY LOCK IN STATUS* AND WILL BE HOUSED SEPARATELY FROM GENERAL POPULATION, FOR A MANDATORY *60 DAY PERIOD OF TIME*. AFTER 60 DAYS YOU MAY REQUEST, IN WRITING, TO THE JAIL ADMINISTRATIVE OFFICER A CHANGE IN YOUR PROTECTIVE CUSTODY STATUS. IF IT IS DETERMINED THAT THERE IS NO FURTHER THREAT TO YOUR SAFETY, YOU WILL BE TAKEN OUT OF PROTECTIVE CUSTODY AND MOVED INTO GENERAL POPULATION. HOWEVER, IF IT IS DETERMINED THAT A THREAT TO YOUR SAFETY STILL EXISTS, YOU WILL BE KEPT IN PROTECTIVE CUSTODY AND YOUR SITUATION WILL BE RE–EVALUATED EVERY 30 DAYS AFTER UNTIL SUCH TIME THAT NO THREAT EXISTS.

**\*13** *Id.* (citing N.Y. COMP.CODES R. & REGS. TIT. 9, § 7013) (emphasis in original). While not specifically articulated in the policy, defendant Franko affirmed, and the jail intake forms corroborated, that the same categories were used when classifying inmates as those articulated in the New York regulations. Most specific to this case was LaRock's present and past criminal charges.

It is undisputed that initially, during classification, LaRock spent two days segregated for classification purposes. Moreover, "[t]he [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (internal quotation marks and citations omitted). The balancing test articulated in *Turner v. Safely* has been deemed uniquely instructive in considering whether "a prison regulation infringing on an inmate's constitutional rights is valid[,] so long as the regulation is reasonably related to the legitimate penological interests." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093791, at \*7 (citing *Turner,* 482 U.S. at 89).

> The *Turner* Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin,* 905 F.2d at 574 (citing *Turner v. Safely,* 483 U.S. 78, 89–91 (1987).

A recent case in the Northern District of New York has already deemed the initial, temporary segregation of an inmate in a county jail during classification procedures valid and not an infringement upon due process protections. *Harvey,* 2012 WL 4093791, at \*7. In that case, the county jail had identical initial classification policies also based on the New York regulations.

> Until an inmate is screened for prior violence; propensity for victimization; possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be. Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty.

*Harvey,* 2012 WL 4093791, at \*7. For substantially similar reasons, even given LaRock's pretrial detainee status, to the extent that LaRock challenges the initial five day classification period spent in segregation such contentions are

insufficient to establish a due process violation. Defendants actions in confining LaRock in segregation for the limited purposes of classifying him was related to a legitimate penological purpose to which there are no ready alternatives and for which the segregation was neither punitive nor excessive. Accordingly, for these reasons to the extent LaRock has attempted to plead a due process claim, such contentions are insufficient to support a constitutional violation.

### ii. Continued Placement in IPC

**\*14** As a pretrial detainee, the Due Process Clause provides a liberty interest in remaining free from restrictive confinement. Moreover, as articulated above, confinement which is deemed punitive pursuant to the above stated factors indicates a liberty interest requiring procedural due process protections. Defendants continually contend that LaRock's confinement was administrative and prophylactic, not disciplinary. *See e.g. Colon v. Goord,* No. 05–CV–129 (TJM/GJD), 2008 WL 783364, at \*7 (N.D.N.Y. Mar.20, 2008) (explaining that in the NYS Department of Corrections and Community Supervision ("DOCCS") facilities, which fall under different regulations but have analogous housing classifications, "IPC is *not* a disciplinary unit ....") (emphasis in original).

However, the undisputed housing conditions for LaRock in IPC, particularly being locked in one's cell for twenty-three hours a day, were more analogous to disciplinary confinement than segregation. *See e.g. Id.* (explaining that in the DOCCS facilities "IPC inmates are afforded more privileges and have less restrictions than Ad[ministrative] Seg[regation] inmates ... [who] are subject to the same restrictions as disciplinary S[pecial] H[ousing ]U[nit] inmates ...."). Accordingly, LaRock's restraint to IPC was comparable to confinement which has historically, and is still presently, regarded as punishment. This was further acknowledged by the COC whereupon it urged defendant Franko to reconsider the classifications of IPC inmates to ensure that the appropriate inmates were being confined there. *See also Id.* ("A review of [DOCCS] rules shows that many of the privileges accorded to general population inmates are also accorded to IPC inmates, albeit in a separate part of the facility."); Franko Aff. ¶¶ 20–21; *see also* Dkt. No. 16 at 75–78; *cf. Torres v. Stewart,* 263 F.Supp.2d 463, 470 (D.Conn.2003) (discussing the correctness of summary judgment against a pretrial detainee due process case alleging

incorrect assignment to maximum security where the plaintiff failed to present evidence that a "decision constituted impermissible punishment."). Further, while defendants stand by their initial classification scheme stating that they believed there were safety and security reasons supporting the IPC confinement, none of there were included in the present record or argued to have existed by defendants. Accordingly, the fact that LaRock spent approximately three months as a pretrial detainee in an environment generally reserved for those guilty of disciplinary infractions and subject to punitive confinement, is sufficient to satisfy a liberty interest raising due process concerns.

Pursuant to *Bell,* in the face of behavior that may be deemed punitive, such restrictions will not be held as such if there is a legitimate governmental purpose proffered. Defendants have failed to proffer a penological justification for classifying federal pretrial detainees with prior or pending sex crimes in IPC. *See Shine v. Hofmnn,* No. 06–CV–237, 2009 WL 2179969, at \*5 (D.Vt. July 22, 2009) (holding that where (1) a pretrial detainee was placed in "close custody" with only two hours of recreation a day because he (i) had a disciplinary rules violation with the last year and (ii) was a detainee and (2) defendants failed to offer a legitimate penological justification for the custody determination, such confinement was deemed punitive). Defendants repeatedly state that housing inmates with a criminal history of sex crimes or with a sex offender status was not punitive, but rather prophylactic, as these inmates represented a risk to safety and security of the facility. Defendants have proffered an affidavit from Franko which indicates that inmates with sex offender status were generally more vulnerable and susceptible to victimization, the population of the jail was increasing without a concomitant increase in the number of corrections officers, and that increase was attributed primarily to larger numbers of sex offenders entering custody. Other districts have deemed an inmate's sex offender status to represent a safety issue requiring protective custody. *See e.g. Tucker v. Royce,* Nos. 09CV35–MPM–JAD, 09CV106– MPM–JAD, 10CV4–MPM–JAD, 2011 WL 541116, at \*6 (N.D.Miss. Feb. 8, 2011) (denying Eighth Amendment claims regarding IPC classification because the inmate "was placed in [IPC] for a reason: as a sex offender, he was vulnerable to assault from other inmates ...."). Moreover, the Second Circuit has discussed, though not explicitly commented on the constitutionality of the policy of offering IPC to inmates with sex offender histories. *See Arnold v. County of Nassau,* 252 F.3d 599, 601 (2d Cir.2001) (explaining in an action alleging failure to protect, and not a due process violation, that the

inmate was initially placed into IPC "pursuant to 'Warden's Order: Sex Crimes,' an order designed to assure that inmates charged with sex crimes are removed from the general prison population because they are a greater risk of assault by other inmates.").

**\*15** However, the present record proffers nothing more than conclusory assertions about the circumstances faced by defendants at Montgomery. Defendants have failed to provide any documentation regarding information including specific numbers of the inmate population and the percentage of sex offenders previously housed at Montgomery, that population's anticipated increase in comparison to the rest of the incoming inmate population, or the number of attacks on sex offenders or those with a sexually based criminal history. *See Smart,* 441 F.Supp.2d at 645 (denying qualified immunity because defendants failed to demonstrate anything more than "conclusory statements" about safety concerns essentially providing the court with "no showing that there was any reason to fear for [the inmate's] personal safety."). Moreover, it stands to reason that with multiple housing pods and an increased number of inmates with sex offenses, an alternative existed for housing all sex offenders together in a housing unit, as opposed to IPC and lock-down in individual cells, providing them with freedoms identical to those in general population while still segregating and protecting them from the allegedly dangerous general population inmates.

As a liberty interest has been established, the next question is whether Allen was provided with appropriate procedural protections. A form of administrative segregation, as opposed to disciplinary confinement, placement in IPC "requires only an informal, nonadversary review." *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006). The procedural due process protections are minimal, dictating that the informal review must occur within a reasonable time, after the inmate has had some notice of the charges lodged against him and an opportunity to present his views to the administrator making the determination about segregation. *See e.g. McClary v. Kelly,* 4 F.Supp.2d 195, 212 (W.D.N.Y.1998) (citing *Hewitt. Helms,* 459 U.S. 460, 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Moreover, the "prison officials must engage in periodic review of the decision ... to ascertain whether a prisoner remains a security risk ... [which is] supported by some evidence." *Id.* at 212–13 (internal quotation marks and citations omitted). Lastly, "administrative segregation may not be used as a pretext for indefinite confinement[, so] ... periodic reviews [cannot be] a sham; the reviews must be meaningful and not simply

perfunctory." *Id.* at 213 (citations omitted); *see also Covino v. Vermont Dep't of Corr.,* 933 F.2d 128, 130 (2d Cir.1991) (explaining that "[a]t some point, however, the administrative necessity for involuntary lock-up begins to pale ... [and] smacks of punishment.").

However, when considering the restraint of a pretrial detainee, if "a purportedly administrative restraint ... is found to be tantamount to punishment," the due process standard governed by *"Wolff v. McDonnell,* which requires written notice of the charges at least twenty-four hour before any hearing, a written statement of factual allegations against the inmate, and at least a limited ability to present witnesses and evidence," applies. *Taylor v. Santana,* No. 05–CV–1860(AKH), 2007 WL 737485, at \*4 (S.D.N.Y. Mar.6, 2007) (citing *Benjamin,* 264 F.3d at 190). While defendants contend that LaRock's IPC placement was prophylactic and not punitive, for the reasons outlined above, such contentions have been deemed insincere and LaRock's restraint has been found excessive given the circumstances. *Cf. Taylor,* 2007 WL 737485, at \*5 (citations omitted) (deeming defendants' actions in sending a pretrial detainee, found guilty of assault for his involvement in an altercation which resulted in the death of another inmate, to solitary confinement during which plaintiff alleged he did not receive notification of the reasons for confinement for approximately one month, as a non-punitive restriction subject to the informal, due process standards given defendants legitimate penological purpose in placing a detainee with "uncontrolled rage and fighting prowess that could be imminently dangers to himself and to others ...." in confinement for the protection of the plaintiff and the rest of the prison population).

**\*16** Initially, LaRock received a document that indicated that because of his criminal history, he was to be placed in IPC. LaRock signed the form which served as notification of the administrative segregation as well as the initial opportunity for LaRock to express his displeasure with his classification. LaRock also requested and received a classification status review in February 2012. While informal, the review indicated that classification would not change at this time and that reasoning was provided to LaRock. Both appear to comply with the minimal procedures guaranteed by the Due Process clause for administrative, non-punitive confinement. However, further procedures providing LaRock with a formal opportunity to present witnesses and evidence at a hearing prior to his IPC confinement were not provided.

Pursuant to Montgomery's policies which are based on state regulations, in the case of administrative segregation pending a disciplinary hearing, the inmate may be placed in administrative segregation for the duration of the disciplinary process, but a formal disciplinary hearing shall occur within fifteen business days from the date of the incident. Dkt. No. 16–1 at 188 (citing N.Y. COMP.CODES R. & REGS. TIT. 9, §§ 7006.7–7006.8). While LaRock was not technically labeled as a disciplinary inmate, for the reasons stated above, his confinement was punitive and review of the placement should have happened, it seems at the very least, within the same fifteen day window.

Accordingly, as defendants have failed to provide sufficient evidence to establish that neither their intent nor LaRock's restrictions were punitive or that such restrictions were pursuant to a legitimate governmental purpose and, in view of LaRock's pretrial detainee status and construing the facts in the light most favorable to LaRock, his IPC confinement was punitive and he was entitled to enhanced due process protections. While the lesser due process protections appear to have been met, the record fails to reflect the same of the greater due process protection afforded to those under punitive confinement. Therefore, to the extent LaRock has pled substantive due process claims surrounding the punitive character of his confinement and related procedural due process claims regarding his continued placement in IPC, such claims remain.

**b. Substantive Due Process**

Liberally reading LaRock's complaint, it appears he has also alleged a *per se* substantive due process claim concerning his placement and continued confinement in IPC based on his criminal history and pending charges. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ... but not against government action that is 'incorrect or ill-advised' " *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Okin v. Village of Cornwall– On–Hudson Police Dep't,* 577 F.3d 415, 431 (2d Cir.2009) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). As already observed by the Northern District of New York,

"[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process. In *Sandin v. Conner,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." *Samms v. Fischer,* No. 10–CV–349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar.25, 2011) (citations omitted).

*\*17* In this case, while the actions of defendants in articulating a policy which summarily housed a population of inmates in IPC pursuant to potentially legitimate concerns related to inmate facility and security could be categorized as incorrect or ill-advised, it does not appear that such a policy was arbitrary, conscience shocking, or constitutionally oppressive. Moreover, given the limited number of recognized circumstances where substantive due process is advanced, and the dissimilarity between those instances and the present claim, to the extent that LaRock is attempting to advance such due process arguments, they are insufficient to establish a constitutional claim.

**2. Equal Protection**

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."). "[A]bsent classification by race, alienage or national origin, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Vargas v. Pataki,* 899 F.Supp. 96, 98 (N.D.N.Y.1995) (citations, quotation marks, and internal alterations omitted). Accordingly, strict scrutiny shall only be employed "where the classification involves a fundamental right or a suspect class." *Id.* (citations and quotation marks omitted).

If an inmate is unable to establish membership in a protected class, "the Supreme Court has recognized 'class of one' claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment." *Fortunatus v. Clinton County, N.Y.,* No. 12–CV–458 (RFT),

2013 WL 1386641, at *11 (N.D.N.Y. Apr.4, 2013) (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). Such plaintiffs

> must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves ... [and] must establish that (1) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006) (citations omitted). "Generally, whether parties are similarly situated is a fact-intensive inquiry," best suited for the jury, unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate. *Id.* (citations omitted).

**\*18** Prisoners are not a part of a suspect class. *Scott v. Denison,* 739 F.Supp.2d 342, 362 (W.D.N.Y.2010) (citations omitted); *Lee v. Governor of State of New York,* 87 F.3d 55, 60 (2d Cir.1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class ...."). "[S]ex offenders [also] do not compromise a suspect or quasi-suspect class ... [thus any] allegedly different treatment is subject to rational basis scrutiny, that is, it must be rationally related to a legitimate state interest." *Taylor v. New York State Dep't of Corr. Servs.,* No. 07–CV–1288 (NAM/RFT), 2009 WL 3522781, at *2 (N.D.N.Y. Oct.29, 2009) (citations omitted).

In this case, a question of fact remains as to LaRock's Equal Protection claim. Both sides agree that Montgomery's policy was to summarily classify and house all sex offenders in IPC for their own safety. Therefore, sex offenders were treated differently from all other inmates who were generally housed in, and accorded the amenities of, general population. LaRock has successfully established a high degree of similarity between himself and the other sex offenders and such

similarity and difference in treatment are undisputable so that mistake is not a reasonable possibility.

As previously discussed, defendants have proffered affidavits indicating that their policy of confining sex offenders and those with sexual offenses in their criminal history to IPC was based on a legitimate concern for safety in the prison given the increasing number of inmates and stagnant number of staff. Furthermore, for the reasons articulated above, there are questions of fact which surround the legitimacy of Montgomery's policy given the lack of factual and statistical evidence. Conversely, if defendants' claims are proven to be more than conclusory, a rational basis may be deemed to exist. Accordingly, defendants' motion should be denied on this ground.

### F. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov.10, 2003).

> [A] decision dismissing a claim based on qualified immunity at the summary judgment state may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude (1) that the official violated a statute or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.

*Coollick v. Hughes,* 699 F.2d 211, 219 (2d Cir.2012) (quoting *Ashcroft v. al-Kidd,* —— U.S. ——, ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)) (internal quotation marks omitted). The Supreme Court has granted district courts "discretion to decide which of the two prongs ... to tackle first [in order to] ... save[ ] judicial resources by avoiding unnecessary decisions whether certain conduct violates a

constitutional or statutory right, which it is beyond reproach that the conduct was not objectively unreasonable in light of existing law." *Id.* (internal quotation marks and citations omitted).

**\*19** A constitutional right is clearly established if it is both reasonably specified and affirmed by both Supreme Court and Second Circuit case law and understood to be viewed by a reasonable defendant as unlawful under the status of the law at the relevant time in question. *Looney v. Black,* 702 F.3d 701, 706 (2d Cir.2012). Such an inquiry is context-specific, looking at "the contours of the right" which is alleged to be protected so that "the very action in question [need not] ha[ve] previously been held unlawful; but ... in the light of pre-existing law the unlawfulness must be apparent." *Doninger v. Niehoff,* 642 F.3d 334, 345–46 (2d Cir.2011) (internal quotation marks and citations omitted).

Defendants contend that their decision to institute a policy segregating all inmates labeled as sex offenders or with sexually violent crimes in their criminal histories into IPC is protected by the qualified immunity doctrine. While there is no New York regulation concerning the placement or review of an inmate, including a pretrial detainee, in local custody being placed into IPC, or a case which has been decided presenting identical facts, the constitutional rights surrounding a pretrial detainee's right to due process and to remain housed in a manner that is not punitive were clearly established at the time of the case. *See Benjamin v. Fraser,* 264 F.3d 175 (2d Cir.2001). Moreover, the right of a pretrial detainee to a heightened level of due process given punitive restrictions was also clearly established. *See Id.* at 190. As was an inmate's right not to be treated different than others unless a rational basis existed. *See Lee v. Governor of State of New York,* 87 F.3d 55, 60 (2d Cir.1996) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Accordingly, it is apparent that LaRock's Fourteenth Amendment rights to Due Process and Equal Protection were clearly established at the time in question.

Defendants contend that because of increased inmate populations, legitimate concerns for the safety and security of the institution, inmates, and staff compelled IPC for inmates like LaRock. Similar scenarios make it clear that holding an inmate in segregation, under adverse conditions, without a legitimate basis, and without review is unreasonable. *See Smart v. Goord,* 441 F.Supp.2d 631, 645 (S.D.N.Y.2006)

(denying qualified immunity where defendants "made no showing with regard to either the conditions of ... confinement or the extent to which confinements of similar duration may or may not be typical .....," proffered only conclusory allegations about asserted safety concerns, and failed to defeat arguments that procedural protections afforded to inmate were anything more than "hollow forma lit[ies]."). Despite defendants' proffers to the contrary, at this juncture, for the reasons stated above, the undersigned cannot conclude that defendants' have met their burden in demonstrating that the policy was related to a legitimate penological objective. Without proof of a compelling safety concern, neither defendants' actions can be deemed reasonable given the case law and constellation of circumstances surrounding LaRock's IPC confinement.

**\*20** Accordingly, it is recommended that defendants' motion on this ground be denied.

## IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 16) be:

1. **GRANTED** with respect to LaRock's claims regarding his condition of confinement, access to courts and counsel, and freedom to practice his religion; and

2. **DENIED** in all other respects [6] .

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## All Citations

Not Reported in F.Supp.2d, 2013 WL 5466410

## Footnotes

1    The Docket indicates that the Report–Recommendation and Order was served on Plaintiff at his last known address at San Joaquin County Jail, but was returned as "undeliverable" with a notation on the envelope that reads "Returned To Sender ... Not Here." Plaintiff provided no forwarding address.

The Local Rules require all *pro se* litigants to "immediately notify the Court of any change of address," Local Rule 10.1(c)(2), and clearly advises parties that "[f]ailure to notify the Court of a change of address in accordance with L.R. 10.1(c)(2) may result in the dismissal of any pending action." Local Rule 41.2(b).

In light of Plaintiff's failure to advise the Court of a forwarding address, the Court deems the Report–Recommendation and Order as unopposed.

2    Plaintiff had requested, and was granted, an extension of time to respond to the motion for summary judgment, but did not submit any opposition. As indicated in n. 1, he has not advised the Court of a forwarding address.

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Defendants move for summary judgment contending that LaRock's conditions of confinement and Equal Protection claims were meritless and they are protected by qualified immunity. Defs Mem. of Law (Dkt. No. 16 at 1–16) at 7–16. Defendants state, in a conclusory manner, that LaRock's access to counsel and law library claims are also meritless. *Id.* at 6–7. Defendants fail to discuss the merit of LaRock's inartfully pled due process claims which, for the reasons stated *infra,* should not be dismissed.

3    LaRock was ultimately convicted on May 29, 2012. Franko Aff. (Dkt. No. 16 at 21–27) ¶ 2; Dkt. No. 16 at 31.

4    Unpublished cases will be attached to the Report–Recommendation and Order.

5    Defendants' memorandum of law did not address any due process issues.

6    Defendants move for summary judgment contending that LaRock's Equal Protection, conditions of confinement, access to courts and counsel, and freedom to practice his religion claims be dismissed. For the reasons discussed *supra,* defendants' motion is to be granted with respect to all but the Equal Protection claims. Defendants fail to discuss the merit of LaRock's inartfully pled due process claims which, for the reasons stated *supra,* should not be dismissed.

**End of Document**                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 8435089
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel FELDER, Plaintiff,

v.

Gary FILION, Superintendent, Sergeant Humphry,[1]
C.O. Lamar, and C.O. B. Lifford, Defendants.

Civ. No. 9:03-CV-516 (DNH/RFT)
|
Signed 09/05/2006

**Attorneys and Law Firms**

DANIEL FELDER, 94-A-6220, Green Haven Correctional
Facility, P.O. Box 4000, Stormville, NY 12582, pro se.

HON. ELIOT SPITZER, Attorney General for the State of
New York, OF COUNSEL: JAMES B. MCGOWAN, ESQ.,
KELLY L. MUNKWITZ, ESQ., Assistant Attorney Generals,
The Capitol, Albany, NY 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

RANDOLPH F. TREECE, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Daniel Felder brings a civil action
pursuant to 42 U.S.C. § 1983, alleging retaliation for filing
grievances, which retaliation included seizure of his glasses,
handcuffing in the facility shower, and harassment by staff,
in violation of the First Amendment. Dkt. No. 1, Compl. at
§ IV. Defendants Gary Filion, Superintendent at Coxsackie
Correctional Facility ("Coxsackie"), Sergeant Humphrey,
Correction Officer ("C.O.") Lamar, and C.O. Lifford bring
a Motion for Summary Judgment. Dkt. No. 37. Plaintiff
opposes the Motion. Dkt. No. 38. For the reasons to follow,
it is recommended that the Defendants' Motion for Summary
Judgment be **granted in part and denied in part**.

**I. FACTS** [2]

On December 10 and 11, 2002, while Plaintiff was
incarcerated at Coxsackie, his cell was searched and his
belongings were strewn about the cell. Dkt. No. 37, Defs.'
7.1 Statement at ¶ 19; Dkt. No. 38, Pl.'s 7.1 Statement
at ¶¶ 1 & 2. On December 11, 2002, Plaintiff filed a

grievance regarding his cell searches and requested that
the officers leave him alone, they be reprimanded, his
legal work be returned, and he be transferred from the
facility. Compl. at § IV, Ex. A,[3] Grievance, dated Dec. 11,
2002. Superintendent Filion found there was no evidence
to substantiate Plaintiff's claims as the staff had stated that
the cell search was done in an orderly fashion and a search
slip was provided. James B. McGowan Decl., Ex. 1, Pl.'s
Dep., Ex. 2, Superintendent's Review, dated Jan. 7, 2003.[4]
Plaintiff appealed to the Central Office Review Committee
("CORC"), which denied Plaintiff's grievance and upheld the
Superintendent's determination. *Id.*, Ex. 1, Pl.'s Dep., Ex. 2,
CORC Review, dated Apr. 9, 2003. The CORC stated that
there was no evidence to substantiate the claim of harassment,
there were no witnesses to corroborate the incident, and the
cell searches were appropriately documented in the logbook.
*Id.*

On January 3, 2003, for the first and only time, Officer
Lamar worked as the "A" officer where Plaintiff resided.
Defs.' 7.1 Statement at ¶ 3. That morning, Defendant Lamar
opened Plaintiff's cell and asked Plaintiff whether he was
going to attend recreation. *Id.* at ¶ 4; Compl. at ¶ 2. Plaintiff
was not prepared for recreation at that moment as he had to
retrieve some belongings. Defs.' 7.1 Statement at ¶ 5. Officer
Lamar then told Plaintiff that the escort who was to take
Plaintiff to the yard was only available at that moment and
if Plaintiff was not ready to go to recreation at that time,
then he should step back into his cell to which Plaintiff
replied he no longer wished to go to the yard. *Id.* at ¶¶ 6
& 16. Since it was required that Plaintiff travel to the yard
with a recreation escort, neither Lamar nor Plaintiff could
debate "why [P]laintiff was not ready to go to recreation or
negotiate how long it would take [P]laintiff to get ready."
*Id.* at ¶ 17. Apparently, according to Plaintiff, Officer Lamar
then verbally harassed Plaintiff by calling him an "asshole"
and blew cigarette smoke into his face. *Id.* at ¶ 9; Pl.'s 7.1
Statement at ¶ 17. That same day, Plaintiff filed a complaint
with Superintendent Filion regarding the incident with Officer
Lamar. Defs.' 7.1 Statement at ¶ 11; Compl., Ex. A, Grievance
Compl., dated Jan. 3, 2003. Defendant Filion responded by
memorandum to Plaintiff on January 29, 2003, and stated
that an investigation had been conducted into the matter but
there was no evidence to support the claim. Compl., Ex. A,
Mem. by Filion, dated Jan. 29, 2003. Defendant Filion further
stated that no further action would be taken. *Id.* Additionally,
within the grievance program, Superintendent Filion denied
the grievance as Lamar had denied threatening Plaintiff or
blowing smoke in his face and noted that Plaintiff had chosen

to stay in his cell and not attend recreation. McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 2, Superintendent's Review, dated Feb. 19, 2003. [5] Plaintiff appealed to the CORC, which upheld the Superintendent's determination and stated there was no evidence to substantiate the claim. *Id.*, Ex. 1, Pl.'s Dep., Ex. 2, CORC Review, dated Apr. 16, 2003. It was further noted that Plaintiff was allowed to attend recreation but that Plaintiff stated he needed time to get ready and then proceeded to change his mind and opted not to attend. *Id.*

**\*2** On January 9, 2003, Plaintiff's cell was searched by Defendant Lifford as part of a facility-wide search. Defs.' 7.1 Statement at ¶ 30; Pl.'s 7.1 Statement at ¶¶ 8 & 9. During the search, Lifford called Plaintiff a "legal beagle" and stated that he expected Plaintiff would sue in regards to the search. Defs.' 7.1 Statement at ¶ 32; Pl.'s 7.1 Statement at ¶ 11. Plaintiff became upset while Defendant Lifford conducted the search due to the fact that his belongings were scattered about the cell. Defs.' 7.1 Statement at ¶ 33; Pl.'s 7.1 Statement at ¶ 12. While the search continued, Plaintiff alleges that Sergeant Humphrey arrived to observe the search and then proceeded to take Plaintiff away from his cell and handcuff him to a hot radiator in the facility shower. Defs.' 7.1 Statement at ¶ 35; Pl.'s 7.1 Statement at ¶ 13. Threats were also allegedly made by Sergeant Humphrey while Plaintiff was handcuffed. Pl.'s 7.1 Statement at ¶ 14.

Upon being returned to his cell, Plaintiff was told by Lifford that some of the property found in his cell was contraband, including two pairs of eyeglasses, cassette tapes, a hair clipper, legal materials, and headphones. Defs.' 7.1 Statement at ¶ 42; Pl.'s 7.1 Statement at ¶ 10. Prior to issuing a misbehavior report regarding the contraband, Lifford consulted with Lieutenant Balint to determine whether Plaintiff's property was in fact contraband, especially if the extra pair of eyeglasses constituted contraband. Defs.' 7.1 Statement at ¶ 43. Based upon the Lieutenant's advice, Officer Lifford issued a misbehavior report on January 9, 2003, which included the eyeglasses as contraband because Plaintiff "had too many pairs." Defs.' 7.1 Statement at ¶¶ 47, 53, & 54; McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 4, Misbehavior Report; Dkt. No. 37, Brian Lifford Decl., Ex. A, Misbehavior Report.

On January 14, 2003, Plaintiff filed a grievance regarding this search and being handcuffed in the facility shower. McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 2, Grievance, dated Jan. 14, 2003. Plaintiff sought to have his glasses and property returned, that he be left alone and not retaliated against for filing grievances, and that Lifford and Humphrey be investigated. *Id.* The

Acting Superintendent, someone other than Superintendent Filion, responded to the grievance. [6] *Id.*, Ex. 1, Pl.'s Dep., Ex. 2, Superintendent's Review, dated Jan. 29, 2003. The Acting Superintendent found in accordance with staff statements, that because Plaintiff was agitated about his cell search, he was made to wait in the shower room. *Id.* The staff also denied handcuffing Plaintiff and the Sergeant denied using profanity. *Id.* No evidence was found to support the grievance, therefore, it was denied. *Id.* Plaintiff appealed to the CORC, which upheld the Acting Superintendent's determination. *Id.*, Ex. 1, Pl.'s Dep., Ex. 2, CORC Review, dated Apr. 9, 2003. The CORC stated Plaintiff could not substantiate any harassment charges, that the cell search was documented on a contraband receipt form, and that the ensuing misbehavior report had been dismissed by the hearing officer. *Id.*, Ex. 1, Pl.'s Dep., Exs. 2, CORC Review, dated Apr. 9, 2003 & 4, Contraband Receipt. The CORC further noted that the concerns involving his glasses were brought to the attention of the medical staff for investigation and that Plaintiff would be informed of the matter. [7] *Id.*, Ex. 1, Pl.'s Dep., Ex. 2, CORC Review, dated Apr. 9, 2003. On April 9, 2003, Thomas Eagen, Director of the Inmate Grievance Program, forwarded the CORC's determination to Defendant Filion for notification as to the whereabouts of Plaintiff's eyeglasses and requested a reply. *Id.*, Ex. 1, Pl.'s Dep., Ex. 9, Eagen Mem., dated Apr. 9, 2003.

**\*3** In the interim before the Acting Superintendent and CORC responded to Plaintiff's grievance, on January 22, 2003, Lieutenant Sweeney held a meeting with Plaintiff regarding the misbehavior report. Defs.' 7.1 Statement at ¶ 56. At that time, Plaintiff agreed that all of the property confiscated could be destroyed except for one pair of his eyeglasses, which was to be returned to Plaintiff. *Id.*; McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 4, Disciplinary Hr'g Disposition, dated Jan. 22, 2003. Plaintiff signed the form for the disposal of his personal property, which noted that one pair of eyeglasses was to be returned. *Id.*, Ex. 1, Pl.'s Dep., Ex. 4, Authorization for Disposal of Property, dated Jan. 22, 2003. Then on the evening of January 23, 2003, [8] Plaintiff states that Defendant Lifford verbally threatened him in regards to the grievance that Plaintiff filed against Lifford. Pl.'s 7.1 Statement at ¶ 15.

## II. DISCUSSION

### A. Summary Judgment Standard

Felder v. Filion, Not Reported in Fed. Supp. (2006)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 102 of 151

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. First Amendment Retaliation Claim

**\*4** Plaintiff claims that Defendants Lamar, Lifford, and Humphrey retaliated against him for filing grievances when Lamar blew smoke in his face and denied him recreation, Lifford confiscated his eyeglasses, Humphrey handcuffed him, and all three Defendants threatened him. Dkt. No. 38, Pl.'s Mem. of Law at pp. 1-2.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) & *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) ).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted). There must also be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky*, 2005 WL 2128851, at \*5 (N.D.N.Y. August 30, 2005) (citing *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995) ).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively*, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) ) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut*, 193 F.3d 144, 148-49 (2d Cir. 1999); *see Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998); *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994).

The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly*, 854 F.2d at 589 (quoting *Haymes v. Montanye*, 547 F.2d 188, 191 (2d Cir. 1976) ) (emphasis and alterations in original).

**\*5** Plaintiff asserts that he was retaliated against by Defendant Lamar for filing a grievance, dated December 11, 2002, in which his cell was searched and ransacked. Pl.'s Mem. of Law at p. 2; Compl. at ¶ 2. The final disposition on the grievance was the CORC's determination on April 9, 2003. McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 2, CORC Review, dated Apr. 9, 2003. While we readily concede that the filing of the grievance is a protected activity, thus fulfilling the first burden, Plaintiff's claim must nevertheless fail against Lamar. *See Franco v. Kelly*, 854 F.2d at 589.

The grievance was filed on December 11, 2002, and the incident involving Lamar occurred on January 3, 2003. Compl. at § IV, Ex. A, Grievance, dated Dec. 11, 2002; Defs.' 7.1 Statement at ¶¶ 4-6. Although the proximity of the events is relatively close, Plaintiff cannot show a causal connection. Plaintiff cannot identify any persons involved in the cell search of December 10 and 11, 2002, for which the grievance was filed. McGowan Decl., Ex. 1, Pl.'s Dep. p. 74, lines 7-24, p. 75, line 24, & p. 76, lines 1-24. Prior to the January 3rd incident, Plaintiff had never encountered Defendant Lamar

during his incarceration at Coxsackie. Defs.' 7.1 Statement at ¶ 1; McGowan Decl., Ex. 1, Pl.'s Dep. p. 33, lines 12-24, & p. 34, lines 1-8. However, Plaintiff believes that Defendant Lamar learned of the grievance filed when she said to Plaintiff "I heard about you, you asshole." McGowan Decl., Ex. 1, Pl.'s Dep. p. 71, lines 13-17. Plaintiff states that he does not "know *per se* that she learned about the grievances that [he] filed specifically, but that's what [he] assumed." *Id.*, Ex. 1, Pl.'s Dep. p. 56, lines 1-13. Despite this assumption, Plaintiff fails to show how the filing of the grievance is causally connected to the adverse actions taken against him, namely the smoke blown in his face and denial of recreation if in fact we accept that such events took place. The grievance filed was against unspecified persons and Plaintiff cannot show Lamar had knowledge of the prior incident or grievance. Even assuming Plaintiff was denied recreation time and smoke was blown in his face, such one-time occurrence by a correction officer he had never met before would not reasonably deter another inmate of ordinary firmness in a similar situation from exercising his constitutional rights. *See* Defs.' 7.1 Statement at ¶ 6.

According to Lamar's Declaration, even if Plaintiff could establish a causal connection, the same action would have been taken whether or not Plaintiff had filed a grievance. *See* Dkt. No. 37, Mary Lamar Decl. at ¶¶ 4-14. Defendant Lamar states that arrangements were made for Plaintiff to attend recreation but due to security concerns, Plaintiff could not travel to recreation without an escort. *Id.* at ¶¶ 4 & 5. Plaintiff was the only one in his company to be attending recreation that day so Plaintiff's opportunity to go to recreation depended upon the availability of the escorts. *Id.* at ¶ 6. As soon as the escort was available on January 3, 2003, Plaintiff's cell was opened but Plaintiff was not ready as he stated he needed to put his shoes on and get his coat and identification. *Id.* at ¶ 7. Defendant Lamar states that it is inappropriate to "hold up" the waiting escort, therefore, she advised Plaintiff that he had to either go to recreation immediately or go back into his cell. *Id.* at ¶ 8. Plaintiff claims that because of Lamar's statements, he was forced to stay in his cell and was therefore denied recreation. *Id.*; Compl. at § IV; Pl.'s Mem. of Law at p. 1. Despite Plaintiff's assertions, the reason Plaintiff did not attend recreation was due to the availability of the escort, not due to the grievance. *Id.* at ¶¶ 11 & 14. Additionally, Defendant Lamar states that she did not deliberately blow smoke at Plaintiff. *Id.* at ¶ 15. Moreover, the verbal harassment alleged, that Lamar called Plaintiff an "asshole," would not rise to the level of an adverse action. *See Bartley v. Collins*, 2006 WL 1289256, at \*6 (S.D.N.Y.

Case 9:22-cv-01094-BKS-ML   Document 33   Filed 07/25/24   Page 104 of 151

Felder v. Filion, Not Reported in Fed. Supp. (2006)

May 10, 2006) (citing *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) ); *Pledger v. Hudson*, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005). Defendant Lamar has shown, by a preponderance of the evidence, that despite the grievance filed, Plaintiff would not have been able to attend recreation because he was not ready at the time his escort arrived.

**\*6** With respect to Defendant Lifford, the search in question occurred on January 9, 2003. Defs.' 7.1 Statement at ¶ 30; Pl.'s 7.1 Statement at ¶¶ 8 & 9. By January 9, 2003, in addition to the December 11th grievance, Plaintiff had filed a grievance against Lamar as well regarding the recreation and smoke incident. Compl., Ex. A, Grievance Compl., dated Jan. 3, 2003. Drawing all inferences in favor of Plaintiff and still assuming the proximity of the events were close, Plaintiff cannot show a causal connection. In fact, Plaintiff himself cannot decide whether the facility-wide search had anything to do with the grievances filed. McGowan Decl., Ex. 1, Pl.'s Dep. p. 118, lines 15-19.

Prior to January 9, Plaintiff had no interactions with Lifford. McGowan Decl., Ex. 1, Pl.'s Dep. p. 102, lines 9-17. On that date, there was a facility-wide search of the inmates' cells and the facility was locked down. *Id.*, Ex. 1, Pl.'s Dep. p. 102, lines 22-24, & p. 103, lines 1-7. During the search, many items were confiscated from Plaintiff's cell as possible contraband, including Plaintiff's eyeglasses. *Id.*, Ex. 1, Pl.'s Dep. p. 108, lines 13-14; Defs.' 7.1 Statement at ¶ 42; Pl.'s 7.1 Statement at ¶ 10. Even if we assume that Lifford had knowledge of both grievances, the search conducted on January 9, 2003 could not have been in retaliation for the grievances. The search was facility-wide, not solely directed at Plaintiff. Nor, in light of Plaintiff's testimony before trial, does it make sense for Plaintiff to claim that Lifford would want to seize Plaintiff's eyeglasses in retaliation for the grievances. At Plaintiff's deposition, Plaintiff stated he believed the glasses were taken because Lifford made fun of how thick the glasses were and because Lifford had referred to him as a "legal beagle." McGowan Decl., Ex. 1, Pl.'s Dep. p. 108, lines 14-24 & p. 109, lines 1-9. It is difficult to envision how those references could be seen as a retaliatory motive for the grievances filed. Additionally, it would seem unlikely that the confiscation of glasses or any other type of item as such during a search would deter other inmates from filing grievances, especially in light of the fact that the search was conducted throughout the entire facility and clearly not directed solely at Plaintiff.

Even if Plaintiff could carry his burden, Lifford would have collected personal property from any inmate that constituted

contraband during a cell search whether or not a grievance was filed. *See* Dkt. No. 37, Brian Lifford Decl. at ¶¶ 5-8, 11 & 16. During the search, Lifford contacted his superior, Lieutenant Balint, in order to confer about Plaintiff's property and whether or not Plaintiff was allowed to possess certain items. *Id.* at ¶ 6. Based on Lieutenant Balint's directions, Lifford filled out a contraband receipt and misbehavior report. *Id.* at ¶ 7, Ex. A, Misbehavior Report; Defs.' 7.1 Statement at ¶¶ 43, 47, 53, & 54; McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 4, Misbehavior Report. Thus, the legitimate non-retaliatory reasoning proffered for the confiscation of the glasses was that they were considered contraband by Lieutenant Balint. Lifford Decl. at ¶ 8, Ex. A, Misbehavior Report; Defs.' 7.1 Statement at ¶¶ 43, 47, 53, & 54. Plaintiff had the normal administrative vehicles to challenge whether or not the glasses were in fact contraband and Lieutenant Sweeney, a hearing officer, told Plaintiff he would receive back one pair of glasses, as there had been two pairs in the cell. Therefore, Lifford has shown, by a preponderance of the evidence, that despite the grievance filed, Plaintiff's property would have been confiscated as contraband.

In addition, Plaintiff claimed that on January 23, 2003, Lifford threatened him after a grievance was filed against him and Humphrey on January 14, 2003. Compl. at ¶ 2. Again, though the filing of a grievance is constitutionally protected conduct, Plaintiff cannot show any adverse action taken against him on that date or any other date as a result of the threat. *See id.*; Pl.'s Mem. of Law. There was no retaliatory conduct taken that would deter any other inmate from exercising his constitutional rights. Thus, Plaintiff has failed to overcome his burden to prove a retaliation claim.

**\*7** As for Defendant Humphrey, Plaintiff claims Humphrey retaliated against him by handcuffing him to the radiator in the facility shower during Lifford's search of Plaintiff's cell on January 9, 2003. Compl. at ¶ 2; Pl.'s Mem. of Law at p. 2. At the time of the incident, on January 9, 2003, the December 11th grievance regarding the search and the January 3rd grievance involving Lamar were filed.

Plaintiff asserts that while he was being handcuffed, Humphrey allegedly stated that if it were "back in the day [Humphrey] would be kicking [Plaintiff's] ass." Compl. at ¶ 2; Pl.'s Mem. of Law at p. 2. In addition, Plaintiff claims that before he was taken and handcuffed, Humphrey had said to him while observing the search "[g]rieve that, you asshole." McGowan Decl., Ex. 1, Pl.'s Dep. p. 121, lines 10-12. However, Humphrey states that he did not escort

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 105 of 151

Felder v. Filion, Not Reported in Fed. Supp. (2006)

Plaintiff to the shower nor did he handcuff him during the time of the cell search. Dkt. No. 37, Richard Humphrey Decl. at ¶ 9. Humphrey even claims that Plaintiff admitted to him that he was confused as to Humphrey's involvement but that he did not want to correct the Complaint. *Id.* at ¶¶ 4 & 5. Nevertheless, Plaintiff has not wavered as to the identification of Humphrey in any of the papers submitted to the Court. *See* Compl. at § IV; McGowan Decl., Ex. 1, Pl.'s Dep.; Pl.'s Mem. of Law.

Assuming for the purposes of this Motion that Sergeant Humphrey was involved as stated and finding that the filing of grievances is constitutionally protected conduct, the Court finds that Plaintiff has met his burden to show that the filing of the grievances was a substantial or motivating factor for the handcuffing incident.

First, the circumstantial evidence of the proximity of the grievances to the incident could show a retaliatory motive. Second, as Humphrey was passing Plaintiff's cell during the search and Plaintiff began to question the manner in which the search was being conducted, apparently Humphrey told him "to shut up, and grieve that, asshole," at which point Humphrey made Plaintiff leave the vicinity of the cell. McGowan Decl., Ex. 1, Pl.'s Dep. p. 114, lines 14-22 & p. 118, lines 2-4. Plaintiff asserts for this reason, he "knew that it was about grievances." *Id.*, Ex. 1, Pl.'s Dep. p. 118, lines 2-5. Plaintiff also assumes from Humphrey's response to Plaintiff's questions that it was in reaction to the grievance. *Id.*, Ex. 1, Pl.'s Dep. p. 118, lines 15-19. Moreover, the fact that Plaintiff was handcuffed to a hot radiator in the facility shower could constitute an adverse action as other inmates in a similar situation may be deterred from exercising their constitutional rights. Pl.'s 7.1 Statement at ¶ 13. Humphrey has not stated that he would have taken the same action in the absence of Plaintiff filing his grievances. Instead, Humphrey denies the events took place as Plaintiff recounts. In light of the discrepancy of the facts and that Plaintiff has at least met his burden of stating a claim, this Court finds that the relation claim amounts to a credibility issue best left for a trier of fact.

Therefore, it is recommended that the Motion for Summary Judgment be **granted in part** as to Defendants Lamar and Lifford and **denied in part** as to Defendant Humphrey.[9]

### C. Personal Involvement

**\*8** Plaintiff states that Superintendent Filion is liable because Filion responded to the grievances in the same manner each and every time and that even when Plaintiff wrote to him personally about such matters, Filion would pass it off to his subordinates. Compl. at § V; McGowan Decl., Ex. 1, Pl.'s Dep. p. 171, lines 3-14. Plaintiff also claims that Filion failed to train his officers to act in a professional manner. Compl. at § V.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Id.* at 144-45 (quoting *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ) (alterations in original). However, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ) (further citations omitted).

Here, Plaintiff does not allege that Defendant Filion was personally involved in any of the alleged violations. Compl. at § V; McGowan Decl., Ex. 1, Pl.'s Dep. p. 171, lines 3-14. In essence, Plaintiff seeks to focus on the fact that after learning about the confiscation of his glasses, Defendant Filion did not retrieve the glasses for Plaintiff in a timely fashion. McGowan Decl., Ex. 1, Pl.'s Dep. p. 171, lines 5-14, p. 172, lines 1-24, & p. 173, lines 8-15. With regard to the grievance

Felder v. Filion, Not Reported in Fed. Supp. (2006)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 106 of 151

pertaining to the glasses, it was not Superintendent Filion, but the Acting Superintendent, who reviewed that particular grievance. *Id.*, Ex. 1, Pl.'s Dep., Ex. 2, Superintendent's Review, dated Jan. 29, 2003. Plaintiff claims that in addition to the grievance, he wrote a separate letter to Superintendent Filion putting him on notice about this issue. *Id.*, Ex. 1, Pl.'s Dep. at p. 174, lines 5-20. Plaintiff did not have a copy of the letter. *Id.*, Ex. 1, Pl.'s Dep. at p. 173, lines 10-15. The fact that Plaintiff may have written a letter does not automatically render the supervisory official responsible for any constitutional violation. *See, e.g., Woods v. Goord, 1998 WL 740782, at *6 (S.D.N.Y. Oct. 23, 1998)* (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Prison supervisors cannot be deemed personally involved based simply on a response to a complaint. *See Sealy v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997).* In any event, Defendant Filion states that any such matter would have been investigated and responded to by his staff. Dkt. No. 37, Gary H. Filion Decl. at ¶¶ 6-8. This type of referral would not create any type of supervisory liability nor would the manner of response Plaintiff received in the Superintendent's review of the grievances, namely Plaintiff's classification of the response as "boilerplate."

**\*9** In addition, as to Plaintiff's assertion that Defendant Filion is liable because officers did not act in a professional manner, Plaintiff has failed to show how this would constitute supervisory liability. Even assuming Plaintiff was claiming grossly negligent supervision of subordinates who committed a violation, Plaintiff has not provided any facts to establish gross negligence and as stated above, there has been no violation committed.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to Defendant Filion for lack of personal involvement and Plaintiff's failure to establish supervisory liability.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Motion for Summary Judgment (Dkt. No. 37) be **GRANTED IN PART** as to Defendants Filion, Lamar, and Lifford, and **DENIED IN PART** as to Defendant Humphrey; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)* (citing *Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)* ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in Fed. Supp., 2006 WL 8435089

### Footnotes

1    Plaintiff mistakenly spells Defendant Humphrey's name as "Humphry." *See* Dkt. No. 37, Humphrey Decl. The Court will refer to this Defendant by the proper spelling.

2    Plaintiff has failed to comply with Northern District of New York Local Rule 7.1(a)(3). Plaintiff submits a "Statement of Facts," however, Plaintiff did not mirror the movant's Statement of Material Facts by either admitting or denying each of the movant's assertions in matching numbered paragraphs. Dkt. No. 38. As such, any facts not specifically controverted by Plaintiff may be deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). Nevertheless, this Court will utilize Plaintiff's Verified Complaint with accompanying Exhibits and Statement of Facts as well as Defendants' Statement of Material Facts with accompanying Exhibits to adduce the uncontested, material facts of the case.

**Felder v. Filion, Not Reported in Fed. Supp. (2006)**

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 107 of 151

3    Plaintiff does not label the Exhibits attached to the Complaint. Therefore, the Exhibits provided will be collectively referred to as "Ex. A."

4    The results of the Inmate Grievance Resolution Committee ("IGRC") investigation were not provided to this Court.

5    The results of the IGRC investigation were not provided to this Court. It is possible, however, that Plaintiff's grievance was filed in accordance with the informal, expedited procedures set forth in N.Y. COMP. CODES R. & REGS. tit. 7, § 70111, wherein allegations of employee harassment are forwarded directly to the Superintendent.

6    The results of the IGRC investigation were not provided to this Court. As Plaintiff again complained of employee harassment, this grievance may also have been expedited. *See supra* note 5.

7    Subsequently, Plaintiff had an appointment with the optometrist to receive contact lenses. Dkt. No. 37, James B. McGowan Decl., Ex. 1, Pl.'s Dep., Ex. 1, Request for Consultation, dated May 10, 2003, Baldwin Lt., dated May 19, 2003, & Baldwin Lt., dated June 11, 2003.

8    The Court notes that Plaintiff's 7.1 Statement asserts this event took place on the evening of January 23, 2003 whereas his Complaint notes that the incident took place on the evening of January 22, 2003. Thus, the Court is unsure of the correct date of the incident in question.

9    In addition, Plaintiff inexplicably attempts to argue an Eighth Amendment claim regarding deliberate indifference to his medical needs in his Response to the Motion. Dkt. No. 38, Pl.'s Mem. of Law at p. 3. However, none of the named Defendants have any connection to his medical treatments. *See* Compl. Therefore, any such cause of action will not be addressed.

---

**End of Document**                                                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-01094-BKS-ML     Document 33     Filed 07/25/24     Page 108 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

2022 WL 1129887
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrew HENDRICKS, Plaintiff,

v.

Shelley M. MALLOZZI, Director of the Inmate
Grievance Program for DOCCS; Earl Bell,
Superintendent, Clinton Correctional Facility; D.
Holdridge, Deputy Superintendent for Security, Clinton
Correctional Facility; and C. DeLutis, Captain of
Security, Clinton Correctional Facility, Defendants.

9:20-CV-1035 (MAD/ML)
|
Signed 01/14/2022

**Attorneys and Law Firms**

Andrew Hendricks, Pro Se Plaintiff, Eastern New York
Correctional Facility, Box 338, Napanoch, New York 12458.

BRENDA BADDAM, ESQ., Assistant Attorney General,
LETITIA A. JAMES, Attorney General for the State of New
York Counsel for Defendants, The Capitol, Albany, New York
12224.

## REPORT and RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

 *1  Currently before the Court, in this civil rights action filed
by Andrew Hendricks ("Plaintiff") against Shelley Mallozzi,
Earl Bell, D. Holdridge, and C. DeLutis (collectively
"Defendants") is Defendants' motion to dismiss for failure
to state a claim upon which relief may be granted pursuant
to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 17.) For the reasons set
forth below, I recommend that Defendants' motion be granted
in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Procedural History
On September 3, 2020, Plaintiff commenced this action by
the filing of a Complaint, accompanied by a motion for
leave to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 2.)
On October 29, 2020, United States District Judge Mae A.

D'Agostino granted Plaintiff's IFP application and dismissed
the Complaint without prejudice pursuant to 28 U.S.C. §§
1915(e)(2)(B) and 1915A(b)(1). (Dkt. No. 5.)

On November 18, 2020, Plaintiff filed an Amended
Complaint. (Dkt. No. 8.) On December 23, 2020, Judge
D'Agostino reviewed Plaintiff's Amended Complaint and set
forth the factual allegations therein. (Dkt. No. 9 at 2-4.) Judge
D'Agostino ordered that (1) Plaintiff's Amended Complaint
was accepted for filing with respect to a claim for retaliation
pursuant to the First Amendment and 42 U.S.C. § 1983,
against Defendants, and (2) any other causes of action in the
Amended Complaint were dismissed. (*See generally* Dkt. No.
9.)

On March 1, 2021, in lieu of an answer, Defendants filed the
pending motion to dismiss pursuant to Fed. R. Civ. P. 12(b)
(6). (Dkt. No. 17.)

### B. Parties' Briefing on Defendants' Motion to Dismiss

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion to dismiss, Defendants
assert the following two arguments: (1) Plaintiff's retaliation
claim fails as a matter of law, and (2) Plaintiff failed to allege
the personal involvement of Defendants Holdridge, Bell, and
Mallozzi. (Dkt. No. 17, Attach. 1 at 6-16.)

More specifically, Defendants first argue that Plaintiff's
retaliation claim fails as a matter of law because the Amended
Complaint fails to allege facts plausibly suggesting that
Defendants took an adverse action against Plaintiff or that
a causal connection existed between his protected speech
and the alleged adverse action. (*Id.* at 8-15.) Defendants
argue that Plaintiff's claim against Defendant DeLutis—
which is premised on grievance that Plaintiff filed against
Correction Officer Ayotte (an unnamed party to this action)
—fails because (a) Plaintiff's conclusory allegation (that
Defendant DeLutis was "sympathetic" towards C.O. Ayotte
for an unknown reason) is insufficient to overcome the
heightened burden of establishing a causal connection of
retaliation by one officer (Defendant DeLutis) on behalf of
another officer (C.O. Ayotte), (b) inmates do not have any
constitutional right to a particular prison job, (c) temporal
proximity alone is insufficient to establish an inference of
retaliation, and (d) Defendant DeLutis's actions were taken
for legitimate, non-retaliatory reasons unrelated to Plaintiff's

Case 9:22-cv-01094-BKS-ML   Document 33   Filed 07/25/24   Page 109 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

protected activity—namely, a security concern. (*Id.* at 8-11.) Defendants argue that Plaintiff's claim against Defendant Holdridge—which is premised on his alleged approval of Defendant DeLutis's decision to remove Plaintiff from his job, a lie that he reviewed confidential documents supporting Plaintiff's removal from his job, and failure to follow DOCCS policies and procedures when removing Plaintiff from his job —fails because (a) inmates do not have any constitutional right to a particular prison job, (b) temporal proximity alone is insufficient to establish an inference of retaliation, (c) Plaintiff's conclusory allegation (that Defendant Holdridge acted out of sympathy towards C.O. Ayotte for an unknown reason) is insufficient to overcome the heightened burden of establishing a causal connection of retaliation by one officer (Defendant Holdridge) on behalf of another officer (C.O. Ayotte), and (d) Defendant Holdridge's alleged lie (that he reviewed security documents that do not exist) and failure to follow DOCCS policy for removal of an inmate from his job, are not constitutional violations and thus do not give rise to liability pursuant to 42 U.S.C. § 1983. (*Id.* at 11-13.) Defendants argue that Plaintiff's claim against Defendants Bell and Mallozzi—which is premised on their denial of his grievance appeal, failure to properly investigate his claims, and assertion that Defendant Bell was "deceptive and misleading" about DOCCS policy—fails because (a) Plaintiff's conclusory allegation that Defendants Bell and Mallozzi retaliated against him for filing a grievance against C.O. Ayotte is insufficient to overcome the heightened burden of establishing a causal connection of retaliation by one officer (Defendant Bell or Defendant Mallozzi) on behalf of another officer (C.O. Ayotte), (b) prisoners do not have a due process right to a thorough investigation of grievances and thus, Defendants Bell and Mallozzi's alleged incomplete investigations are not adverse actions, (c) there is no temporal proximity between the filing of Plaintiff's grievance against C.O. Ayotte on October 12, 2017, and the affirmations of Plaintiff's grievance appeals by Defendants Bell and Mallozzi on January 18, 2018, and May 8, 2019, respectively. (*Id.* at 14-15.)

**\*2** Second, Defendants argue that based on the Second Circuit decision set forth in *Tangretti*, Plaintiff must allege facts plausibly suggesting that Defendants Holdridge, Bell, and Mallozzi violated his First Amendment rights with their own individual actions. (*Id.* at 15-17.) Defendants argue that the Amended Complaint fails to allege that Defendants Holdridge, Bell, and Mallozzi were (a) aware of Plaintiff's protected speech (i.e., the grievance he filed against C.O. Ayotte), (b) knew the extent of the investigation

into the first grievance filed by Plaintiff, or (c) acted with retaliatory animus towards Plaintiff because of the grievance filed against C.O. Ayotte. (*Id.*) Further, Defendants argue that Plaintiff's allegations regarding Defendants Bell and Mallozzi—that they were involved in the affirmation of Plaintiff's grievance denial—are insufficient to allege personal involvement. (*Id.*)

### 2. Plaintiff's Opposition

Generally, in opposition to Defendants' motion, Plaintiff argues that (1) the Amended Complaint alleges facts plausibly suggesting a claim of retaliation; and (2) the Amended Complaint plausibly alleges the personal involvement of Defendants Holdridge, Bell, and Mallozzi. (Dkt. No. 22.)

First, Plaintiff argues that he plausibly alleged a claim of retaliation against (1) Defendant DeLutis because (a) he alleged that Defendant DeLutis e-mailed Ms. Hicks telling her to remove Plaintiff from the tailor shop for no reason other than to punish Plaintiff for filing a grievance, which was an adverse action, and (b) there is a causal connection between Plaintiff's grievance and his removal from the tailor shop which can be inferred from (i) the temporal proximity of the two incidents, (ii) Defendant DeLutis's removal of Plaintiff from the tailor shop before conducting an investigation into Plaintiff's grievance, and (iii) the fact that DOCCS' policies and procedures regarding removal of inmates from a program were not followed when removing Plaintiff from the tailor shop, (2) he alleged that Defendant Holdridge became personally involved in the constitutional violation (a) when he lied about reviewing confidential documents that did not exist, and (b) with his support of Defendant DeLutis's decision to remove Plaintiff from the tailor shop, which "showed gross negligence and demonstrated deliberate indifference," (3) he alleged that Defendants Bell and Mallozzi became personally involved in the constitutional violation when they chose "not to do what was right" and "remedy the wrong and in doing so[,] showed gross negligence and demonstrated deliberate indifference to [Plaintiff's] constitutional rights." (Dkt. No. 22 at 4-7.)

Second, Plaintiff argues that (1) as supervisors, Defendants Bell and Mallozzi were personally involved because they learned of the constitutional violation through Plaintiff's grievance appeal and failed to rectify the situation, and (2) Defendant Holdridge was personally involved because Plaintiff sent him a letter requesting information about

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 110 of 151

Plaintiff's removal from the tailor shop and Defendant Holdridge stated that he reviewed confidential documentation supporting Plaintiff's removal and that he supported Plaintiff's removal. (*Id.*)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

**\*3** On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [1]

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal*

*Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

**\*4** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 111 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

### III. ANALYSIS

#### A. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendant DeLutis

After carefully considering the matter, I answer this question in the affirmative for the reasons set forth below.

A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v.*

*Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

For purposes of this motion, it is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of a grievance. (Dkt. No. 17, Attach. 1 at 8); *see Davis v. Goord*, 320 F.3d at 352-53 ("[T]he filing of prison grievances is a constitutionally protected activity."); *Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is protected speech).

**\*5** I reject Defendants' argument that the Amended Complaint fails to allege facts plausibly suggesting that they took an adverse action against Plaintiff. Although courts in the Second Circuit have held that "inmates in the DOC[C]S system do not have any constitutional, statutory, regulatory, or precedential right to a particular prison job," *Muhammad v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 345 (W.D.N.Y. 2000) (citing *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987)), courts have also held that terminating a prisoner's employment is an "adverse action" for purposes of a First Amendment retaliation claim. *Casey v. Pallito*, 12-CV-0284, 2016 WL 96157, at *7 (D. Vt. Jan. 7, 2016); *see Logan v. Graham*, 18-CV-0291, 2019 WL 8015209, at *13, n.19 (N.D.N.Y. Nov. 26, 2019) (Lovric, M.J.) (finding that the firing of the plaintiff from his job as a feed-up porter constituted an adverse action for purposes of a First Amendment retaliation claim); *Henderson v. Vanderwerff*, 13-CV-1537, 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016) (D'Agostino, J.) (holding that the "[p]laintiff's complaint plausibly alleges that Officer Chuttey was involved in the adverse action of terminating [the p]laintiff from his prison job in retaliation for his filing of the grievance against Officer Richardson."); *Chavis v. Struebel*, 317 F. Supp. 2d 232,

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 112 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] less desirable work assignments satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim); *Van Pelt v. Finn*, 92-CV-2977, 1993 WL 465297, at *4 (S.D.N.Y. Nov. 12, 1993) (holding that reassignment of an inmate to a less desirable job with lower pay constitutes an adverse action).

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie*, 719 F. Supp. 2d 353, 366 (S.D.N.Y. 2011). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but, at the summary judgment stage, has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017); *see Ziemba v. Thomas*, 390 F. Supp. 2d 136, 157 (D. Conn. 2005) ("Temporal proximity alone is not sufficient for the plaintiff's claim to survive summary judgment.").

I also reject Defendants' argument that the Amended Complaint fails to allege facts plausibly suggesting a causal connection between Plaintiff's protected speech on October 12, 2017 (Dkt. No. 8 at ¶ 11), and Defendant DeLutis's alleged e-mail to Ms. Hicks on October 26, 2017, telling her to remove Plaintiff from his position in the tailor shop (Dkt. No. 8 at ¶ 27).

First, the Second Circuit has made clear that "temporal proximity of an allegedly retaliatory [action] to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (holding that, within the context of an employment discrimination claim, "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."). Although there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment, *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017), the same is not true at the motion to dismiss stage. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (collecting cases) ("To be sure, a 'plaintiff

can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.' Such circumstantial evidence of retaliation, however, without more, is insufficient to survive summary judgment."). Defendants cite to *Thomas v. Waugh*, 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on *de novo* review) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)), which held that "temporal proximity alone is insufficient to establish an inference of retaliation." However, the Second Circuit case relied on by the Court in *Thomas*, did not draw such a conclusion. *Slattery*, 248 F.3d at 95. Instead, the Second Circuit in *Slattery*, held that, in the context of an employment case, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95. Here, unlike the facts presented in *Slattery*, the Amended Complaint does not allege facts plausibly suggesting that gradual adverse job actions began before Plaintiff was removed from his position in the tailor shop. (*See generally* Dkt. No. 8.) As a result, I find that temporal proximity alone is sufficient to infer a causal connection at the motion to dismiss stage.

**\*6** Second, the Amended Complaint alleges more than mere temporal proximity from which, a causal connection could be inferred. As set forth by Plaintiff in his memorandum of law, a causal connection could also be inferred based on Defendants' alleged failure to follow "DOCCS's policies and procedures regarding requests for removal and removal of inmates from program." (Dkt. No. 22 at 4; *accord* Dkt. No. 8 at ¶ 34.) While Defendants' alleged failure to follow DOCCS' policies and procedures does not "explicitly state an intent to retaliate, [it] is consistent with and impl[ies] a retaliatory motive." *Burton v. Lynch*, 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009).

Third, although Plaintiff alleges that Defendant DeLutis took an adverse action against him on behalf of C.O. Ayotte and "it is difficult to establish one defendant's retaliation for complaints against another defendant," *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011), I find that the Amended Complaint alleges facts plausibly suggesting a causal connection. More specifically, Plaintiff alleges that Defendant DeLutis was "in charge of the investigation" regarding the grievance that Plaintiff filed against C.O. Ayotte. (Dkt. No. 8 at ¶ 26.) In addition, the Amended Complaint alleges that (1) Plaintiff filed the

Case 9:22-cv-01094-BKS-ML     Document 33     Filed 07/25/24     Page 113 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

grievance on October 20, 2017,[2] (2) on October 26, 2017, Defendant DeLutis sent an e-mail to Ms. Hicks directing her to remove Plaintiff from the tailor shop for "security reasons," and (3) on October 27, 2017, Defendant DeLutis directed Sergeant Stuart to interview Plaintiff and C.O. Ayotte about Plaintiff's grievance. (Dkt. No. 8 at ¶¶ 26-27.) Thus, the Amended Complaint alleges that Defendant DeLutis was aware of Plaintiff's protected speech (the grievance against C.O. Ayotte) at the time he took the adverse action against Plaintiff (directing his removal from the tailor shop) and that those events occurred in close temporal proximity to each other. *See Young v. Shipman*, 18-CV-0782, *2020 WL 1329159, at \*4-5 (N.D.N.Y. Mar. 23, 2020)* (Sannes, J.) (finding that the plaintiff alleged facts plausibly suggesting a causal connection between the plaintiff's protected speech (a grievance that the plaintiff filed against Defendant Sawyer) and the adverse action (taken by Defendant Shipman) where Defendant Shipman was allegedly aware of the plaintiff's grievance against Defendant Sawyer and the events occurred in close temporal proximity).

As a result, I recommend that Defendants' motion to dismiss the Amended Complaint, arguing that Plaintiff's retaliation claim fails as a matter of law against Defendant DeLutis, be denied.[3]

### B. Whether Plaintiff Alleged Facts Plausibly Suggesting a Retaliation Claim Against Defendants Holdridge, Bell, and Mallozzi

For the reasons stated in Defendants' memorandum of law, I recommend that Plaintiff's retaliation claim against Defendants Holdridge, Bell, and Mallozzi be dismissed for failure to state a claim upon which relief may be granted. The following is intended to supplement, but not supplant those reasons.

**\*7** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts

rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement). Before deciding *Ashcroft v. Iqbal*, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright*, 21 F.3d at 501 (additional citation omitted)).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti*, 983 F.3d at 618. The Second

Circuit explained that, " 'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id.* (quoting *Iqbal*, 556 U.S. at 676). "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly." *Fabrizio v. Smith*, 20-CV-0011, 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (Lovric, M.J.) (collecting cases), *report and recommendation adopted by* 2021 WL 2211023 (N.D.N.Y. June 1, 2021) (Suddaby, C.J.).

**\*8** "In light of *Tangreti*, [a] plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment ... claim." *Bryant v. Miller*, 18-CV-0494, 2021 WL 5095284, at *20 (N.D.N.Y. July 22, 2021) (Hummel, M.J.), *report and recommendation adopted by* 2021 WL 4272396 (N.D.N.Y. Sept. 21, 2021) (Suddaby, C.J.); *see Fabrizio*, 2021 WL 2211206, at *10 (holding that the plaintiff's "attempt to plead personal involvement based upon the denial of a grievance and/or appeals, lacks merit because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment retaliation claim."); *Zielinski v. Annucci*, 17-CV-1087, 2019 WL 2479616, at *12 (N.D.N.Y. Jan. 8, 2019) (Hummel, M.J.), *report and recommendation adopted by* 2019 WL 1305826 (N.D.N.Y. Mar. 22, 2019) ("[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."); *Gomez v. Sepiol*, 11-CV-1017SR, 2014 WL 1575872, at *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation."); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff).

Plaintiff's allegations against Defendants Holdridge, Bell, and Mallozzi, relate solely to their (a) denial of Plaintiff's

grievance, (b) affirmation of Plaintiff's grievance denial, and/or (c) affirmation of Defendant DeLutis's removal of Plaintiff from the tailor shop. (*See generally* Dkt. Nos. 1, 22.) After the Second Circuit's ruling in *Tangreti*, these allegations are insufficient to plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozzi. As a result, I recommend that Defendants' motion to dismiss with respect to Defendants Holdridge, Bell, and Mallozzi, be granted.

**ACCORDINGLY**, it is hereby respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 8) be **DISMISSED** with respect to Defendants Holdridge, Bell, and Mallozzi for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6); and it is further respectfully

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 17) be **GRANTED** to the extent that it sought dismissal of Defendants Holdridge, Bell, and Mallozzi because the Amended Complaint failed to state a claim upon which relief may be granted, and **DENIED** to the extent that it sought dismissal of the Amended Complaint with respect to Defendant DeLutis; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[4]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1129887

**Footnotes**

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 115 of 151

1    *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

2    Plaintiff also alleges that this grievance was filed on October 12, 2017. (*Compare* Dkt. No. 8 at ¶ 11, *with* Dkt. No. 8 at ¶ 26.) For purposes of this motion, the Court need not resolve whether Plaintiff's grievance was filed on October 12, 2017, or October 20, 2017.

3    To the extent that Defendants claim that they would have taken the same action against Plaintiff absent the protected conduct, at this stage of the litigation, the Court is unable, on a motion to dismiss, to resolve such factual disputes. *See Carl v. Dirie,* 09-CV-0724, 2010 WL 3338566, at *6 (N.D.N.Y. March 29, 2010) (Treece, M.J.) (denying the defendant's motion to dismiss retaliation claim due to factual issues surrounding whether the defendants would have taken the same actions in the absence of retaliatory motives).

4    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 116 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

2022 WL 856885
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrew HENDRICKS, Plaintiff,

v.

Shelley M. MALLOZZI, Director of the Inmate
Grievance Program for DOCCS; Earl Bell,
Superintendent, Clinton Correctional Facility; D.
Holdridge, Deputy Superintendent for Security, Clinton
Correctional Facility; and C. Delutis, Captain of
Security, Clinton Correctional Facility, Defendants.

9:20-CV-1035 (MAD/ML)
|
Signed 03/23/2022

**Attorneys and Law Firms**

ANDREW HENDRICKS, 07-B-0269, Eastern New York
Correctional Facility, Box 338, Napanoch, New York 12458,
Plaintiff, Pro Se.

BRENDA BADDAM, AAG, NEW YORK STATE
ATTORNEY GENERAL, The Capitol, Albany, New York
12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff commenced this civil rights action on September
3, 2020, alleging violations of his constitutional rights while
he was incarcerated at Clinton Correctional Facility. *See*
Dkt. No. 1. On October 29, 2020, this Court dismissed the
complaint without prejudice pursuant to 28 U.S.C. §§ 1915(e)
(2)(B) and 1915A(b)(1). *See* Dkt. No. 5. Plaintiff filed a
proposed amended complaint on November 18, 2020. *See*
Dkt. No. 8. In his amended complaint, Plaintiff asserted that
Defendants C. DeLutis, K. Hicks, D. Holdridge, Earl Bell,
and Shelley M. Mallozzi violated his First and Fourteenth
Amendment rights when they removed him from his prison
job in retaliation for filing a grievance against a correctional
officer. *See id.* at ¶¶ 24-57. On December 23, 2020, this
Court accepted the amended complaint for filing only to the

extent that it asserted First Amendment retaliation claims
against Defendants DeLutis, Holdridge, Bell, and Mallozzi,
and dismissed the remaining claims without prejudice. *See*
Dkt. No. 9.

On March 1, 2021, in lieu of an answer, Defendants filed
a motion to dismiss the amended complaint pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure.
*See* Dkt. No. 17. On January 14, 2022, Magistrate Judge
Lovric issued a Report and Recommendation recommending
that Defendants' motion to dismiss be granted with respect
to Defendants Holdridge, Bell, and Mallozzi, and denied
with respect to Defendant DeLutis. *See* Dkt. No. 28. On
January 31, 2021, Plaintiff objected to the Report and
Recommendation to the extent it recommended granting
Defendants' motion to dismiss with respect to Defendants
Holdridge, Bell, and Mallozzi. *See* Dkt. No. 29. Currently
before the Court is Magistrate Judge Lovric's Report and
Recommendation and Plaintiff's objection thereto.

**II. BACKGROUND**

The amended complaint alleges that, on October 11, 2017,
Plaintiff was given an "Inmate Counseling Notification" by a
nonparty civilian employee of the tailor shop where Plaintiff
worked. *See* Dkt. No. 8 at ¶ 10. Two days later, Plaintiff
submitted a grievance to the Inmate Grievance Resolution
Committee ("IGRC") alleging that nonparty Corrections
Officer ("C.O.") Ayotte was harassing him in connection with
the Inmate Counseling Notification. *See id.* at ¶ 11. Defendant
DeLutis "was in charge of the investigation[ and] directed
[a nonparty C.O.] to interview [Plaintiff] and C.O. Ayotte
about the incident, which he did, separately, on 10/27/17." *Id.*
at ¶ 26. On November 1, 2017, at the request of Defendant
DeLutis, Plaintiff was removed from his position at the tailor
shop for confidential "security reasons." *Id.* at ¶ 29.

On December 11, 2017, Plaintiff filed a second grievance
complaining that his removal from his tailor shop job was
done in retaliation for the prior grievance he had filed against
C.O. Ayotte. *See id.* at ¶ 30. The IGRC denied the second
grievance, stating that Plaintiff was removed from the tailor
shop for legitimate security concerns. *See id.* at ¶ 47. The
IGRC told Plaintiff he was not allowed to know what those
security reasons were because "it might jeopardize the safety
and security of the facility." *Id.*

**\*2** Plaintiff appealed the IGRC's decision to the Superintendent, Defendant Bell, on December 27, 2017. *Id.* Defendant Bell ultimately denied the appeal and found Plaintiff's retaliation claim to be "unsubstantiated" because Plaintiff was removed from the tailor shop for legitimate security concerns. *Id.* at ¶ 48. In rendering this decision, Defendant Bell allegedly quoted the "Policy, Procedures and Standards for Programing Inmates manual" and stated that "[a] change in program can be made at anytime, 'in person or in writing ....' " *Id.* at ¶ 49. The amended complaint claims that this quote was "nothing less than a shameless and unattractive attempt to be deceptive and misleading" because the manual "clearly does not say 'in person or in writing' in that particular section." *Id.*

Plaintiff appealed Defendant Bell's determination to the DOCCS Central Office Review Committee ("CORC"), where Defendant Mallozzi was serving as Director. *Id.* CORC upheld Defendant Bell's determination, finding that Plaintiff was removed from his position at the tailor shop for security reasons. *See id.* at ¶ 53.

Meanwhile, on November 27, 2017, Plaintiff sent a letter to Defendant Holdridge requesting information about his removal from the tailor shop. *See id.* at ¶ 43. Defendant Holdridge replied the same day, "stating that he had reviewed the 'confidential documentation supporting [Plaintiff's] removal' and that he ... also support[ed] the removal" because it was "in the best interest of the facility." *Id.* The complaint asserts that Defendant Holdridge's statement that he reviewed confidential documentation is a "deliberate and deceptive untruth" because Plaintiff "F.O.I.L. requested any and all documents" related to his removal and the only thing he received was a copy of an email from Defendant DeLutis requesting the removal. *Id.* at ¶¶ 44-45.

On March 1, 2021, Defendants DeLutis, Holdridge, Bell, and Mallozzi filed a motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dkt. No. 17. On January 14, 2022, Magistrate Judge Lovric issued a Report and Recommendation recommending, as relevant here, that the motion to dismiss be granted as to Defendants Holdridge, Bell, and Mallozzi. *See* Dkt. No. 28. Magistrate Judge Lovric found that—after the Second Circuit's recent ruling in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)— a " 'plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest "[t]he factors necessary to establish" a First Amendment ... claim.' " Dkt.

No. 28 at 17 (quotation omitted). Noting that "Plaintiff's allegations against Defendants Holdridge, Bell, and Mallozzi, relate[d] solely to their (a) denial of Plaintiff's grievance, (b) affirmation of Plaintiff's grievance denial, and/or (c) affirmation of Defendant DeLutis's removal of Plaintiff from the tailor shop," Magistrate Judge Lovric concluded that Plaintiff's "allegations are insufficient to plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozi." *Id.*

Plaintiff's raises two objections to Magistrate Judge Lovric's Report and Recommendation. First, Plaintiff argues that the amended complaint alleged facts beyond the denial or affirmation of the denial of a grievance that plausibly support the personal involvement of Defendants Holdridge, Bell, and Mallozzi in Plaintiff's retaliation claim. *See* Dkt. No. 29 at ¶¶ 1-4. Second, Plaintiff argues that it was unfair for Magistrate Judge Lovric to rely on *Tangreti* in rejecting his retaliation claims because *Tangreti* was decided after Plaintiff filed his amended complaint. *See id.* at ¶¶ 5-7. Plaintiff also asks for permission to file a second amended complaint should the Court choose to adopt the Report and Recommendation. *See id.* at ¶ 7.

## III. DISCUSSION

### A. Standard of Review

**\*3** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 118 of 151

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *[Twombly*, 550 U.S.]* at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## B. Plaintiff's Objections

Plaintiff's first objection is that his amended complaint has alleged facts that plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozzi in the events

that form the basis of his retaliation claim. *See* Dkt. No. 29 at ¶ 1. Specifically, Plaintiff asserts that the amended complaint states that Defendant Holdridge "took it upon himself to get personally involved" by responding to a letter written by Plaintiff and "stating that he [had] reviewed the confidential documentation supporting [Plaintiff's] removal from the Tailor Shop ... <u>knowing full well</u> that no such documentation even existed." *Id.* at ¶ 2 (citing Dkt. No. 8 at ¶¶ 42-45). Plaintiff also asserts that Defendant Bell did more than "merely deny [his] grievance on appeal"; claiming that he "reconfigur[ed] and manipulat[ed] the wording of DOCCS policy," showing "blatant disregard for and deliberate indifference to [Plaintiff's] First Amendment rights." *Id.* at ¶ 4 (citing Dkt. No. 8 at ¶¶ 46-51). Finally, Plaintiff argues that the amended complaint states that Defendant Mallozzi "just rubber stamped [D]efendant Bell's decision," making him "just as liable as [D]efendant Bell." *Id.*

**\*4** The Court finds that Defendants' motion to dismiss should be granted with respect to Defendants Holdridge, Bell, and Mallozzi. As Magistrate Judge Lovric found, "[i]t is well settled that affirming the outcome of a disciplinary hearing does not in itself constitute personal involvement in any potential due process violation," or other alleged underlying unconstitutional conduct. *Abdul-Halim v. Bruyere*, No. 9:19-CV-740, 2021 WL 3783087, *3 (N.D.N.Y. Aug. 26, 2021); *see also Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, *5 (S.D.N.Y. Jan. 26, 2021) ("Failing to correct another officer's violation does not suffice"); *Gomez v. Sepiol*, No. 11-CV-1017, 2014 WL 1575872, *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation"); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff). Contrary to Plaintiff's argument, Defendant Holdridge's reliance on confidential documentation and Defendant Bell's alleged error when quoting DOCCS policy do not transform their review of his second grievance into personal involvement in the underlying constitutional violation (the allegedly retaliatory removal of Plaintiff from his job); nor do these alleged actions amount to separate constitutional violations.

Plaintiff next objects to the application of the Second Circuit's holding in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), [1] to this case. *See* Dkt. No. 29 at ¶¶ 5-7. Specifically,

Hendricks v. Mallozzi, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 119 of 151

Plaintiff notes that the amended complaint was filed before the decision in *Tangreti* was issued, and argues that it would be "unfair" for the Court to apply *Tangreti* where he "obviously had no knowledge that the [prior] test would soon be invalidated" at the time he wrote the amended complaint. *Id.* at ¶ 7. The Court finds that *Tangreti* is properly applied to this case. "[T]he general rule [is] that a court must apply the law as it exists at the time it renders its decision." *Walsche v. First Inv'rs Corp.*, 981 F.2d 649, 653 (2d Cir. 1992) (citations omitted); *see also Kremer v. Chem. Const. Corp.*, 623 F.2d 786, 788-89 (2d Cir. 1980), *aff'd*, 456 U.S. 461 (1982) ("The general rule of long standing is that judicial precedents normally have retroactive as well as prospective effect"). The narrow exception to this general principle identified in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), does not apply here. [2]

Accordingly, the Court adopts Magistrate Judge Lovric's Report and Recommendation in its entirety.

**C. Leave to Amend**

Finally, Plaintiff requests leave to file a second amended complaint should the Court choose to adopt Magistrate Judge Lovric's Report and Recommendation. *See* Dkt. No. 29 at ¶ 7. In general, a court should not dismiss a *pro se* litigant's complaint without granting leave to amend at least once " 'when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). However, an opportunity to amend is not required where the plaintiff has previously been afforded such an opportunity. *See Coleman v. brokersXpress, LLC*, 375 Fed. Appx. 136, 137 (2d Cir. 2010); *see also Bivona v. McLean*, No. 9:19-CV-0303, 2019 WL 2250553, *5 (N.D.N.Y. May 24, 2019); *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, *8 (N.D.N.Y. Jan. 13, 2008), *aff'd*, 357 Fed. Appx. 388 (2d Cir. 2009).

**\*5** Here, Plaintiff has already been afforded one opportunity to amend the complaint and has not made any specific showing as to how he would cure the defects that have persisted if given a second opportunity to amend. Accordingly, Plaintiff's request for leave to file a second amended complaint is denied.

## IV. CONCLUSION

After carefully reviewing the Report and Recommendation, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Lovric's Report and Recommendation (Dkt. No. 28) is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 17) is **GRANTED in part** and **DENIED in part**; [3] and the Court further

**ORDERS** that Defendants Holdridge, Bell, and Mallozzi are terminated as Defendants in this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 856885

## Footnotes

1    In *Tangreti*, the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards for establishing supervisory liability. Ultimately, the Second Circuit held that, to establish a constitutional violation against a supervisor, a plaintiff "must plead and prove that [the supervisor-]defendant, through [his or her] own individual actions, has violated the constitution." *Tangreti*, 983 F.3d at 618 (internal quotation marks omitted).

2    "To qualify for purely prospective application, a decision 'must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed' " and "the court must then 'weigh' the issue of whether retroactive application would conflict with or further the purposes of the new rule and whether it would produce inequitable results." *Walsche*, 981 F.2d at 653 (quoting *Chevron Oil Co.*, 404 U.S. at 106-07).

3    Plaintiff's First Amendment retaliation claim remains against Defendant DeLutis.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8618745
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Christopher CALHOUN, Plaintiff,

v.

Angel QUIROS, et al., Defendants.

3:23-CV-00715 (SVN)
|
Signed December 13, 2023

**Attorneys and Law Firms**

Christopher Calhoun, Cheshire, CT, Pro Se.

**INITIAL REVIEW ORDER**

Sarala V. Nagala, United States District Judge

**\*1** *Pro se* plaintiff Christopher Calhoun, a sentenced inmate currently incarcerated at Cheshire Correctional Center ("Cheshire"), filed this action pursuant to 42 U.S.C. § 1983. He names sixteen defendants: Commissioner Angel Quiros, Doctor Freston, Lieutenant Laprey, Deputy Commissioner of Operations John/Jane Doe, Deputy Commissioner of Administration John/Jane Doe, Lieutenant Roy, Warden Bowles, Deputy Warden of Operations at Northern Correctional Institution John/Jane Doe, Deputy Warden of Administration at Northern Correctional Institution John/Jane Doe, Counselor Sanders, Captain Danneck, Captain Papoosha, Captain McCreary, [1] Director of Security Antonio Santiago, Initial SRG Disciplinary Hearing Officer John Doe, and Initial SRG Disciplinary Investigator John Doe. Plaintiff sues all Defendants in their official and individual capacities. Plaintiff asserts First Amendment claims for violation of his rights to freedom of association and speech, Eighth Amendment claims for violation of his right to be free from cruel and unusual punishment, and Fourteenth Amendment claims for denial of due process. Plaintiff seeks compensatory and punitive damages from Defendants in their individual capacities, as well as injunctive relief.

The Prison Litigation Reform Act requires that federal courts review complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). Upon review, the Court must dismiss the complaint, or any portion of the

complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

The Court has thoroughly reviewed all factual allegations in the complaint and conducted an initial review pursuant to 28 U.S.C. § 1915A. [2] Based on this initial review, the Court orders as follows.

**I. FACTUAL BACKGROUND**

**\*2** While the Court does not set forth all of the facts alleged in Plaintiff's complaint, [3] it summarizes his basic factual allegations here to give context to its ruling below.

The incidents underlying this action occurred while Plaintiff was confined at MacDougall-Walker Correctional Institution ("MacDougall"), Northern Correctional Institution ("Northern"), and Corrigan Correctional Center ("Corrigan"). [4] Compl., ECF No. 1 at 6.

On September 2, 2020, Plaintiff was issued a Disciplinary Report for Security Risk Group ("SRG") Affiliation, and removed from the general population to a restrictive housing unit. *Id.* at 8. This was Plaintiff's first such disciplinary report. *Id.* The Disciplinary Investigator, Defendant John Doe, told Plaintiff that he could receive harsh sanctions, including loss of visiting and telephone privileges, if he did not plead guilty to the disciplinary charge. *Id.*

Plaintiff did not want to plead guilty, but the Disciplinary Investigator told the restrictive housing staff not to permit him to rest or sleep. *Id.* In addition, the restrictive housing unit was very noisy which also prevented Plaintiff from sleeping. *Id.* After two days in these conditions, Plaintiff pleaded guilty before the Disciplinary Investigator. *Id.* The Investigator told Plaintiff that he would be brought before a Disciplinary Hearing Officer who would accept his plea and have him removed from the restrictive housing unit. *Id.*

No one told Plaintiff that, in addition to being a disciplinary hearing, the hearing was also an SRG affiliation hearing. *Id.* Nor did anyone tell Plaintiff that by pleading guilty to the disciplinary charge of SRG affiliation, he waived his right to appeal from the SRG affiliation hearing. *Id.* In addition, Plaintiff alleges that the Disciplinary Hearing Officer and Investigator failed to follow Department of Correction ("DOC") Administrative Directive 9.5(23)

(G),[5] which Plaintiff contends provides that a disciplinary investigator cannot accept a guilty plea to a first charge of security risk group affiliation. *Id.* When Plaintiff appealed his SRG affiliation designation to Defendant Director of Security Antonio Santiago, Director Santiago denied the appeal, stating that Plaintiff had received a fair hearing and been afforded appropriate due process. *Id.* at 8–9.

**\*3** After being designated as an SRG affiliate, Plaintiff was placed in the SRG Program, which he alleges involves "gladiator events." *Id.* at 9. Plaintiff describes the Program as "a placement of prisoners who are aggressive and even deadly into cells with other prisoners who are matched as mortal enemies to fight until one loses. Only then are they separated." *Id.* Plaintiff also alleges that "prisoners who could otherwise defend themselves in a physical altercation are placed in handcuffs behind their backs and placed into 'recreation yards' with other prisoners who have the ability to remove the handcuffs or whom the guards have selected to attack another prisoner and so placed handcuffs on so l[o]osely that such prisoner could easily remove the handcuffs and use them like brass knuckles."[6] *Id.*

On February 28, 2021, Plaintiff sent Defendant Captain Papoosha an inmate request asking that inmates not be handcuffed with their hands behind their backs during recreation. *Id.* at 10. He received no response. *Id.* Plaintiff filed grievance appeals, but never received any response. *Id.*

Plaintiff gave his counselor, Defendant Sanders, inmate request forms for the warden (presumably Defendant Warden Bowles) and Defendant Captain McCreary. Defendant Sanders stated that she put his request to the warden in the box for delivery and handed the request to Captain McCreary personally, but Plaintiff alleges these were false statements as neither defendant responded to his request. *Id.*

Plaintiff submitted another request form complaining about the SRG Program to Captain McCreary on February 24, 2021, but received no answer. *Id.* He alleges McCreary is aware of the gladiator events and in fact promotes and facilitates attacks on prisoners by other prisoners. *Id.*

While at Northern, Plaintiff submitted an inmate request form to Defendant Commissioner Quiros but received no response. *Id.*

On November 16, 2021, while confined in the Walker building of MacDougall-Walker Correctional Institution,

Plaintiff was placed in the recreation yard with his hands cuffed behind his back. *Id.* He was attacked by other inmates, whom he alleges correctional staff knew were his enemies, and suffered a fractured skull and a contusion on his forehead. *Id.* Defendant Dr. Freston determined that Plaintiff should go to an outside hospital for evaluation of his injuries. *Id.* Defendant Lieutenant Laprey, who had escorted Plaintiff to the medical unit, "made a gesture" that indicated his disagreement with Dr. Freston's decision. *Id.* at 11. Plaintiff was eventually taken to the hospital by prison transport van, unaccompanied by any persons with medical training, instead of by ambulance. *Id.* Plaintiff believes that prison officials wanted this form of transport, and Dr. Freston agreed to it, to cover up the incident of inmate-on-inmate violence. *Id.*

At the hospital, Plaintiff was diagnosed with depressed skull fractures and a large hematoma. *Id.* His head was described as normocephalic and atraumatic. *Id.* Plaintiff was positive for headaches, visual disturbances, and wounds. *Id.* Plaintiff has been sent to the hospital five times to address these injuries. *Id.* Plaintiff also alleges that he suffers gaps in his memory that persist to this day. *Id.*

Plaintiff's complaint seeks compensatory and punitive damages from the Defendants in their individual capacities. *Id.* at 12. He also seeks various forms of injunctive relief, including that DOC be ordered to abolish the SRG Program; that DOC be ordered to adopt an inmate request system that requires a receipt for submission of inmate request forms and return of the form after it is responded to by prison officials; that he receive adequate medical care, a single cell for a medical reason, and prescription transition lenses; that the Court ban the prison practice of transporting prisoners to emergency rooms via prison transport vehicles and by prison employees who do not have medical training; and, finally, that all attacks in the DOC, whether they require medical treatment or not, be reported to the Governor of the State of Connecticut. *Id.* at 12.

## II. DISCUSSION

**\*4** As an initial matter, the Court notes that Plaintiff's complaint is not a model of clarity. Although it states that it asserts violations of the First, Eighth, and Fourteenth Amendments, it does not separate the allegations into separate claims, or specify which claims are asserted against which Defendants. In assessing which of Plaintiff's claims should proceed past initial review, the Court has construed Plaintiff's allegations liberally to raise the strongest claims they might

suggest, and has assessed the merit of those claims as-construed. *See Sykes*, 723 F.3d at 403.


### A. Defendant Capacity and Relief Sought

First, the Court examines the capacities in which Defendants are sued and the relief sought against them. Plaintiff sues all Defendants in their individual and official capacities. ECF No. 1 at 2. He seeks compensatory and punitive damages against all Defendants in their individual capacities only, *id.* at 12, which the Eleventh Amendment permits. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). He also seeks a variety of injunctive relief against all Defendants, without specifying in which capacity such relief is sought. ECF No. 1 at 12. Claims for injunctive relief may not be asserted against Defendants in their individual capacities, as they would not have the authority to provide such relief in their individual capacities. *See Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011); *Patterson v. Lichtenstein*, No. 3:18-cv-2130 (MPS), 2020 WL 837359, at *2 (D. Conn. Feb. 20, 2020). Accordingly, all claims for injunctive relief against Defendants in their individual capacities are dismissed pursuant to 28 U.S.C. § 1915A(b)(1). Plaintiff may proceed with his injunctive relief requests against Defendants in their *official* capacities.


### B. First Amendment Claims

Plaintiff contends that Defendants have violated his First Amendment rights to freedom of speech and freedom of association. ECF No. 1 at 5.

It is not clear what allegations support his First Amendment claim and, as a threshold matter, the Court notes that the mere mention of a constitutional provision is not sufficient to state a claim for relief under that provision. *See, e.g., Monger v. Connecticut Dep't of Transp.*, No. 3:17CV00205(JCH), 2017 WL 3996393, at *5 (D. Conn. Sept. 11, 2017) ("Merely mentioning the state constitution, however, is not sufficient to state a claim upon which relief can be based.").

Plaintiff alleges that he was threatened with the "removal of visiting privileges and denial of telephone privileges" in order to induce him to plead guilty to the SRG Affiliation Disciplinary Report, which, as far as the Court can discern, is the only allegation potentially touching on a First Amendment violation. *See* ECF No. 1 at 8. However, Plaintiff does not allege that he was *actually* ever denied telephone or visitation privileges, nor that he was ever rendered unable to communicate with family members or friends—this omission is fatal to any First Amendment claim he may have. *See Marrero v. Weir*, No. 3:13-CV-0028 (RNC), 2014 WL 4799228, at *6 (D. Conn. Sept. 26, 2014) (dismissing claim that "withholding ... telephone and visitation privileges" in order to induce cooperation with investigation constituted a First Amendment violation, in part because "there [was] no allegation that [plaintiff] was unable to communicate with family members and friends by other means"). [7]

**\*5** Accordingly, Plaintiff's First Amendment claims for a violation of his First Amendment rights to freedom of speech and freedom of association are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).


### C. Eighth Amendment Claims

The Court construes Plaintiff's complaint as asserting two Eighth Amendment claims, one challenging the conditions of confinement in the SRG Program and the other challenging the medical care provided after his injury on November 16, 2021.

"The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To state a cognizable Eighth Amendment claim, Plaintiff must allege facts establishing an objective and a subjective element. *Matzell v. Annucci*, 64 F.4th 425, 435 (2d Cir. 2023). "First, a plaintiff must show that the alleged deprivation is objectively 'sufficiently serious' to constitute 'cruel and unusual punishment,' and second, a plaintiff must show that the charged official acted with a 'sufficiently culpable state of mind.' " *Id.* (quoting *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019)).

To satisfy the objective element, "a plaintiff must plead 'a harm of a magnitude that violates a person's eighth amendment rights.' " *Id.* (citation omitted). Conditions that violate the Eighth Amendment "create inhumane prison conditions, deprive inmates of basic necessities or fail to protect their health or safety." *Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 227 (W.D.N.Y. 2003) (citation and internal quotation marks omitted). To satisfy the subjective element, "a plaintiff must show that the prison officials had 'a state of mind that is the equivalent of criminal recklessness,' ...... or

that the prison officials acted with deliberate indifference ...." *Matzell*, 64 F.4th at 435 (quoting *Francis*, 942 F.3d at 150).

### 1. Conditions in SRG Program

Plaintiff contends that the conditions in the SRG Program constitute cruel and unusual punishment. Plaintiff describes harsh conditions under which prison officials intentionally house inmates with inmates who want to harm them, enter inmates into "gladiator events" with other inmates, and place inmates in the recreation yard in handcuffs, depriving them of the ability to exercise and subjecting them to the possibility of attack, as allegedly happened to Plaintiff on November 16, 2021. ECF No. 1 at 9–10.

The Eighth Amendment imposes on prison officials a duty to "take reasonable measures to guarantee the safety of inmates," which includes "protecting prisoners from violence at the hands of other prisoners." *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (cleaned up) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 833 (1994)). In addition, recognizing that "exercise is a basic human need that must be provided for inmates," courts have allowed claims to proceed related to allegations that prison officials forced inmates to wear handcuffs during recreation. *See, e.g.*, *Taylor v. Murphy*, No. 3:10-CV-245 (HBF), 2011 WL 1343883, at *3–*6 (D. Conn. Apr. 7, 2011).

For purposes of initial review, the Court considers Plaintiff's allegations sufficient to state a claim under the Eighth Amendment related to the conditions of confinement in the SRG program.

**\*6** The next question is against which Defendants such a claim may proceed. Initially, the Court notes that a plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation. *See* *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation omitted). When assessing the sufficiency of a defendant's alleged "personal involvement," the Court may not apply a "special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020). Thus, a plaintiff must plead that each defendant, "through the official's own individual actions," has violated his rights. *Id.* (quoting *Iqbal*, 556 U.S. at 676). For an Eighth Amendment deliberate indifference

claim against a prison supervisor, "the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id.* at 616. A "supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official." *See* *Young v. Choinski*, 15 F. Supp. 3d 172, 189 (D. Conn. 2014).

Here, the Court will allow the Eighth Amendment claim to proceed for monetary damages against Defendants McCreary, Quiros, Deputy Commissioner of Operations John/Jane Doe, and Deputy Commissioner of Administration John/Jane Doe in their individual capacities. As to these Defendants, Plaintiff alleges something beyond mere awareness of the SRG Program "gladiator events" and failure to respond to grievances. Specifically, he alleges that Defendant McCreary "promotes and facilitates attacks on prisoners by other prisoners knowingly and deliberately," *see* ECF No. 1 at 10, and that Defendants Quiros and Deputy Commissioners John/Jane Doe "work concertedly to conceal what really happens in this [SRG Program] environment and promote the gladiator events as a 'Program,' " *see id.* at 11. For purposes of initial review, the Court finds this sufficient to allege these four Defendants were deliberately indifferent to the serious risk of harm posed to Plaintiff by the SRG Program. *See* *Tangreti*, 983 F.3d at 616. Defendants remain free to challenge this initial finding in a motion to dismiss.

The Court will not allow this Eighth Amendment claim to proceed for monetary damages against any other Defendant. Plaintiff alleges generally that "[a]ll Defendants," and specifically the Warden and Deputy Wardens at MacDougall, were "aware" of the gladiator events and of what occurred in the SRG Program in the Walker Building. [8] ECF No. 1 at 9, 11. To begin, the warden and deputy wardens at MacDougall are not named as Defendants, so Plaintiff cannot proceed with any claims against them. More generally, the complaint includes no facts to undergird the nonspecific allegations made against "all Defendants." The conclusory allegations of awareness of the gladiator events, standing alone, are insufficient to establish that the Defendants were actually personally involved in any underlying constitutional violation, or that they perpetuated it as supervisors. *See* *Tangreti*, 983 F.3d at 616; *see also* *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (noting that the court is not bound to accept conclusory allegations). Plaintiff also notes that he sent inmate request forms regarding the conditions of confinement in the SRG Program to Defendant

Papoosha, Defendant Quiros, and "the Warden" (again, presumably Warden Bowles), *see* ECF No. 1 at 10, but these allegations likewise do not demonstrate personal involvement. *See Young*, 15 F. Supp. at 189.

**\*7** Although claims for injunctive relief do not require a plaintiff to allege personal involvement, *see Stevenson v. Quiros*, No. 3:20-CV-01518 (VLB), 2020 WL 7188607, at \*6 n.5 (D. Conn. Dec. 7, 2020); *Vaughan v. Aldi*, No. 3:19-CV-00107 (JAM), 2019 WL 1922295, at \*2 (D. Conn. Apr. 29, 2019), the Court will permit the Eighth Amendment claim to proceed for injunctive relief only against the same four Defendants (Defendants McCreary, Quiros, Deputy Commissioner of Operations John/Jane Doe, and Deputy Commissioner of Administration John/Jane Doe) in their official capacities, as the other Defendants are either not mentioned by name at all, or are only lumped into the conclusory allegations of awareness of the conditions in the SRG Program. *Faber*, 648 F.3d at 104 (noting that the court is not bound to accept conclusory allegations). Although only defendants with the authority to grant the requested relief are proper defendants in a suit for injunctive relief, and it is not yet clear which of these four Defendants, if any, have such authority, the Court may take up this issue at a later stage. *See Stevenson*, 2020 WL 7188607, at \*6 n.5 (allowing claim for injunctive relief to proceed past initial review, and postponing decision on the issue of authority).

### 2. Medical Care

In his second Eighth Amendment claim, Plaintiff contends that, after he suffered an assault at the hands of other inmates on November 16, 2021, Dr. Freston was persuaded by Lieutenant Laprey not to send him to the hospital via ambulance for treatment of his skull fracture and other injuries. *See* ECF No. 1 at 11. This appears to have delayed Plaintiff's treatment, as he waited in a prison bullpen for an unspecified amount of time before being taken via prison transport to the hospital. *See id.* at 11. Plaintiff suffered skull fractures, a hematoma, headaches, vision issues, and gaps in his memory as a result of the assault, and was sent back to the hospital five times to address his injuries. *Id.*

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). As

with all Eighth Amendment claims, a claim for deliberate indifference to medical needs has both an objective and subjective component. The objective component requires the plaintiff to demonstrate that he had a sufficiently serious "medical need," in other words, a " '*serious* illness or injury' resulting in the infliction of unnecessary pain and suffering." *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003) (citing *Estelle*, 429 U.S. at 105). For the subjective element, a plaintiff must show that the prison official's actions were more than "an inadvertent failure to provide adequate medical care." *Id.* at 184 (citing *Estelle*, 429 U.S. at 105–06). Deliberate indifference can be demonstrated when prison officials "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfere with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05.

For purposes of initial review, Plaintiff's allegations regarding his head injury, which was serious enough to warrant sending him to an outside hospital five times, are sufficient to allege a serious medical need that has caused him "pain and suffering." *See Smith*, 316 F.3d at 184.

As to the subjective element, Plaintiff's allegations are also sufficient to pass the initial review stage. Plaintiff's allegations sufficiently raise the issue that Dr. Freston and Lieutenant Laprey may have "intentionally ... delay[ed] [Plaintiff's] access to medical care" by waiting for Plaintiff to be taken to the hospital by prison transport, rather than by an ambulance, and that this delay was for a non-medical purpose. *See Estelle*, 429 U.S. at 104–05. To the extent Dr. Freston was influenced by Lieutenant Laprey in this decision, as Plaintiff alleges, Dr. Freston's decision would not be based on sound medical judgment, as Lieutenant Laprey is not a medical professional. *See Gibson v. St. Elizabeth Med. Ctr. Hosp. Exec. Dir.*, No. 22-1868, 2023 WL 3295843, at \*2 (2d Cir. May 8, 2023) (summary order) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (quoting *Chance*, 143 F.3d at 703 (internal quotation marks omitted)); *Quigley v. Williams*, No. 3:21cv1158 (MPS), 2022 WL 16797334, at \*2 (D. Conn. Nov. 8, 2022) (noting that court had permitted claim that doctor was influenced by correctional staff and not basing treatment on her medical judgment to proceed on initial review).

**\*8** Thus, the Court will permit Plaintiff's deliberate indifference to medical needs claim to proceed against Dr. Freston and Lieutenant Laprey for further development of the record.

D. Fourteenth Amendment Claims

The Court construes Plaintiff's complaint as asserting three Fourteenth Amendment procedural due process claims, one challenging prison grievance procedures, the second challenging various aspects of the SRG classification hearing, and the last challenging the procedures related to the disciplinary hearing.

In order to establish a procedural due process claim under the Fourteenth Amendment, a plaintiff "must show that (1) he possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process." *Ashby v. Quiros*, No. 3:17-CV-916(CSH), 2018 WL 2324081, at *8 (D. Conn. May 22, 2018).

*1. Grievance Procedures*

Plaintiff alleges that he sent multiple inmate requests and grievances which went unaddressed—including one to Captain Papoosha, one to the Warden, one to Captain McCreary, and one to Commissioner Quiros. ECF No. 1 at 10. At least two of the grievances, the one to the Warden and the one to Captain McCreary, Plaintiff attempted to deliver with the help of Counselor Sanders, who he alleges falsely stated that she had delivered the requests through the proper channels. *Id.*

The Supreme Court has never held that the Constitution requires state prisons to have formal grievance procedures. In *Riddick v. Semple*, 731 F. App'x 11 (2d Cir. 2018), the Second Circuit rejected a state prisoner's constitutional claim regarding prison grievance procedures. The court noted that the prisoner's "claim that defendants violated his due process rights by restricting his access to the prison's grievance procedures confuses a state-created procedural entitlement with a constitutional right. However, neither state policies nor state statutes create federally protected due process entitlements to specific state-mandated procedures." *Id.* at 13 (quoting *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003)) (internal quotation marks and ellipsis omitted); *see also Schlosser v. Manuel*, No. 3:19-cv-1444 (SRU), 2020 WL 127700, at *5 (D. Conn. Jan. 10, 2020) ("Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance or to have a grievance processed properly.").

As Plaintiff has no constitutional right to have his grievances properly processed, his Fourteenth Amendment due process claim related to inmate request forms and grievance procedures fails as a matter of law and is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

*2. Classification Hearing*

Plaintiff also asserts due process claims related to his SRG classification hearing. Specifically, Plaintiff asserts that Disciplinary Investigator Doe and Disciplinary Hearing Officer Doe failed to inform him of the fact that the disciplinary hearing was also a classification hearing and that he would have no right to appeal from that hearing if he pled guilty to the disciplinary infraction, [9] and that Director of Security Santiago denied his appeal of his SRG classification.

**\*9** Plaintiff's due process claim against Disciplinary Hearing Investigatory Doe and Disciplinary Hearing Officer Doe will be allowed to proceed, as Plaintiff has sufficiently alleged a liberty interest and the denial of process related to that interest. The United States Constitution does not create a liberty interest in avoiding transfer to more adverse conditions of confinement. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). However, state law may create liberty interests in being free from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 222–23 (quoting *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995)) (internal quotation marks omitted). Thus, the Court must consider the nature of the restrictions Plaintiff faced and the severity of those conditions in relation to the ordinary incidents of prison life and not any specific procedural requirement in the prison directives. *Id.* at 223 (citing *Sandin*, 515 U.S. at 484). The Second Circuit has held that the *Sandin* analysis should be applied when considering due process claims relating to administrative classification. *See Arce v. Walker*, 139 F.3d 329, 334–35 (2d Cir. 1998) (applying *Sandin* to claim for placement in non-punitive administrative segregation).

Here, Plaintiff has sufficiently alleged a liberty interest in his classification. Plaintiff alleges that he was confined with inmates who intended to harm him and, ultimately, did harm him. He alleges that correctional officers deliberately matched cellmates who would fight and, possibly, kill one another. For purposes of initial review, the Court considers Plaintiff's allegations sufficient to demonstrate an

"atypical and significant hardship;" thereby establishing a liberty interest in his classification. *See Sandin*, 515 U.S. at 484; *see also Velez-Shade v. Population Mgmt.*, No. 3:18CV1784(JCH), 2019 WL 4674767, at \*11 (D. Conn. Sept. 25, 2019) (analyzing DOC directives and recognizing liberty interest in SRG classification).

Plaintiff further sufficiently alleges that he was not provided with sufficient process before being classified in the SRG Program, as Plaintiff alleges that he was not told that the hearing also was a classification hearing or given any notice of the classification hearing. Thus, his due process claim will proceed against Defendants Disciplinary Hearing Officer and Disciplinary Investigator Doe. *See Velez-Shade*, 2019 WL 4674767, at \*12 (holding that prisoner did not have opportunity to defend against change in classification where prisoner did not receive separate classification hearing or notice that disciplinary hearing was also classification hearing); *see also Trimmier*, 2020 WL 5231300, at \*8 (allowing procedural due process claim where plaintiff received no notice or hearing before being reclassified as SRG member).

On the other hand, Plaintiff's claim against Director Santiago does not sufficiently state a claim for purposes of initial review. Plaintiff alleges that Director Santiago denied his appeal, but he cannot even state a liberty interest in having his classification appealed at all. There is no constitutional right to appeal the decision in a disciplinary hearing, *see Staton v. Gonzalez*, No. 3:22-CV-855 (VLB), 2023 WL 3042187, at \*6 (D. Conn. Apr. 21, 2023), and Plaintiff has identified no state-created right to an appeal his classification. As disciplinary hearings typically afford more due process protections to inmates than classification hearings, and there is no right to appeal a disciplinary hearing, the Court does not find Plaintiff has stated he did not receive sufficient process where he filed an appeal of a classification that was denied. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 563–71 (1974) (describing procedures required at disciplinary hearings as advance notice of the charges, opportunity to call witnesses and present documentary evidence, impartial decision maker, and written decision from factfinder detailing evidence relied upon and rationale for disciplinary action taken). Absent a constitutional right to appeal the classification decision, the Fourteenth Amendment claim against Defendant Santiago is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### 3. Disciplinary Hearing

**\*10** Plaintiff alleges that Disciplinary Investigator Doe and Disciplinary Hearing Officer Doe improperly accepted his guilty plea to the disciplinary charge in violation of prison directives. This claim must be dismissed because the Defendants did not violate the directive. Directive 9.5(16)(b) is entitled "Disciplinary Investigator Disposition," and appears to describe situations under which the investigator may accept a guilty plea, impose sanctions, and dispose of the disciplinary report *without holding any disciplinary hearing*. If one of the charges is SRG affiliation, the directive appears to require a disciplinary hearing even when there is a guilty plea. Here, Plaintiff alleges that, after he agreed to plead guilty, the Disciplinary Investigator told him that he would be brought before the Disciplinary Hearing Officer, who would accept his guilty plea—there is no allegation that he did not have a hearing. Thus, it does not appear that Disciplinary Investigator Doe and Disciplinary Hearing Officer Doe disposed of the disciplinary report without a hearing and, thus, did not violate the directive in accepting Plaintiff's guilty plea.

Plaintiff also alleges that Defendant Disciplinary Investigator Doe ordered restrictive housing staff to prevent Plaintiff from resting to pressure him to plead guilty to the disciplinary charge. The court must consider separately claims relating to disciplinary and classification hearings, even when the two hearings are combined. *See Mendez v. Lis*, No. 3:18-cv-1460 (MPS), 2019 WL 1644235, at \*5 (D. Conn. Apr. 16, 2019) (considering separately results of classification and disciplinary decisions even where the two hearings are combined). Plaintiff does not allege that he incurred any sanctions as a result of pleading guilty to the disciplinary charge itself. Absent any sanctions, Plaintiff did not suffer an atypical and significant hardship as a result of his guilty plea, as the fact that pleading guilty also affected his classification is a separate issue. *See id.* ("In short, the SRG Program and resulting deprivations were the result of the classification decision as opposed to the disciplinary finding, and the plaintiff does not allege any facts setting out a sanction resulting from the disciplinary finding."). Thus, Plaintiff does not have a due process claim against Defendant Disciplinary Investigator Doe based on his guilty plea to the disciplinary charge, and this Fourteenth Amendment claim against Disciplinary Investigator Doe is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). Should Plaintiff seek to challenge

any sanction imposed as a result of the disciplinary finding of guilt, he may raise that issue in an amended complaint.

### E. Remaining Defendants

Finally, Plaintiff includes Lieutenant Roy, Warden Bowles, Deputy Warden of Operations at Northern John/Jane Doe, Deputy Warden of Administration at Northern John/Jane Doe, and Captain Danneck as defendants but includes no specific allegations against them. A conclusory allegation, that all defendants "knew" Plaintiff's rights were being violated, *see* ECF No. 1 at 8, 9, is insufficient to state a plausible claim. *See Faber*, 648 F.3d at 104 (court not bound to accept conclusory allegations). As Plaintiff alleges no facts showing that these five defendants violated his constitutional rights, all claims against them are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### **ORDERS**

All First Amendment claims, and all claims against Defendants Lieutenant Roy, Warden Bowles, Deputy Warden of Operations at Northern John/Jane Doe, Deputy Warden of Administration at Northern John/Jane Doe, Counselor Sanders, Captain Danneck, Captain Papoosha, and Director of Security Santiago are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The case can proceed on (1) the Eighth Amendment conditions of confinement claim against Defendants Commissioner Quiros, Deputy Commissioner of Operations John/Jane Doe, Deputy Commissioner of Administration John/Jane Doe, and Captain McCreary; (2) the Eighth Amendment claim for deliberate indifference to medical needs against Defendants Dr. Freston and Lieutenant Laprey; and (3) the Fourteenth Amendment due process claim against Defendants Initial SRG Disciplinary Hearing Officer John Doe and Initial SRG Disciplinary Investigator John Doe related to the failure to inform Plaintiff of the classification hearing embedded in his disciplinary hearing.

**\*11** Plaintiff has two options as to how to proceed in response to this Initial Review Order:

### **OPTION ONE**

If Plaintiff wishes to proceed immediately on the claims against Defendants Commissioner Quiros, Deputy Commissioner of Operations John/Jane Doe, Deputy Commissioner of Administration John/Jane Doe, Captain McCreary, Dr. Freston, Lieutenant Laprey, Hearing Officer Doe and Disciplinary Investigator Doe, and only as set forth above, he may do so without further delay. If Plaintiff selects this option, he shall file a notice on the docket by **January 12, 2024,** informing the Court that he elects to proceed with service as to the claims against these Defendants. The Court will then begin the effort to serve process these Defendants. The Court notes, however, that service cannot be effected on Defendants Deputy Commissioner of Operations John/Jane Doe, Deputy Commissioner of Administration John/Jane Doe, Hearing Officer Doe, or Disciplinary Investigator Doe without those Defendants' full names and current addresses. Accordingly, if Plaintiff chooses the option of proceeding with this suit as described in this paragraph, he will need to serve discovery requests on the other Defendants in order to identify the full names and mailing addresses of the Doe Defendants. If Plaintiff chooses to proceed with this suit as described in this paragraph, he will have ninety (90) days from the date of appearance of any other Defendants to provide the full names and mailing addresses to the Court by filing a notice with that information.

### **OPTION TWO**

Alternatively, if Plaintiff wishes to attempt to replead any of the claims asserted in his Complaint that have been dismissed in order to attempt to state a viable claim, he may file an Amended Complaint by **January 12, 2024.** An Amended Complaint, if filed, will completely replace the Complaint and the court will not consider any allegations made in the Complaint in evaluating any Amended Complaint. The Court will review any Amended Complaint after filing to determine whether it may proceed to service of process on any defendants named therein. If Plaintiff elects to file an Amended Complaint, the Complaint this Initial Review Order addressed will not proceed to service of process on any defendant.

If the Court receives no response from Plaintiff by **January 12, 2024,** the Court will presume that Plaintiff wishes to proceed with Option One, on the Complaint as to the claims permitted to go forward in this Initial Review Order, and Plaintiff will have to show good cause if he seeks to amend the complaint in any manner in the future.

**Change of Address**. If Plaintiff changes his address at any time during the litigation of this case, Local Rule 83.1(c) 2 provides that he **MUST** notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEAS NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. Plaintiff should also notify Defendants or counsel for Defendants of his new address.

  **\*12**  SO ORDERED at Hartford, Connecticut, this 13th day of December 2023.

**All Citations**

Slip Copy, 2023 WL 8618745

---

## Footnotes

1    Plaintiff names this defendant as "Mcreary" in the case caption and "McCreary" within the body of the complaint. As the second spelling seems more likely, the Court uses that spelling in this order.

2    It is well-established that "*[p]ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants). Notwithstanding this liberal interpretation, however, a *pro se* complaint will not survive dismissal unless the factual allegations meet the plausibility standard. *See Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A complaint that includes only " 'labels and conclusions,' " " 'a formulaic recitation of the elements of a cause of action' " or " 'naked assertion[s]' devoid of 'further factual enhancement,' " does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

3    Plaintiff filed three purported "exhibits" to his complaint between one and three months after filing his complaint. *See* ECF Nos. 12-14. These include photographs, inmate grievances, disciplinary reports, and medical reports. *See id.* For purposes of this Initial Review Order, the Court has not considered these exhibits, as they were not properly presented to the Court. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (noting that, for purposes of deciding a motion to dismiss, a Court "*may*" consider documents that are attached to the complaint, incorporated by reference, or "integral" to the complaint) (emphasis added). The Court notes that this decision does not impact the outcome of this ruling, as, having reviewed the exhibits, they do not alter the conclusions reached herein. The Court may revisit this decision and consider the exhibits at a later stage, subject to any arguments Defendants or Plaintiff may make in a future motion.

4    The Court notes that Plaintiff has alleged no events clearly occurring at Corrigan.

5    The provision quoted by Plaintiff is now found in Administrative Directive 9.5, section 16(b)(i)(7). There is no section 23 in the current directive, which became effective on October 1, 2019, and thus was operative at the time of the events in the complaint. *See* www.portal.ct.gov/DOC/AD/AD-Chapter-9. Section 16(b)(i)(7) provides that an "Investigator may accept the [guilty] plea and dispose the disciplinary report unless the inmate has been charged with ... Initial Security Risk Group Affiliation, or any Security Risk Group activity which causes a designation change."

6   Plaintiff includes anecdotal information relating to other inmates to support these statements.

7   The Court notes that, in his supplemental filings, one of Plaintiff's grievance filings mentions that he was restricted to three phone calls per week and that he could only have short visits with immediate family members while in the SRG program. *See* ECF No. 13 at 4–5. Although a prison inmate's right to communicate with family and friends are First Amendment rights, such rights can be curtailed to serve the legitimate policies and goals of the correctional system. *Marrero*, 2014 WL 4799228, at *6 (citing cases). Because the facts concerning limitations of phone and visitation privileges are not mentioned in his complaint, the Court does not assess them for purposes of this Initial Review Order. As the Court is giving Plaintiff an opportunity to amend his complaint, however, he can choose to include such allegations in any amended complaint.

8   The Court notes that is not clear from the Plaintiff's complaint whether Plaintiff was part of the SRG Program only in the Walker Building at the MacDougall/Walker Correctional Institution, or also at Northern and Corrigan. The Court assumes that it exists across DOC and in all facilities for purposes of this ruling. Defendants remain free to challenge this assumption in a motion to dismiss, should they believe it impacts what relief may be sought from which Defendants.

9   Although the complaint states that "[n]one of the Defendants notified the Plaintiff" of the two hearings contained within the disciplinary hearing or the potential loss of his right to appeal, the Court construes this statement as referring only to Disciplinary Investigator Doe and Hearing Officer Doe, not to all sixteen Defendants, as these two Defendants appear to be the only ones who were involved with Plaintiff during the hearing process. *See* ECF No. 1 at 8; *see also Trimmier v. Cook*, No. 3:20CV396(KAD), 2020 WL 5231300, at *8 (D. Conn. Sept. 2, 2020) (where Plaintiff's allegations are not entirely clear, construing due process claim as against only certain defendants).

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3042187
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Terrell STATON, Plaintiff,

v.

William GONZALEZ, et al., Defendants.

No. 3:22-cv-855 (VLB)
|
Signed April 21, 2023

**Attorneys and Law Firms**

Terrell Staton, Somers, CT, Pro Se.

ORDER

Vanessa L. Bryant, United States District Judge

**\*1** Plaintiff, Terrell Staton, currently confined at Osborn Correctional Institution in Somers, Connecticut, filed this case *pro se* under 42 U.S.C. § 1983. In the original complaint, Plaintiff named fourteen defendants and asserted federal claims under the First, Fourth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution as well as state tort and constitutional claims. By Initial Review Order filed March 1, 2023, the court dismissed all federal and state law claims except the Eighth Amendment claim for use of excessive force against defendants Doyle and Juxon-Smith and the associated state law claim for assault and battery. Doc. #12 at 26. The court afforded Plaintiff an opportunity to file an amended complaint to reassert his claims against the response team but cautioned him that any amended complaint must identify the team members and allege fact supporting a claim against each one. *Id.* at 11.

Plaintiff now has filed an amended complaint. He does not list all defendants in the case caption. In the body of the amended complaint, he indicates that he is asserting claims against Captain Ibes, Lieutenant Davis, C/O Bobadilla, C/O Andrades, C/O Anderson, C.C.T. Mobley, C/O Joseph, Response Team Members, Lt. Hule, C/O Juxon-Smith, Lieutenant Joshua Doyle, Warden Caron, Commissioner Angel Quiros, and Nick Rodriguez. He seeks damages and waiver of attachment for costs of incarceration from the defendants in their individual and official capacities.

Under 28 U.S.C. § 1915A (2000), the court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. *Id.* This requirement applies both when plaintiff pays the filing fee and when he proceeds *in forma pauperis. See* Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam).

In reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[ ]." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "pro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also* Tracy v. Freshwater, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

I. Allegations

**\*2** Plaintiff includes fewer allegations in the amended complaint. As this circuit has long held that an amended complaint completely replaces the original complaint, the court recounts and considers only the allegations in the amended complaint. *See International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (holding that amended complaint completely replaced original complaint), *cert. denied sub nom. Vesco & Co. v. International Controls Corp.*, 434 U.S. 1014 (1978); *see also* Shields v. Cititrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (same).

On October 19, 2021, Plaintiff had an encounter with correctional staff when he was attempting "to rectify a vandalism." Doc. #17 at 1. Plaintiff discovered that, during COVID-19 cleaning in his dorm, his property bag had been opened and another inmate's shampoo had spilled onto Plaintiff's prayer rug. *Id.* at 4. Plaintiff alleges that an

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 132 of 151

Staton v. Gonzalez, Not Reported in Fed. Supp. (2023)

investigation conducted by the "Commissioner of Human Resources" discovered that Officer Andrades "negligently introduced another inmate[']s shampoo bottle into the plaintiff[']s property." *Id.* at 4.

Plaintiff asked Officer Bobadilla to call a lieutenant. *Id.* at 3. Officer Bobadilla did not immediately do so. *Id.* About four minutes later, Officer Bobadilla asked Plaintiff what his problem was. *Id.* Plaintiff stated only that he required a lieutenant to rectify a property issue. *Id.* After Plaintiff made additional requests, Officer Bobadilla presses his alarm instead of calling a lieutenant. *Id.*

During the incident, Plaintiff was sprayed with a chemical agent and his left bicep was torn. *Id.* at 1. Officer Juxon-Smith caused the bicep to be torn and Lieutenant Doyle sprayed Plaintiff with the chemical agent. *Id.* at 8. When he was placed in restrictive housing, Plaintiff did not identify any bodily injuries to the medical staff or Captain Ibes. *Id.* at 1. Plaintiff alleges that he was unable to do so because he was focused on trying to flush the chemical agent from his eyes. *Id.*

During the incident, Officer Anderson "negligently engaged in touching and engaged in sexually inappropriate face smearing of the plaintiff[']s buttocks...." *Id.* at 5. Plaintiff alleged that he was not resisting and was compliant during the encounter. *Id.* Plaintiff attributes the violation of his property and use of force to the fact that, on October 6, 2021, he filed two habeas corpus actions challenging denial of parole. *Id.* Captain Ibes did not retain the prayer rug as evidence. *Id.* at 6.

On October 21, 2021, Lieutenant Hule denied Plaintiff medical attention for the bruise on his arm, stating that the bruise was "just a scratch." *Id.* at 1, 7.

On October 22, 2021, the eye doctor noted that Plaintiff had a scratch on the cornea of his right eye. *Id.* at 1. Plaintiff alleges that Lieutenant Doyle caused the scratch because he had tried to spray the chemical agent into Plaintiff's eye while wearing gloves made from coarse fabric. *Id.*

Officer Joseph negligently investigated the incident. *Id.* at 8. In November 2021, C.C.T. Mobley failed to file Plaintiff's disciplinary appeal because he had used an old form and did not provide him the correct form. *Id.* at 6-7.

## II. Discussion

Despite the fact that the court granted Plaintiff leave to amend his complaint only as to the claim against the Response Team members, Plaintiff asserts many of the claims from the original complaint including federal claims for use of excessive force, deliberate indifference, and abuse of process/ denial of due process.

### A. Excessive Force

**\*3** On initial review of the original complaint, the court determined that the case should proceed on the excessive force claims against defendants Juxon-Smith and Doyle. Plaintiff repeats these claims in the amended complaint but identifies Officer Juxon-Smith as Officer Juxon-Smith. As Officer Juxon-Smith has returned a signed waiver of service of summons form indication that this is the correct spelling of his name, Doc. #16, the court assumes that Plaintiff has misspelled the name in the amended complaint. The claim continues to proceed against Officer Juxon-Smith and Lieutenant Doyle.

### B. Response Team

Plaintiff again names the response team as a defendant. In the Initial Review Order, the court stated that Plaintiff could file an amended complaint asserting a claim against members of the response team but that he must identify the team members and allege facts to support a claim against each member he identifies. The court cautioned Plaintiff that all claims against the response team would be dismissed if he failed to comply with these instructions. *See* Doc. #17 at 11. Plaintiff has included a claim against Officer Anderson, presumably one member of the response team. The court considers that claim below. As Plaintiff has not identified any other members of the team, all claims generally directed to the response team are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### C. Officer Anderson / Sexual Assault

Plaintiff alleges that Officer Anderson sexually assaulted him during the use of force by putting his face against Plaintiff's clothed buttocks. The Second Circuit set forth the appropriate standard for reviewing such a claim in *Crawford v. Cuomo,* 796 F.3d 252 (2d Cir. 2015). "Although not 'every malevolent touch by a prison guard gives rise to a federal cause of action,' the Eighth Amendment is offended by conduct that is 'repugnant to the conscience of mankind.' " *Id.* at 256 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). Actions " 'incompatible with evolving standards of decency' " meet this standard. *Id.* (quoting *Hudson,* 503 U.S. at 10).

"A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257. In analyzing a claim for sexual abuse, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257-58 (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (explaining that Eighth Amendment analysis turns on whether force was used "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm")).

Plaintiff alleges that Officer Anderson "smeared" his face into Plaintiff's buttocks. Based on the facts alleged, the court can discern no legitimate purpose in this action. As it appears the alleged action was intended to humiliate Plaintiff, the claim against Officer Anderson will proceed for further development of the record.

### D. Officer Andrades

Plaintiff alleges that an investigation showed that Officer Andrades was responsible for the shampoo on his prayer rug. In the Initial Review Order, the court informed Plaintiff that if he intended to assert a First Amendment free exercise of religion claim regarding the prayer rug, he "must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials does not further some legitimate penological objective." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 279 (N.D.N.Y. 2018) (citing *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)). The court dismissed this claim in the original complaint because Plaintiff alleged no facts establishing "sincerely held" religious beliefs or showing that his beliefs were "substantially burdened." Despite the court's instruction, Plaintiff still has not alleged facts supporting a First Amendment claim. Accordingly, the First Amendment claim remains dismissed.

**\*4** In addition, the court informed Plaintiff that any Fourteenth Amendment claim for denial of due process based on damage to or destruction of property is not cognizable in this action because the State of Connecticut provides an adequate post-deprivation remedy. *See* Doc. #12 at 18-19. That claim also remains dismissed.

In the amended complaint, Plaintiff repeatedly refers to the contamination of his prayer rug as a "hate crime." To the extent that he seeks criminal prosecution of Officer Andrades, his claim fails. An alleged victim of a crime has no right to have the alleged perpetrator investigated or criminally prosecuted. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Jones v. Howard*, No. 3:15-CV-997(VAB), 2015 WL 4755751, at \*3 (D. Conn. Aug. 11, 2015) (dismissing claim seeking prosecution of defendant for religious hate crime). Any claim seeking prosecution for a religious hate crime is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### E. Officer Bobadilla

Again, Plaintiff alleges that Officer Bobadilla did not immediately call a lieutenant when Plaintiff asked. On initial review, the court could discern no constitutional right violated by Officer Bobadilla and Plaintiff fails to identify one in his amended complaint. The claim against Officer Bobadilla remains dismissed.

### F. Lieutenant Hule

Plaintiff alleges that Lieutenant Hule did not call for medical treatment when Plaintiff showed him bruises on his arm. As the court explained on initial review, to state a claim for deliberate indifference to serious medical needs, Plaintiff must present allege facts showing that his medical need was "sufficiently serious." *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* A "sufficiently serious" deprivation can exist if the plaintiff suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Plaintiff also must allege facts showing that the defendant was deliberately indifferent to his serious medical needs. "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). The defendants must "appreciate

the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (quotation marks omitted)). Thus, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

Plaintiff alleges only that he showed Lieutenant Hule a bruise on his arm and Lieutenant Hule did not immediately call the medical unit or send Plaintiff there. Although Plaintiff now alleges that he suffered a torn bicep, he alleges no facts suggesting that Lieutenant Hule was aware of anything other than bruising. Thus, Plaintiff has not alleged facts suggesting that Lieutenant Hule was aware of and deliberately disregarded a substantial risk of serious harm. The deliberate indifference claim against Lieutenant Hule is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### G. Supervisory Officials Caron, Quiros, and Rodriguez
**\*5** Warden Caron, Commissioner Quiros, and District Administrator Rodriguez are supervisory officials. Plaintiff alleges no facts against them. He merely identifies his claims against defendants Caron, Quiros, and Rodriguez as negligent supervision.

As the court stated in the Initial Review Order, to state a claim for supervisory liability, Plaintiff must "plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Thus, Plaintiff must allege facts showing that each supervisory defendant was personally aware of, and deliberately disregarded, facts showing a substantial risk to his health or safety. *See id.* After *Tangreti*, negligent supervision is no longer sufficient to state a claim for supervisory liability. *See Braxton v. Bruen*, No. 9:17-cv-1346(BKS/ML), 2021 WL 4950257, at \*5 n.8 (N.D.N.Y. Oct. 25, 2021).

As Plaintiff fails to allege facts satisfying this requirement, the supervisory liability claims against defendants Quiros, Caron, and Rodriguez are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### H. Captain Ibes
Plaintiff alleges that Captain Ibes negligently asked him about the incident while he still was experiencing the effects of the chemical agent and did not preserve his prayer rug as evidence. The court can discern no constitutional right prohibiting Captain Ibes from asking Plaintiff what had happened immediately following the incident. "In some circumstances, a state actor's destruction of evidence can give rise to a claim for denial of a plaintiff's constitutional right of access to the courts." *McCloud v. Prack*, 55 F. Supp. 3d 478, 483 (W.D.N.Y. 2014) (citing to *Patterson v. Burge*, 328 F. Supp. 2d 878, 897 (N.D. Ill. 2004)). Plaintiff does not demonstrate that Captain Ibes knew or should have known that the prayer rug was evidence likely to be used in a future legal proceeding justying some duty to preserve the evidence, if there is such a duty. Further, an inmate raising a claim under the right of access to the courts must allege facts demonstrating an actual injury from the violation. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996). Plaintiff does not allege that he was unable to pursue his state post-deprivation remedies for damage to his prayer rug. Thus, the failure to preserve the prayer rug has not denied Plaintiff access to the courts.

While Captain Ibes' actions may have been negligent, negligence does not support a cognizable section 1983 claim. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) ("[T]o state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice."). Plaintiff's claims against Captain Ibes are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### I. Officer Joseph and Lieutenant Davis
Plaintiff alleges that Officer Joseph failed to properly investigate the disciplinary charge and that Lieutenant Davis was negligent and biased in his role as disciplinary hearing officer.

The court dismissed any due process claims relating to the disciplinary hearing because Plaintiff's sanctions did not constitute an atypical and significant hardship as required to state a cognizable claim. *See* Initial Review Order, Doc. #12 at 15-18. Although Plaintiff has not provided copies of the disciplinary hearing report with the amended complaint, he alleges no facts that would cause the court to alter its determination. Thus, any claims regarding the disciplinary

Staton v. Gonzalez, Not Reported in Fed. Supp. (2023)

Case 9:22-cv-01094-BKS-ML   Document 33   Filed 07/25/24   Page 135 of 151

hearing, *i.e.*, the claims against Officer Joseph and Lieutenant Davis, remain dismissed.

### J. C.C.T. Mobley

**\*6** As in the original complaint, Plaintiff alleges only that defendant Mobley [1] failed to file his disciplinary appeal. As the court stated in the Initial Review Order, there is no constitutional requirement for an appeal of a disciplinary hearing decision. *See Wolff v. McDonnell*, 418 U.S. 539, 563-71 (1974) (describing procedures required for a disciplinary hearing only as: advance notice of the charges, an opportunity to call witnesses and present documentary evidence, an impartial decision maker, and a written decision from factfinder detailing evidence relied upon and rationale for disciplinary action taken); *Avuso v. Semple*, No. 3:18-cv-116(JAM), 2019 WL 2941628, at \*5 (D. Conn June 14, 2019) (no constitutional right to appeal from adverse disciplinary finding); *Cox v. New York City Dep't of Corr.*, No. 94 CV 3644, 1995 WL 604699, at \*4 (E.D.N.Y. Oct. 3, 1995) (although state may afford prisoner a right to appeal from disciplinary proceeding, there is no federal constitutional right to such an appeal). The claim against defendant Mobley remains dismissed.

### K. Conspiracy

Plaintiff includes many references to conspiracy among the defendants in the amended complaint. However, all defendants are identified as correctional employees. Under the intracorporate conspiracy doctrine, the officers, employees, and agents of a single corporate entity are legally incapable of conspiring together. *See Federal Ins. Co. v. United States*, 882 F.3d 348, 368 n.14 (2d Cir. 2018) (affirming application of intracorporate conspiracy doctrine in conspiracy claim under 42 U.S.C. § 1985).

Although the Second Circuit has not yet considered whether the intracorporate conspiracy doctrine applies to section 1983 cases, district courts within the Second Circuit have applied the doctrine in section 1983 cases and, in particular, to section 1983 cases filed by prisoners. *See, e.g., Schlosser v. Walker*, No. 3:20-cv-433(WIG), 2020 WL 7324679, at \*3-4 (D. Conn. Dec. 11, 2020); *Jones v. Wagner*, No. 3:20-cv-475(VAB), 2020 WL 4272002, at \*5 (D. Conn. July 24, 2020); *Edwards v. Annucci*, No. 17 CV 5018(VB), 2019 WL 1284295, at \*9-10 (S.D.N.Y. Mar. 20, 2019).

There is an exception to the intracorporate conspiracy doctrine if the plaintiff can show that the defendants were "pursuing personal interests wholly separate and apart from the entity." *Ali v. Connick*, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). A mere allegation that the defendants had personal bias against the plaintiff, however, is insufficient to satisfy the exception. *See Vega v. Artus*, 610 F. Supp. 2d 185, 205 (N.D.N.Y. 2009) (holding that prisoner must do more than allege that defendants were motivated by personal bias against him to show that defendants were pursuing personal interests wholly separate and apart from the entity); *see also Harris v. City of Newburgh*, No. 16-CV-2731(KMK), 2017 WL 4334141, at \*8 (S.D.N.Y. Sept. 17, 2017) (for exception to apply, plaintiff must plausibly allege that defendants "acted other than in the normal course of their corporate duties"). Plaintiff alleges no facts suggesting that the defendants were acting other than in the course of their duties. Thus, the exception does not apply, and Plaintiff cannot state a plausible conspiracy claim.

### L. Municipality

Plaintiff includes many allegations about a "municipality." For example, he alleges:

> The municipality was acting for its private advantage after the plaintiff filed his (TSR-CV-5001089-S and TSR-CV-5001093-S) in state habeas corpus seeking remedy for illegal denial and stigma-plus of disciplinary proceedings of (3:22-cv-854(VLB)) in which the municipality had gone rogue as in a private munici[al] capacity depriving the plaintiff of equal protections of the law and imposing roguish and negligent behavior to the parole board on August 30, 2021.

**\*7** Doc. #17 at 4.

The Connecticut Department of Correction is a state agency, not a municipality. *See Vaden v. Connecticut*, 557 F. Supp. 2d 279, 288 (D. Conn. 2008). As there is no municipality involved in this action, all of Plaintiff's claims against the municipality, including those for retaliation and denial of equal protection, are dismissed pursuant to 28 U.S.C. § 1915A(b)(1). As Plaintiff fails to allege facts suggesting that

Case 9:22-cv-01094-BKS-ML   Document 33   Filed 07/25/24   Page 136 of 151

Staton v. Gonzalez, Not Reported in Fed. Supp. (2023)

any named defendant was aware that he had filed state actions, the court does not consider these claims to be asserted against any named defendant.

CONCLUSION

All claims in the amended complaint are DISMISSED with the exception of the excessive force claims against defendants Juxon-Smith and Doyle and the sexual harassment/sexual assault claim against defendant Anderson.

Plaintiff may not amend his complaint further without obtaining prior permission from the court.

The Clerk shall contact the Department of Correction Office of Legal Affairs to ascertain a current service address for Officer Anderson, mail a waiver of service of process request packet containing the Amended Complaint and this Order to Officer Anderson at that address within twenty-one (21) days of this Order, and report to the court on the status of the waiver request on the thirty-fifth day after mailing. If the defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on the defendant in his individual capacity and the defendant shall be required to pay the cost of such service.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3042187

## Footnotes

1    Plaintiff identified defendant Mobley as Motley in the original complaint.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 137 of 151

Cox v. New York City Dept. of Corrections, Not Reported in F.Supp. (1995)

1995 WL 604699

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Keith Thomas COX, Plaintiff,

v.

NEW YORK CITY DEPARTMENT OF
CORRECTIONS, Commissioner Abate, Warden
Galletta; Warden Poullard, C.O. Smart # 8055,
C.O. Cordona # 6297, C.O. Dove # 6032,
and Captain Marshall # 1060, Defendants.

94 CV 3644.
|
Oct. 3, 1995.

**Attorneys and Law Firms**

KEITH THOMAS COX # 94–A–0825 Auburn Correctional
Facility 135 State Street Auburn, New York 13021 Plaintiff
Pro se.

PAUL A. CROTTY Corporation Counsel of the City of New
York (Susan P. Hartzell, of counsel) 100 Church Street New
York, New York 10007 Counsel for defendants.

DIENST & SERRINS (Pamela H. Schwager, of counsel) 233
Broadway New York, New York 10279 Counsel for defendant
Smart.

MEMORANDUM AND ORDER

EUGENE H. NICKERSON, District Judge:

 **\*1** Plaintiff, *pro se,* brought this action pursuant to 42 U.S.C.
§ 1983 against the New York City Department of Corrections
(Department of Corrections), the former Commissioner of
the Department of Corrections, two wardens, three correction
officers (officers), and one captain at the Brooklyn House
of Detention for Men (House of Detention). Plaintiff alleges
several violations of his Eighth and Fourteenth Amendment
rights arising out of an incident that occurred while he was an
inmate at the House of Detention.

Defendants move pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure to dismiss the complaint for failure
to state a claim. Plaintiff moves for a default judgment against

defendants Abate, Dove, Cordona, Smart and Marshall for
failure to file a timely response to the complaint.

I

On August 3, 1994 plaintiff filed his complaint. By order
dated August 9, 1994, the court granted plaintiff *in forma
pauperis* status and directed the Clerk of the Court to
serve copies of the complaint on defendants. Due to an
administrative error, defendants Abate, Dove and Cordona
were not served until November 7, 1993. On November
16, 1994 these defendants requested and were granted an
extension of time to respond to the complaint until December
16, 1994.

An initial attempt to serve defendants Smart and Marshall was
unsuccessful because the Department of Corrections claimed
to have no record of such persons in the personnel department.
Defendants Smart and Marshall were finally served on June
23, 1995 after the court directed service on them at the specific
facilities where they work. On August 18, 1995, defendants
Smart and Marshall requested and were granted an extension
of time until September 15, 1995, to respond to the complaint.
On September 15, counsel for Smart and Marshall informed
the court that the June 23, 1995 service was defective because
it did not contain plaintiff's complaint.

Defendants filed three motions to dismiss—the first on
October 27, 1994 by defendants Galletta, Poullard and the
Department of Corrections, the second on December 2, 1994
by defendants Abate, Dove and Cordona, and the third on
September 20, 1995 by defendant Marshall. Defendant Smart
still has not responded to plaintiff's complaint. But he changed
counsel on or about September 20, 1995. For this reason, the
court grants him a further extension until October 20, 1995 to
respond. Plaintiff's motion for a default judgment is denied.

II

The complaint alleges, in substance, the following relevant
facts. On August 17, 1993 Officer Smart and Captain
Marshall intervened in an argument between plaintiff and
another inmate in the mess hall at the House of Detention.
When plaintiff tried to explain his behavior, Captain Marshall
became verbally abusive toward plaintiff, and Officer Smart
choked and otherwise physically assaulted plaintiff, knocking
him unconscious.

Case 9:22-cv-01094-BKS-ML    Document 33    Filed 07/25/24    Page 138 of 151

Cox v. New York City Dept. of Corrections, Not Reported in F.Supp. (1995)

Plaintiff was taken to Kings County Hospital, where he spent 48 hours in the prisoner's ward before being returned to the House of Detention.

**\*2** On August 20, 1993, after Officer Cordona also verbally harassed him, plaintiff wrote to the Department of Corrections Inspector General's Office expressing concern over his safety.

On August 21, 1993 plaintiff was charged with a disciplinary infraction pertaining to the August 17 incident. A hearing was held on August 24, 1993, and that same day plaintiff received a sanction of 130 days of punitive segregation for violating the rules and regulations of the facility and of the Department of Corrections. Plaintiff appealed the decision to Warden Galletta on August 25, 1993.

On August 29, 1993 plaintiff was sent to the James A. Thomas Center Central Punitive Segregation Unit. Plaintiff filed an Order to Show Cause on October 21, 1993 because he had not received a reply from Warden Galletta to his appeal. On November 10, 1993 plaintiff was granted a hearing at which his punishment was "sustained in part for 60 days."

Plaintiff nonetheless was held in segregation after the date by which he should have been released. He wrote a letter to the Office of Compliance on January 17, 1994, the matter subsequently was investigated, and he was released from segregation on February 4, 1994.

Plaintiff seeks 11.5 million dollars in damages.

### III

For this 12(b)(6) motion to dismiss, the court assumes the facts stated in the complaint to be true and will grant the motion if there is no set of facts under which the plaintiff could prevail. *See Conley v. Gibson* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957).

The court construes *pro se* complaints liberally, *see Haines v. Kerner* 404 U.S. 19, 92 S.Ct. 594 (1972), and reads plaintiff's complaint and papers filed in opposition to the motions to dismiss to allege that 1) Officer Smart used excessive force against him during the August 17, 1993 incident, in violation of the Eighth Amendment prohibition against cruel and unusual punishment; 2) Captain Marshall did not prevent officer Smart's use of excessive force on plaintiff and was

verbally abusive to him that same day, in violation of the Eighth Amendment; 3) Officer Cordona verbally abused and intimidated plaintiff in violation of the Eighth Amendment; 4) Warden Galletta failed to respond to plaintiff's appeal from the August 24, 1993 disciplinary proceeding in violation of his Fourteenth Amendment right to due process; 5) former Commissioner Abate failed properly to investigate the August 17, 1993 incident, in violation of the Fourteenth Amendment; 6) the Department of Corrections failed to protect plaintiff's rights under the Fourteenth and Eighth Amendments by mishandling the incident complained of and allowing plaintiff to remain in segregated housing beyond the time period ordered; and 7) all the named defendants were involved in a conspiracy to cover up the incident in violation of plaintiff's Fourteenth Amendment right to due process.

### IV

#### A

Section 396 of the New York City Charter provides that "all actions and proceedings for the recovery of penalties ... shall be brought in the name of the City of New York and not in that of any agency." New York City Administrative Code and Charter, ch. 16, § 396. The Department of Corrections is not a suable entity. *See also Torres v. New York City Department of Corrections,* No. 93 Civ. 6296, 1995 WL 63159, at \*2 (S.D.N.Y. Feb. 15, 1995). The court treats this action as brought against the city.

**\*3** To state a claim against a municipality under § 1983, a plaintiff cannot rely on a respondeat superior theory of liability. Rather, he must show that an official policy or custom is responsible for the deprivation of constitutional rights. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38 (1978). Even liberally construed, plaintiff's complaint does not allege that an official policy or custom was responsible for his injury.

#### B

In order to maintain a § 1983 action against an individual, a plaintiff must show that a particular defendant, acting under color of state law, deprived him of a federal statutory or constitutional right. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604 (1970). A prison guard's assault

of an inmate violates the Eighth Amendment's prohibition on cruel and unusual punishment when it involves (1) an unnecessary and wanton infliction of pain, and (2) more than a *de minimis* use of force. *See Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995 (1992).

Plaintiff says Officer Smart assaulted him while he tried to explain the mess hall incident to Captain Marshall. Plaintiff's complaint, construed liberally, alleges that Officer Smart's use of force was malicious and was not a good faith effort to maintain or restore discipline. *See Hudson,* 503 U.S. at ——, 112 S.Ct. at 998. Moreover, plaintiff's allegation that he spent two days in the hospital suggests that Officer Smart applied more than *de minimis* force. Plaintiff has stated a claim against Officer Smart.

Liability for violations of constitutional rights extends not only to the perpetrators, but also to any officials who could have prevented the violations but failed to do so. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the rights of citizens from infringement by other law enforcement officials in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). An officer who fails to intervene when there is a realistic opportunity to do so is liable for any harm he might have averted, provided that he knew or had reason to know that excessive force was being used or that any constitutional violation was committed. *See id.*

Plaintiff says that Captain Marshall stood and watched while Officer Smart applied excessive force in violation of the Eighth Amendment. Construed liberally, the complaint alleges that Captain Marshall's proximity to the incident and her position as a captain gave her the opportunity to prevent Officer Smart's alleged violation of plaintiff's constitutional rights. Thus, plaintiff has stated a claim against Captain Marshall.

### C

A defendant is only liable for damages under § 1983 if he was personally involved in the alleged constitutional deprivation. *See Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). But a supervisory official may be "personally involved" and thus liable if he (a) directly participated in the violation, or (b) failed to remedy a wrong after learning about it in a report or appeal, or (c) created, allowed, or maintained a custom

or policy under which unconstitutional practices occurred, or (d) was grossly negligent in supervising the subordinates who caused the violation. *See Williams,* 781 F.2d at 323.

**\*4** Plaintiff has not stated a claim against Warden Poullard, Officer Dove, or former Commissioner Abate. The complaint does not mention any of these defendants or plead any facts suggesting that they were personally involved in the alleged constitutional deprivations. "[W]here the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff," the complaint should be dismissed as against that defendant. *Morabito v. Blum,* 528 F.Supp. 252, 262 (S.D.N.Y.1981).

In his opposition papers, plaintiff says that the allegations in his complaint concerning the disciplinary proceeding and resulting punitive segregation are "directed toward" Warden Poullard. But plaintiff offers no details to supplement this vague reference. Even construing plaintiff's pleadings liberally, the court cannot say that plaintiff has stated a claim against either Warden Poullard or Officer Dove.

Plaintiff's opposition papers also state that former Commissioner Abate failed to establish and monitor a system of handling the "abundant unusual incidents" at the House of Detention. They also say that former Commissioner Abate is liable for mishandling the August 17, 1993 incident because a member of her staff was sent to the hospital to investigate the incident soon after it occurred but no investigation was completed.

Even liberally construed, plaintiff's reference to "abundant unusual incidents" at the facility do not support the conclusion that Abate "created, allowed or maintained a custom or policy under which unconstitutional practices occurred." *Williams,* 781 F.2d at 323. Similarly, the mere fact that a member of former Commissioner Abate's staff came to plaintiff's hospital room does not show that Abate "failed to remedy a wrong after learning about it in a report or on appeal." *Id.* For this reason, plaintiff has not alleged that former Commissioner Abate was "personally involved," *see Williams,* 781 F.2d at 323, in the alleged deprivation of plaintiff's constitutional rights. Plaintiff's claim against former Commissioner Abate is dismissed.

### D

Abusive language does not rise to the level of constitutional harm and is not actionable under § 1983. *See Morgan v. Ward,* 699 F.Supp. 1025, 1055 (N.D.N.Y.1988). Thus plaintiff also fails to state a claim against Officer Cordona.

E

Plaintiff says he appealed the sanction of 130 days punitive segregation to Warden Galletta and received no response. Although New York State provides prisoners the right to appeal from a disciplinary proceeding, *see* N.Y. Comp.Codes R. & Reg. tit. 7, §§ 253.8 (1989), 254.8 (1990), there is no federal constitutional right to such an appeal. Warden Galletta did not violate plaintiff's constitutional rights by failing to respond to his appeal. *See Mays v. Mahoney,* No. 91 Civ. 3435, 1994 WL 48831, at *6 (S.D.N.Y. Feb. 14, 1994) and cases cited therein.

**\*5** But Warden Galletta could conceivably be liable under a different theory of § 1983 liability, namely, that he failed to remedy a constitutional deprivation after learning about it in plaintiff's appeal from the disciplinary proceeding. *See Williams,* 781 F.2d at 323.

While an inmate in a disciplinary hearing is not entitled to "the full panoply of rights" afforded a defendant in a criminal proceeding, *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975 (1974); *see also Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992), an inmate does have a constitutional right to twenty-four hours advance written notice, a right to be advised of the facts relied on in bringing the charges, a qualified right to call witnesses and present documentary evidence, a qualified right to assistance in the preparation of a defense, *see Wolff,* 418 U.S. at 563–66, 94 S.Ct. at 2974–79; *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988), and a right to a fair and unbiased hearing officer, *see McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983).

Plaintiff says he wanted to call "all the housing area's [sic] that were in the messhall when the incident took place," but was only allowed to call one witness. An inmate's right to call witnesses at a disciplinary hearing is a qualified right that may be denied where it will be "unduly hazardous to institutional safety or correctional goals." *Wolff* 418 U.S. at 56, 94 S.Ct. at 2979. The court cannot determine from the record before it whether denial of such a request was an abuse of discretion and whether Warden Galletta may therefore be liable for failing to remedy that abuse. The court declines to dismiss the claim against Warden Galletta at this time.

F

Finally, in a letter dated August 4, 1994 to the "Director of Investigations of the Board of Corrections" plaintiff says "Personally I feel theres [sic] a cover up going on because of the excessive force used upon my person while unconscious; this malicous [sic] act of brutality was condoned as well as acted in concert by superior officer(s) on the scene of the aforementioned incident."

The court construes this letter as part of plaintiff's complaint to allege a conspiracy by the defendants to cover up a violation of plaintiff's constitutional rights.

The court construes *pro se* pleadings especially liberally, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594 (1972), and does not apply a "heightened pleading standard" to § 1983 claims, *see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, ——, 113 S.Ct. 1160, 1162–63 (1993). But a complaint alleging conspiracy under § 1983 nevertheless must contain more than mere vague and conclusory allegations and should describe some facts from which the existence of a conspiracy may be inferred. *See Dwares v. New York,* 985 F.2d 94, 99 (2d Cir.1993); *Fariello v. Rodriguez,* 148 F.R.D. 670, 677 (E.D.N.Y.1993); *Brooks v. Lange,* No. 91 Civ. 7382, 1993 WL 256553, at *3 (S.D.N.Y. July 7, 1993). Plaintiff fails to allege any facts that would tend to suggest the existence of a conspiracy.

V

**\*6** Plaintiff's motion for a default judgment is denied.

Defendants' motion to dismiss is denied as to defendants Marshall and Galletta, and granted as to defendants Department of Corrections, Abate, Poullard, Dove, and Cordona. The claims against defendants Poullard and Dove are dismissed without prejudice. Plaintiff may amend his complaint, within thirty days of receipt of this memorandum and order, to state claims against defendants Poullard and Dove.

So Ordered.

**All Citations**

Not Reported in F.Supp., 1995 WL 604699

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Neural Magic, Inc. v. Meta Platforms, Inc.,   D.Mass.,
March 6, 2023

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion.................................................................................................. 4

A. Standard for Admissibility of Expert Evidence............................................. 6

1. Deborah L. Sweeney.......................................................................................... 9

a. Qualified?.......................................................................................................... 9

2. Kevin W. George, M.D...................................................................................... 10

3. James T. O'Donnell........................................................................................... 13

a. General Causation............................................................................................ 14

i. Qualified?.......................................................................................................... 14

ii. Reliability of Testimony?............................................................................... 17

b. Specific Causation........................................................................................... 19

c. Warnings............................................................................................................ 19

i. Qualified?.......................................................................................................... 20

ii. Reliability of Testimony?............................................................................... 22

II. Summary Judgment Motion......................................................................................... 24

### Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd ., No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004)* (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T. O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse

practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence
There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.' " *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community."

*Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Amorgianos,* 303 F.3d at 265 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting

motion to preclude where plaintiff defaulted); *see also Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or

to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

 **\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.*, exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label*

to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way,* ..., of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis.' ')

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition is in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967

F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report at 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only

(1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's

memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

   i. Qualified?
O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See*

Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

 **\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations

omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*


ii. Reliability of Testimony?

**\*11**  Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil] causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert.' " *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12**  For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.


II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the of doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to

Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

## Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation, 296 F.Supp.2d 1374* (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel) had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton, 243 F.Supp.2d at 677, n. 1.* It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.